IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
DURHAM DIVISION
Case No.: 1:02 CV 00992

| | |
|---|---|
| JOHN McCULLOUGH, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| ARAMARK EDUCATIONAL SERVICES, INC., | ) |
| | ) |
| | ) |
| Defendant. | ) |

### DEFENDANT ARAMARK EDUCATIONAL SERVICES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

Defendant ARAMARK Educational Services, Inc. ("ARAMARK"), by counsel and pursuant

to Fed. R. Civ. P. 56 and Local Rule 56.1, hereby submits this Memorandum of Law in support of its

Motion for Summary Judgment. For the reasons set forth below, ARAMARK respectfully submits

that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law.

### I.    NATURE OF THE CASE

Plaintiff filed this action under the Fair Labor Standards Act, 29 U.S.C. § 201 *et. seq.*

("FLSA"). ARAMARK employed Plaintiff as a salaried "sous chef" (*i.e.*, assistant manager) and

classified him as an exempt employee for FLSA purposes. Plaintiff worked for ARAMARK as a

salaried manager for roughly ten months, then resigned. Although he applied for a salaried

management position, Plaintiff now alleges that ARAMARK should have classified him as an

hourly, nonexempt employee. He therefore claims entitlement to overtime pay for all hours worked

in excess of 40 hours per week. The forecast of the evidence confirms, however, that ARAMARK

properly classified Plaintiff as an exempt employee under the executive and administrative

provisions of the FLSA, and that Plaintiff was not subject to the FLSA's overtime provisions.

## II.    STATEMENT OF FACTS

ARAMARK is a diversified service provider.  It is engaged, among other things, in the provision of dining and catering services on university campuses.  In July 2001, ARAMARK commenced food service and catering operations at the Friday Center in Chapel Hill, North Carolina.

Plaintiff applied for the sous chef position with ARAMARK on July 20, 2001.  See Employment Application (Exhibit A).  Plaintiff also submitted his resume with his application.  See Resume (Exhibit B).  Plaintiff did not, however, seek an hourly job where he would simply cook food.  John McCullough Tr. 73.[1]  Rather, he applied for a salaried sous chef position at ARAMARK to utilize the management skills he had garnered over the course of his career.  Id.  In seeking the salaried management position, Plaintiff relied in large part on his resume to tout his managerial experience:  "A dedicated professional with twelve years of experience in food preparation **and management**." (emphasis added).  Exhibit B.  Plaintiff's resume showed that, before coming to ARAMARK, Plaintiff had extensive managerial and supervisory experience as a salaried sous chef with numerous employers.  At the Westfield YMCA in New Jersey, Plaintiff served as a salaried Catering Director and Chef, **managing** an 8500 membership club and **supervising** four employees. At Clyde's Restaurant in Reston, Virginia, Plaintiff was salaried sous chef at a 700-1100 meal per day restaurant where he received **corporate management training** and **supervised** a large kitchen staff.  At the Oval Room in Washington, D.C., Plaintiff was salaried sous chef where he **supervised** line and prep cooks.  At Jasmine Café in Reston, Virginia, Plaintiff worked as a salaried sous chef and **managed** the entire staff in the owner's absence.  At the Golden Dog in Sydney, Australia, Plaintiff was promoted from sous chef to head chef in a 1500 meal per week restaurant where he

---

[1] The excerpts of the deposition transcripts cited in this memorandum are attached as follows: Plaintiff John McCullough (Exh. C); and Executive Chef Dennis Mann (Exh. D).

2

**supervised** a kitchen staff of seven, trained new employees, and handled all purchasing. Id. (emphasis added).

Plaintiff expanded on the breadth of his supervisory and managerial experience in his deposition testimony. McCullough Tr. 28-51. Each of Plaintiff's employment positions before ARAMARK required Plaintiff to perform various supervisory and management duties. For example, at Paolo's Restaurant, which was not listed on his resume, Plaintiff oversaw all food production and supervised four to five cooks. Id. at 28. At Jasmine Café, Plaintiff handled all food production. Id. at 43. At Clyde's Restaurant, Plaintiff performed management tasks such as hiring, firing, disciplining, and evaluating employees. Id. at 47. In each of these jobs, Plaintiff was a salaried, exempt sous chef who was not paid overtime. Id. at 32-33, 39-40, 45, 50. Furthermore, Plaintiff never complained at any of these prior jobs, where he held the same type of salaried sous chef position as at ARAMARK, that he should have been paid for hours worked in excess of 40 hours per week. Id. at 40-42, 45-46, 50-51, 70-71.

The managerial and food production skills Plaintiff touted on his resume also satisfied ARAMARK's job description for sous chef at the Friday Center. For example, the sous chef would have "administrative authority, responsibility and accountability necessary to direct the food production and presentation to the guest and staff." He was required to "supervise the daily food production operations." He was responsible for "scheduling and training all kitchen personnel," and for "directly supervis[ing] all kitchen personnel." He had responsibility "for assisting the Executive Chef in hiring, discipline, performance reviews, and initiating pay increases." He had to "participate in management team meetings necessary to the success of the operation." He was tasked to "ensure that the customer's expectations are consistently exceeded at all times with the maximum fiscal responsibility." See Job Description (Exhibit E).

3

Dennis Mann served as Executive Chef for ARAMARK at the Friday Center and was Plaintiff's direct supervisor. During Plaintiff's interview with Chef Mann, Plaintiff learned that his average workweek might entail working 50 or more hours per week. McCullough Tr. 66-67. Plaintiff also knew, before accepting the sous chef position at ARAMARK, that he was applying for an exempt, salaried position, and that he would not be paid for hours worked in excess of 40 during a week. Id. at 68-70. Chef Mann considered Plaintiff the most qualified applicant and offered him the salaried sous chef position for the Friday Center. Dennis Mann Tr. 42-43. With full awareness that he was applying for a salaried position and was not eligible for overtime pay, Plaintiff accepted the sous chef position and began work on or about July 25, 2001. See Compl. ¶¶ 7, 8; Offer Letter to Plaintiff, dated July 30, 2001 (Exhibit F). Plaintiff's starting salary was $576.92 per week, or $30,000.00 per year. Exhibit F. In addition, Plaintiff received a $500 sign-on bonus. Id. Plaintiff's position made him eligible for various benefits, including medical coverage, disability insurance, life insurance, and a retirement plan. Id.

As salaried sous chef at ARAMARK, Plaintiff "was expected to manage the business." Mann Tr. 52. Plaintiff was responsible not only for food production himself, but also for supervision of the production of food by others. McCullough Tr. 153; Mann Tr. 43; Exh. E. This food production responsibility also required Plaintiff's involvement in counseling and disciplining of kitchen employees. Chef Mann and Plaintiff terminated employees for performance problems. McCullough Tr. 85, 90; Mann Tr. 68-70. Further, without any direction from Chef Mann, Plaintiff counseled employees on the correct procedures to follow when absent from work. McCullough Tr. 98; Mann Tr. 71-72. Plaintiff and Chef Mann also counseled employees jointly. McCullough Tr. 98-99; Mann Tr. 71-72. Plaintiff had authority to send employees home to manage labor costs. Mann Tr. 49. Chef Mann and Plaintiff jointly handled interviewing, hiring, firing, disciplining, counseling, and supervising of hourly employees at the Friday Center. Id. at 90-92.

4

In addition to his personnel duties, ARAMARK granted Plaintiff specific management duties and authority. Chef Mann hired Plaintiff to be second in charge of the kitchen at the Friday Center, and Plaintiff was in charge in Chef Mann's absence. McCullough Tr. 72-73; Mann Tr. 44. Chef Mann hired Plaintiff "[t]o supervise the entire kitchen" and "[t]o ensure each department ran as it should, as efficiently as it could, assisting [Chef Mann] with the cost." Mann Tr. at 44-45. Plaintiff was responsible for ordering food. Id. at 44. Plaintiff "was directly responsible for everything in the kitchen if [Chef Mann] wasn't there." Id. at 45-46. He was expected to help keep track of labor costs and minimize unnecessary overtime by other employees. Id. at 46, 49. Plaintiff was expected to handle customer complaints in Chef Mann's absence. McCullough Tr. at 104. Plaintiff supervised two subordinate, hourly line cooks. Id. at 81. Plaintiff expected subordinate employees to bring problems to him for resolution. Id. at 83. Plaintiff and Chef Mann were responsible for the eight hourly employees in the kitchen. Id. at 89. Plaintiff understood that he and Chef Mann had authority to counsel employees in the kitchen. Id. at 101. Plaintiff had authority to handle customer complaints about the kitchen. Id. at 104. He was given keys to the facility. Id. at 106. Plaintiff attended Banquet Event Orders meetings with managers, where upcoming events were planned and organized. Id. at 113. Plaintiff was in charge of ordering produce for the kitchen and assisted Chef Mann in planning the daily menus. Id. at 105, 154; Mann Tr. 44, 82.

For about ten months at ARAMARK, Plaintiff accepted his salary and performed his supervisory and managerial functions as an exempt employee who was not entitled to overtime pay. During his entire employment period, Plaintiff never complained to anyone that he should have been paid overtime for hours worked in excess of 40 hours per week. McCullough Tr. 75. In May 2002, Plaintiff voluntarily resigned from his employment with ARAMARK. Compl. ¶ 7. He commenced this action for overtime pay on November 14, 2002.

5

## III.  ARGUMENT

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247, 106 S. Ct. 2505, 2509-10, 91 L. Ed. 2d 202 (1986). "[T]he burden on the moving party may be discharged by 'showing' -- that is, pointing out to the district court -- that there is an absence of evidence to support the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986). Once the moving party has made this showing, "Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by [his] own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324, 106 S. Ct. at 2553. To establish that an issue is genuine, the nonmoving party must proffer evidence such that a reasonable jury could return a verdict in his favor. See Anderson, 477 U.S. at 248-49; 106 S. Ct. at 2511. A party may not survive summary disposition by merely reasserting conclusions from the complaint. "To avoid summary judgment, [a plaintiff] must produce not 'merely colorable' but 'significantly probative' evidence." Abcor Corp. v. A.M. Int'l, Inc., 916 F.2d 924, 930 (4th Cir. 1990) (citations omitted).

**A.      Plaintiff Was Employed in Bona Fide "Executive" and "Administrative" Capacities under the FLSA; Therefore, He Was Exempt from Its Overtime Requirements.**

Congress enacted the FLSA to help eliminate the existence of labor conditions that are detrimental to the health, efficiency, and welfare of workers in the United States. See 29 U.S.C.A. § 202(a); Thomas v. Jones Rests., Inc., 64 F. Supp. 2d 1205, 1208 (M.D. Ala. 1999). However, "[t]he goal of ameliorating the uglier side of a modern economy did not imply that all workers were equally needful of protection" by the FLSA. Nicholson v. World Bus. Network, Inc., 105 F.3d 1361, 1363

6

(11th Cir. 1997). The FLSA therefore exempts from the overtime pay requirements "any employee employed in a bona fide professional, administrative, or executive capacity." 29 U.S.C. § 213(a)(1). Exempt status is an affirmative defense under the FLSA, and, therefore, the defendant bears the burden of proof on that issue. See Clark v. J.M. Benson Co., 789 F.2d 282, 286 (4th Cir. 1986).

The test to determine qualification for both the executive and administrative exemptions includes an "earnings" and a "duties" component. The earnings component determines the level of proof that will be required on the duties component. For employees earning less than $250 per week, the employer will be required to satisfy the "long test." Employees earning more than $250 per week are considered highly paid employees, and the employer will satisfy its burden by meeting the requirements of the "short test." 29 C.F.R. § 541.1 (executive exemption); 29 C.F.R. § 541.2 (administrative exemption).[2] The short test applies here because Plaintiff earned more than $250 per week. See supra. Under the short test for the executive exemption, the "duties" component requires that the employee's "primary duty" (1) consist of the management of the enterprise or a customarily recognized department thereof; and (2) include the customary and regular direction of the work of two or more employees. 29 C.F.R. § 541.1.

1.      Plaintiff's Salary Basis of More Than $250 Per Week.

There is no dispute that Plaintiff was paid over $250 per week. Plaintiff's salary at ARAMARK was $576.92 per week, or $30,000.00 per year. See Exh. F.

---

[2] Under the short test for the "administrative exemption," the duties component requires that (1) the employee's "primary duty" consist of office or nonmanual work directly related to management policies or general business operations of his employer or his employer's customers; and (2) include "work requiring the exercise of discretion and independent judgment." 29 C.F.R. § 541.2. The analysis is similar to that used in determining an employee's primary duty under the executive exemption. Therefore, the executive exemption will be discussed first, and the administrative exemption will then be discussed briefly to address any differences in the requirements.

## 2. Plaintiff's Customary and Regular Direction of Two or More Employees.

Plaintiff was second in command over the kitchen. Mann Tr. 44. Plaintiff testified that approximately eight employees were his subordinates, and that he was responsible for directing the daily food production. McCullough Tr. 78-79, 153. Plaintiff directly supervised two hourly line cooks. Id. at 81. Plaintiff expected subordinate employees to bring problems to him for resolution. Id. at 83. Plaintiff and Chef Mann were responsible for the eight hourly employees in the kitchen. Id. at 89. Plaintiff understood that he and Chef Mann had authority to counsel employees in the kitchen. Id. at 101. Chef Mann testified that Plaintiff was, in fact, hired to supervise the entire kitchen. Mann Tr. 44-45, 52-53. Thus, Plaintiff clearly meets the second prong of the executive exemption test.

## 3. Plaintiff's Primary Duty Consisted of Management.

The "primary duty" analysis is an "extremely individual and fact-intensive" one, requiring a careful examination of the full range of the employee's job duties and responsibilities. Morisky v. Public Serv. Elec. & Gas Co., 111 F. Supp. 2d 493, 499 (D.N.J. 2000). The determination of what constitutes an employee's primary duty depends upon what function is of "principal" or "chief" importance to the employer. Sturm v. TOC Retail, Inc., 864 F. Supp. 1346, 1353 (M.D. Ga. 1994) (convenience store managers found exempt executive employees because their primary duty was management). The analysis of whether an employee's primary duty is management begins with determining which of the employee's duties involve management. See Shockley v. City of Newport News, 997 F.2d 18, 25-26 (4th Cir. 1993). The regulations list five factors for determining an employee's primary duty, although the "presence or absence of any one factor is not determinative; instead, the court must look at the total picture." Thomas, 64 F. Supp. 2d at 1214; see also 29 CFR § 541.103. The five factors are: (1) time spent in the performance of managerial duties; (2) relative importance of managerial and nonmanagerial duties; (3) the frequency with which the employee

exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid employees doing similar nonexempt work. 29 C.F.R. § 541.103; see also Shockley, 997 F.2d at 26; Donovan v. Burger King Corp., 675 F.2d 516, 520-21 (2d Cir. 1982).

(a)    **Time Spent in the Performance of Managerial Duties.**

The regulations recognize that "[t]he amount of time spent in the performance of managerial duties is a useful guide in determining whether management is the primary duty of an employee." 29 C.F.R. § 541.103. The first part of this factor requires a finding that the employee performed managerial duties; the second examines the time spent in those duties.

The regulations list a number of duties as examples of "management" activities, such as interviewing, selecting and training employees; directing employees' work; evaluating employee performance; disciplining employees; planning the work and determining the types of materials to be bought or stocked; and apportioning work among employees. 29 C.F.R. § 541.02. Here, ARAMARK hired Plaintiff as a sous chef, a key function of which is to supervise the daily food production operations, including directly supervising all kitchen personnel. See Exh. E; Mann Tr. 53. Courts have held that the supervision of other employees is "clearly" a management duty. See Donovan v. Burger King Corp., 672 F.2d 221, 226 (1st Cir. 1982). Moreover, Chef Mann and Plaintiff jointly handled interviewing, hiring, firing, disciplining, counseling, and supervising of subordinate hourly employees at the Friday Center. Mann Tr. 90-92. Plaintiff participated in counseling employees about their performance; he ordered produce for the kitchen; he helped manage labor costs; he planned the menu; and he was in charge of the day-to-day food production operations. McCullough Tr. 49, 85, 90, 105, 153, 187; Mann Tr. 52, 82. In short, as Chef Mann testified, Plaintiff managed the business. Mann Tr. 52.

9

In addition to the requirement that exempt employees perform managerial duties, the regulations also address the amount of time an employee spends on such duties. 29 C.F.R. § 541.103. The regulations provide a 50 percent "rule of thumb." Id. However, the percentage of time spent in managerial work is not determinative, and, indeed, the regulations recognize that the 50 percent rule is not conclusive. See 29 C.F.R. § 541.103; see also Murray v. Stuckey's, Inc., 939 F.2d 614, 618 (8th Cir. 1991); Burger King Corp., 672 F.2d at 226 (time alone is not the sole test); Haines v. Southern Retailers, Inc., 939 F. Supp. 441, 448-49 (E.D. Va. 1996) (same). As the First Circuit recognized in Burger King Corp., 672 F.2d at 226, "the more natural reading of 'primary' is 'principal' or 'chief,' not 'over one-half.'" Furthermore, the court noted, "a strict time division is somewhat misleading here: one can still be 'managing' if one is in charge, even while physically doing something else. The 50 percent rule seems better directed at situations where the employee's management and non-management functions are more clearly severable than they are here." Id.

Similarly, Plaintiff's management and nonmanagement functions at ARAMARK were not clearly severable. Plaintiff's duties were to "direct the food production and presentation" and "supervise the daily food production operations." See Exh. E; Mann Tr. 53, 90-92. Merely because Plaintiff also prepared food does not exclude him from the exemption. It is "quite clear that an employee can manage while performing other work, and that this other work does not negate the conclusion that his primary duty is management." Burger King Corp., 672 F.2d at 226 (exempt assistant managers spent a portion of their time performing many of the same tasks as hourly employees, including taking orders, preparing food, expediting orders); see also Horne v. Crown Central Petroleum, Inc., 775 F. Supp. 189, 190 (D.S.C. 1991) ("That the amount of time spent on non-management tasks is greater than fifty percent is not dispositive, particularly where non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial."). Plaintiff was responsible

10

for directing overall food production and supervising the kitchen; his food preparation duties were performed simultaneous to supervision and management tasks. McCullough Tr. 153; Mann Tr. 43-44. Thus, although Plaintiff may have spent much of his time preparing food, he still satisfies this factor as an executive employee.

In a case with similar facts, the court found untenable Plaintiff's argument that the amount of time he spent preparing food rendered him nonexempt. In Cobb v. Finest Foods, Inc., 582 F. Supp. 818 (E.D. La. 1984), the plaintiff argued that his primary duty was the preparation of hot foods, not management. The court found this argument unconvincing: "While it appears that [the] plaintiff was personally responsible for producing a great deal of food that was prepared each day, the court finds this one factor to be non-persuasive." Id. at 822. Notwithstanding the fact that the plaintiff in Cobb performed a fair amount of nonexempt labor as a consequence of his day-to-day activities, the court found that his primary duty was one of direction and management. Id. at 823. See also In re Food Lion, Inc., 1998 U.S. App. LEXIS 11809, at *25 (4th Cir. June 4, 1998)[3] (even though employee performed managerial and nonexempt work at the same time, court granted summary judgment for employer because primary duty was managerial).

Although Plaintiff may have been responsible for overseeing food preparation, which often included personally preparing food, that does not negate his managerial role. As observed in Cobb, "[t]he nature of the cafeteria enterprise and the instruction techniques used by the defendant in training new cooks required plaintiff to produce a great deal of food." Id. at 822. A plaintiff may not escape exempt status under the FLSA merely by attempting to characterize his position as menial and unimportant. See, e.g., Stuckey's, Inc., 939 F.2d at 617-18 ("Seeking to demean or minimize the importance of the manager's position, the plaintiff managers testified that most of their time was

---

[3] The unpublished opinions cited in this memorandum are attached as Exhibit L.

spent on routine non-management jobs." Nevertheless, the court found that the store managers were in charge of day-to-day operations.).

Even in cases where employees have claimed that most of their time was spent on nonmanagerial tasks, courts still have found them to be exempt employees. For example, in Haines v. Southern Retailers, Inc., 939 F. Supp. 441 (E.D. Va. 1996), a convenience store manager testified that she spent only 10 to 50 percent of her time performing managerial responsibilities. The court found that "[t]his factual dispute over the percentage of time [the employee] spent pursuing executive functions does not preclude summary judgment for [the employer]." Id. at 449. The court held that her employment satisfied the overall test, even if a factual issue remained as to one factor. Id. at 449-50. Thus, although Plaintiff contends that he spent far more than 50 percent of his time at ARAMARK simply cooking food, courts have repeatedly held that this one factor is not determinative.[4] The five-factor test is a "weighing test," and an employee's employment situation can satisfy the overall test even if a factual issue remains on this one factor. Haines, 939 F.Supp at 449. Furthermore, as shown above, Plaintiff plainly performed managerial tasks and nonexempt work simultaneously, making the 50 percent rule inapplicable.

**(b)     Relative Importance of Managerial and Non-managerial Duties.**

The second factor compares the relative importance of the management tasks performed to the importance of the nonmanagement tasks performed. 29 C.F.R. § 541.103. Like the plaintiff in Haines, here Plaintiff "down-play[s] and minimize[s] the importance of [his] position, testifying that

---

[4] See also Jones v. Virginia Oil Co., No. 02-1631, 2003 U.S. App. LEXIS 14675, at *3 (4th Cir. July 23, 2003) (convenience store manager found exempt where she testified she spent 75 to 85 percent of her time carrying out basic line worker tasks such as cooking burgers and food, cleaning, working the cash register, stocking shelves, and serving ice cream); In re Food Lion, Inc., 1998 U.S. App. LEXIS at *25 (although grocery store managers claimed only 5 percent of work was managerial, court found they performed nonexempt and managerial work at the same time and were exempt employees); Stuckey's, 939 F.2d at 618 (Eighth Circuit found that district court's conclusion that managers spent 65 to 90 percent of their time on nonmanagerial tasks was relevant and not clearly erroneous; "[h]owever, it is not a controlling factor under the regulations.").

[he] spent most of [his] time performing routine non-managerial jobs." Haines, 939 F. Supp. at 450; see also Stuckey's, 939 F.2d at 618; Burger King, 672 F.2d at 227; Horne, 775 F. Supp. 189. Plaintiff claims that "[b]asically I was just the food production." McCullough Tr. 161. However, Plaintiff's managerial duties were essential to the functioning of the organization, notwithstanding Plaintiff's self-serving statements to the contrary. "The courts have tended to reject such post-hoc efforts to minimize the relative importance of managerial duties." Haines, 939 F. Supp. at 450.

Plaintiff was responsible for performing numerous activities essential to the daily functioning of the business. For example, Plaintiff participated in counseling employees on their performance; he ordered produce for the kitchen; he helped plan the menu; he was in charge of the day-to-day food production operations; and he was expected to manage the business. McCullough Tr. 85, 90, 105, 153, 187-190; Mann Tr. 52, 82-83. Along with Chef Mann, Plaintiff handled interviewing, hiring, firing, disciplining, counseling, and supervising of subordinate hourly employees at the Friday Center. Mann Tr. 90-92. Plaintiff's managerial tasks here are similar to those of the plaintiff in Cobb, where the employee advised his supervisor on the planning of the menus, evaluated job assignments, made suggestions to his manager on the type and quantity of food to be ordered, and evaluated the progress of the operation. 582 F. Supp. at 821. The court in Cobb held that the employee's duties were of sufficient importance to meet this factor in the primary duty test. Id. at 822-23. Like the plaintiff's duties in Cobb, Plaintiff's duties here also satisfy this factor.

### (c-d) Frequency with which Employee Exercises Discretionary Powers and Relative Freedom from Supervision.

The frequency of the exercise of discretion and the freedom from direct supervision are the significantly overlapping third and fourth factors of the primary duties test. See Haines, 939 F. Supp. at 450. As such, they will be discussed together.

13

Plaintiff exercised discretion in various supervisory and personnel actions. For example, Plaintiff had discretion in interviewing and hiring employees, and he was included in the interview process for new employees. Mann Tr. 90. Plaintiff could interview any employee as he so desired; Chef Mann consulted with him regarding employees he anticipated hiring for the kitchen; and Plaintiff had the authority to hire employees. Id. at 53, 90. Plaintiff also had the authority, which he exercised, to counsel and discipline employees. McCullough Tr. 85, 100-101. For instance, Plaintiff, without any direction or suggestion from Chef. Mann, counseled Donna Baldwin regarding her performance in the kitchen. McCullough Tr. 97-99, 101; Mann Tr. 71-72.

Plaintiff also participated in the counseling of other employees, and Chef Mann consulted him regarding counseling and termination of employees. See Records of Employee Discussion/Counseling, dated September 8, 2001, September 13, 2001 and February 13, 2002 (Exhibit G); McCullough Tr. 91-92; Mann Tr. 68, 71-74, 90. Furthermore, Plaintiff played a key role in the termination of C.C. Tann, an hourly chef, on October 4, 2001. McCullough Tr. 85; Mann Tr. 69-70. In fact, the counseling form used for Mr. Tann, written by Chef Mann, repeatedly referred to Plaintiff's opinion. See Record of Employee Discussion/Counseling, dated October 4, 2001 (Exhibit H) ("Sous Chef John McCullough and myself are of the same opinion that CC Tann cannot keep up with the production needs of an upscale, high volume operation. We had hoped that CC Tann would improve his performance but did not. We continued to train him . . . ."). Plaintiff cannot credibly argue, based on this counseling session and Plaintiff's involvement in other counseling and disciplinary actions, that he did not exercise influence and discretion in counseling and terminating employees.

The freedom to make these types of personnel decisions demonstrates an employee's discretionary powers. Even if an employee exercises such power infrequently, the fact that an employee has that discretion is nevertheless important. See Burger King Corp., 675 F.2d at 521

(while assistant managers did not exercise the power to hire and fire frequently, there were some instances thereof in the record, which demonstrated discretion); see also Haines, 939 F. Supp. at 447 n. 5 (although manager argued she only handled one customer complaint, the fact is that she did, in fact, deal with such complaints, however infrequently). Thus, while Plaintiff attempts to downplay his authority to counsel, evaluate, hire, and terminate employees, the fact that he participated in such activities -- however infrequently -- is legally significant.

Plaintiff similarly attempts to minimize his role in planning the Friday Center menu each day, although he had significant discretion in planning the menu. Chef Mann decided the hot entrée to be served, and Plaintiff then determined what to serve with the entrée, which included two soups, a vegetarian entrée, two fresh vegetables, and a starch. McCullough Tr. 187; Mann Tr. 82. Plaintiff performed various other management functions involving discretion and freedom from direct supervision. In fact, he was second in charge only to Chef Mann, and he was the highest ranking kitchen employee when Chef Mann was absent. McCullough Tr. 72-73, 80. Thus, Plaintiff had authority over all day-to-day operations in the kitchen whenever Chef Mann was absent. Id. at 111, 192-93. Tellingly, Plaintiff described his typical day as one where he would come in to work and determine for himself what needed to be done to get the food production up and running; Plaintiff considered only what Chef Mann had done the night before. Id. at 159-160.

Moreover, even where employees have strict policies and guidelines they are required to follow, courts have found them to have the requisite amount of discretion and authority to qualify as exempt. For example, in Haines, the plaintiff asserted that she could not hire or fire employees without management's approval; that she performed many duties pursuant to strict guidelines; and that she was not permitted to discipline employees without her supervisor's approval. 939 F. Supp. at 450. The court noted that her arguments were similar to those of plaintiffs in a number of other decisions, and it found them "equally unconvincing": "Those courts uniformly rejected such

15

arguments, holding that, notwithstanding the existence of close supervision by upper management, manager positions similar to that held by [plaintiff] are vested with enough discretionary power and freedom from supervision to qualify for the executive exemption." Id.[5]

Plaintiff clearly exercised sufficient discretion and was sufficiently free from supervision to satisfy this factor.

### (e) Relationship between Employee's Salary and Wages Paid Nonexempt Employees.

The final factor in the "primary duties" test is the relationship between the employee's salary and the wages paid to employees doing similar nonexempt work. 29 C.F.R. § 541.103. It is undisputable that Plaintiff was earning $588.46 per week ($30,600 annually) when he resigned from his position with ARAMARK. See Plaintiff's Personnel Data Form (Exhibit I). Matt Alston and C.C. Tann, both nonexempt hourly cooks at the Friday Center, were paid substantially less than Plaintiff. During Plaintiff's tenure, Mr. Alston was paid $10-12.00 per hour ($20,800 to $24,960 annually). See Alston's Personnel Data Form (Exhibit J). Plaintiff and Chef Mann terminated Mr. Tann, but at the time Mr. Tann was being paid $8.50 per hour ($15,470 annually). See Tann's Personnel Data Form (Exhibit K). Because these similar, nonexempt hourly employees were paid significantly less than Plaintiff, the final factor in the primary duties test is satisfied. See Cobb, 582 F. Supp. at 821, 823 (plaintiff earned more than the highest paid hourly employee and final factor therefore satisfied); see also Horne, 775 F. Supp. at 191 (where plaintiff was being compensated at higher rate than other employees, paying him overtime would be a windfall).

---

[5] See also Burger King, 672 F.2d at 226 (fact that company had well defined policies and tasks were spelled out in great detail did not negate employee's managerial role); Stuckey's, 939 F.2d at 619 (same); Meyer v. Worsley Cos. Inc., 881 F. Supp. 1014, 1016, 1020-21 (E.D.N.C. 1994) (executive exemption applies despite the fact that upper management "employed a very direct, hands-on supervisory style"); Thomas, 64 F. Supp. 2d at 1213 (same); Horne, 775 F. Supp. at 191 (same, where managers had detailed policies and procedures to follow regarding store operations and were required to work certain hours).

### 4. Additional Considerations for Administrative Exemption.

In addition to qualifying for the executive exemption under the FLSA, Plaintiff also satisfies the administrative exemption. "The same principles discussed above with regard to determining whether an employee's primary duty is management apply as well in analyzing whether an employee's primary duty is administration." Shockley v. City of Newport News, 997 F.2d 18, 28-29 (4th Cir. 1993); see also 29 C.F.R. § 541.206(b). The factors examined under the administrative exemption, such as the type of work an employee performs, the amount of discretion he has, and the general relationship of his work to management, are nearly identical to those analyzed under the executive exemption. See 29 C.F.R. §§ 541.203, 541.205.

One factor under the administrative exemption is whether the employee's work is "directly related to management policies." This factor includes a similar analysis to the primary duties prong of the executive exemption. Courts have found that this requirement is not limited to persons participating in the formulation of policies; it also includes those charged with carrying out the policy. See Cobb, 582 F. Supp. at 818 (employee was exempt administrative employee where he had discretion in training the cooks and determining the methods of food preparation); see also Stricker v. Eastern Off Road Equipment, Inc., 935 F. Supp. 650, 655 (D. Md. 1996) ("An exempt administrative employee need not actually participate in either the formulation of policy or the broad operation of the business. Rather, '[e]mployees whose work is 'directly related' to management policies or to general business operations include those [whose] work affects policy or whose responsibility it is to execute or carry it out." (citing 29 C.F.R. § 541.205(c))).

Plaintiff's contention that he performed nonmanagerial work does not negate the fact that his work was "directly related to management policies." As under the executive exemption, a "bona fide administrative worker may nevertheless perform some manual work which is directly and closely related to the work requiring the exercise of discretion and independent judgment." Id. at 655; see

also 29 C.F.R. § 541.205(c).[6] Therefore, the fact that Plaintiff may perform some duties that are nonmanagerial does not disqualify him from the administrative exemption. "Plaintiffs' status as exempt administrative employees under the Fair Labor Standards Act, however, does not change merely because they perform some nonexempt labor." Counts v. South Carolina Elec. & Gas Co., 317 F.3d 453, 454 (4th Cir. 2003); see also Reich v. Avoca Motel Corp., 82 F.3d 238, 239 (8th Cir. 1996) (motel managers performed duties such as laundry, snow shoveling, lawn mowing, and cleaning, in addition to their personnel tasks and management tasks).

Plaintiff asserts that he performs "manual" work and that this disqualifies him from the administrative exemption, which requires the primary duty to be office or nonmanual work. However, Plaintiff misconstrues the FLSA's meaning of "manual." In fact, courts in the Fourth Circuit have identified the sort of duties that qualify as manual tasks. In Stricker, a manager of a truck and off-road vehicle equipment store argued that he performed manual work, and that he "was little more than a salesman, a stock boy, a janitor, and a clerical worker." 935 F. Supp. at 652-53. The court first noted:

> [P]laintiff is not disqualified from the administrative exemption simply because his work involved the 'hands-on' management of a retail store and required him to perform some duties outside of the store. . . . Moreover, the interpretations themselves do not purport to *require* that exempt administration take place in an office or at a desk.

Id. at 658 (emphasis in original). "Some of the examples of exempt work listed in the interpretations are plainly not 'white-collar office work' thus making it clear that the word 'nonmanual' in the regulations is intended to provide an additional category of exempt work and is not intended to be descriptive of office work." Id. The Stricker court found that the plaintiff's primary duties did not involve manual work, which it described as performing repetitive manual tasks or using tools,

_____

[6] The issue of discretion under the administrative exemption closely parallels the discretion and independent judgment required under the executive exemption. See Section 2(c-d), supra.

18

instruments, machinery, or other equipment; therefore, this element of the regulations did not take the plaintiff out of the exempt class. Id.; see also 29 C.F.R. §§ 541.201(a)(3)(i), 541.203(b).

Similarly, Plaintiff's work did not include repetitive manual tasks as envisioned in the regulations. Nor was he using tools or machinery as contemplated by the regulations. Plaintiff supervised food production, which included preparing the food. While this may not be a "desk job," neither does it involve the type of "manual" work described in the regulations. Courts in the Fourth Circuit have recognized the similarity between the administrative and executive exemptions. "Although employees with these duties [described in the administrative regulations] are frequently deemed executives for the purposes of FLSA, courts have held that such workers may be classified as administrators." Stricker, 935 F. Supp. at 657-58. Thus, because Plaintiff qualifies as an exempt executive, it follows that he is also exempt under the administrative exemption.

**B.    Additional Consideration Barring Plaintiff's Claims for Overtime Pay.**

It is incontrovertible that Plaintiff accepted the sous chef position with ARAMARK knowing that it was an exempt, salaried position, for which he would not receive overtime pay for hours worked in excess of 40 per week. McCullough Tr. 67-70. In addition, Plaintiff never complained to ARAMARK about not being paid overtime. Id. at 75-76. Plaintiff testified:

> Q.    Is it fair to say that you understood when you first interviewed with Mr. Mann, that if you took the position as a salaried sous-chef at ARAMARK, you would not be paid for the time worked in excess of 40 hours per week?
>
> A.    Yes.
>        . . . .
>
> Q.    When you first interviewed with Mr. Mann, did you ever discuss with him that you expected to be paid for hours worked in excess of 40 hours per week, even though you would be a salaried sous-chef?
>
> A.    No.
>
>        . . . .
>
> Q.    Okay.  Is it fair to say that at the time you took the position, based on your past employment positions as a salaried sous-chef--

19

A.     Uh-huh.

Q.     --you understood that if you worked in excess of 40 hours per week as a
       salaried employee at ARAMARK in the sous-chef position, you would not be
       paid overtime pay for hours worked in excess of 40 hours per week?

A.     Yes.

Id. at 67-70.

Courts have found an employee's first time, post-termination request for overtime pay
significant: "[A]nother factor weighed by the court is the fact that plaintiff at no time during his
employment with defendant questioned defendant's policy of not paying him overtime." Cobb, 582
F. Supp. at 824. In Cobb, the plaintiff failed to file a claim for overtime compensation until
approximately one year after leaving defendant, which "leads to the conclusion that neither plaintiff
nor defendant considered him entitled to overtime." Id.; accord Kelly v. Adroit, Inc., 480 F. Supp.
392, 394 (E.D. Tenn. 1979) ("Another factor weighing significantly on the Court's mind is the fact
that plaintiff at no time during his employment with defendant questioned defendant's policy of not
paying him overtime.").

To be sure, Plaintiff knew he was not entitled to overtime pay both before and during his
employment with ARAMARK. Having received the benefits as a salaried manager, Plaintiff should
now not be permitted to claim -- for the first time and months after he resigned from ARAMARK --
an entitlement to the very overtime pay which Plaintiff clearly and unambiguously understood and
agreed that he would not be entitled to receive while working at ARAMARK.

## IV.     CONCLUSION

In the case at bar, the facts show that ARAMARK employed Plaintiff in a bona fide
executive and administrative capacity. There is no genuine issue of material fact, and ARAMARK is
entitled to summary judgment as a matter of law on Plaintiff's FLSA claims. ARAMARK
respectfully requests that the Court grant its Motion for Summary Judgment and that Plaintiff's
Complaint be dismissed with prejudice.

20

Respectfully submitted this the _3rd_ day of September 2003.

By: _A. Todd Brown_

A. Todd Brown
(NC Bar No. 13806)
Jacqueline M. Yount
(NC Bar No. 27646)
Hunton & Williams LLP
Bank of America Plaza
Suite 3500
101 South Tryon Street
Charlotte, NC 28280
*Attorneys for Defendant ARAMARK Educational Services, Inc.*

21

## CERTIFICATE OF SERVICE

I certify that on this **3rd** day of September 2003, I caused a copy of the foregoing **DEFENDANT ARAMARK EDUCATIONAL SERVICES, INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT** to be sent by first-class mail, postage prepaid to the following:

> Ashley Osment
> McSurely and Osment
> P.O. Box 1290
> Chapel Hill, NC 27514
> *Attorneys for Plaintiff*

_____
A. Todd Brown

22

ATTACHMENT/EXHIBIT_____A_____

 **ARAMARK**

As an EQUAL EMPLOYMENT OPPORTUNITY/AFFIRMATIVE ACTION EMPLOYER, ARAMARK does not discriminate against applicants or employees because of their age, race, color, religion, national origin, sex (except where sex is a bonafide occupational qualification) or on any other basis prohibited by law. Furthermore, ARAMARK will not discriminate against any applicant or employee because he or she is mentally or physically disabled, a disabled veteran, or a veteran of the Vietnam era, provided he or she is qualified and meets the requirements established by ARAMARK for the job.

*McCullough* **PLEASE TYPE OR PRINT CLEARLY**

DATE 7/20/01

NAME (Last) *McCullough* (First) *John* (Middle) —

SOCIAL SECURITY NUMBER 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

CURRENT ADDRESS (Street) *13202 Draw hill lane* (City) *Chapel hill* (State) NC (Zip Code) 27514

PHONE NUMBER Area Code (919) 932-5438

RESIDENT ADDRESS (Street) (if different from above) (City) (State) (Zip Code)

PHONE NUMBER Area Code ( )

ARE YOU 18 YEARS OR OLDER? ☑ YES ☐ NO   IF NOT, STATE YOUR DATE OF BIRTH *1/24/68*

## TYPE OF POSITION DESIRED

POSITION APPLIED FOR: *Sous Chef*

☑ FULL TIME   ☐ PART TIME   ☐ SUMMER   ☐ TEMPORARY   ☐ OTHER

SALARY EXPECTED

WILL YOU RELOCATE?   TO WHAT AREA?   ☐ YES   ☑ NO

WILL YOU TRAVEL?   ☑ YES   ☐ NO

DATE AVAILABLE TO WORK WITH ARAMARK *ASAP*

HAVE YOU EVER WORKED FOR ARAMARK?   ☐ YES   ☑ NO

IF YES, WHEN AND WHERE?

HAVE YOU EVER APPLIED TO ARAMARK?   ☐ YES   ☑ NO

IF YES, WHEN AND WHERE?

To comply with the Immigration Reform and Control Act of 1986, if you are hired you will be required to provide documents to establish your identity and your authorization to be employed in the United States. Such documents will be required within the first three (3) business days following your hire, or upon your first work day if your employment period will be less than three (3) days.

HOW WERE YOU REFERRED TO ARAMARK? *Job add in paper.*

ARE YOU WILLING TO TAKE A PHYSICAL EXAM AT OUR EXPENSE IF THE NATURE OF THE JOB REQUIRES ONE?   ☑ YES   ☐ NO

HAVE YOU EVER BEEN CONVICTED OF A CRIME (MISDEMEANOR OR FELONY)?   ☐ YES   ☑ NO

IF YES, EXPLAIN: (WHERE) (WHEN) (CHARGED) (SENTENCE)

(Disclosure of a criminal record will not necessarily disqualify you for employment. Each conviction will be evaluated on its own merits with respect to time, circumstances and seriousness, in relation to the job for which you are applying.)

220-002U (2/97)

**ARAMARK 0101**

# EXPERIENCE
## (Most Recent Experience First)

| 1. NAME AND ADDRESS OF EMPLOYER | STARTING POSITION | ENDING POSITION |
|---|---|---|
| Westfield YMCA<br>New Jersey<br><br>FROM MO _01_ YR _02_ TO MO _06_ YR _01_<br>PHONE NUMBER<br>Area Code<br>(908) 233-2700 | Kitchen manager/chef | Same |
| | **SALARY** | NAME AND TITLE OF SUPERVISOR |
| | Starting / Ending<br>$ / $ | Ida martin |
| | **REASON FOR LEAVING**<br>Moving to NC + all in house catering/though kiwi catering | |

| 2. NAME AND ADDRESS OF EMPLOYER | STARTING POSITION | ENDING POSITION |
|---|---|---|
| Grand Summit hotel<br>Summit NJ<br><br>FROM MO _08_ YR _97_ TO MO _12_ YR _98_<br>PHONE NUMBER<br>Area Code<br>(908) 273-3000 | Roundmans | Same. |
| | **SALARY** | NAME AND TITLE OF SUPERVISOR |
| | Starting / Ending<br>$ 12 per hour / $ 14 per hour | Adam T. Scott   He has<br>HR department   Chef   left |
| | **REASON FOR LEAVING**<br>to start small catering Company | |

| 3. NAME AND ADDRESS OF EMPLOYER | STARTING POSITION | ENDING POSITION |
|---|---|---|
| Clydes Restaurant<br>Reston, Virginia<br><br>FROM MO _03_ YR _96_ TO MO _06_ YR _97_<br>PHONE NUMBER<br>Area Code<br>(703) 787-6601 | Sous chef | Sous chef |
| | **SALARY** | NAME AND TITLE OF SUPERVISOR |
| | Starting / Ending<br>$ 32,000 / $ 32,000 | HR department<br>call ? |
| | **REASON FOR LEAVING**<br>Moving to NJ | |

MAY WE CONTACT THE EMPLOYERS LISTED ABOVE?  ☑ YES  ☐ NO

IF NO, INDICATE BY NUMBER WHICH ONE(S) YOU DO NOT WISH US TO CONTACT _____

USE THIS SPACE TO DESCRIBE ANY PREVIOUS WORK HISTORY AND/OR TO DETAIL PARTICULAR JOB RESPONSIBILITIES LISTED ABOVE. INCLUDE ANY ADDITIONAL INFORMATION WHICH YOU FEEL MAY BE RELEVANT TO THE JOB FOR WHICH YOU ARE APPLYING.

ARAMARK 0102

# RECORD OF EDUCATION

| Name and Address of School | Dates Attended From Mo./Yr. | Dates Attended To Mo./Yr. | Graduated YES | Graduated NO | Type of degree/ diploma received or expected | Major/Minor Fields of Study |
|---|---|---|---|---|---|---|
| **High School** (Last Attended) | | | | | | |
| **Colleges/ Universities** | *Otumoetai College New Zealand 1981-1965* | 81-85 | ✓ | | *SC School Certificate* | |
| **Graduate School** | | | | | | |
| **Other** (Business, Technical, Secretarial, etc.) | *Bay of plenty Polytechnic* | 86-90 | ✓ | | *General Catering Restaurant Service* | |

LIST ANY CLUBS, ORGANIZATIONS, SOCIETIES, OR PROFESSIONAL GROUPS TO WHICH YOU BELONG WHICH HAVE A DIRECT BEARING UPON YOUR QUALIFICATIONS FOR THE JOB WHICH YOU ARE SEEKING. (INDICATE AMERICAN DIETETIC ASSOCIATION REGISTRATION NUMBER IF APPLICABLE TO THE POSITION FOR WHICH YOU ARE APPLYING.)

LIST ANY HOBBIES OR INTERESTS WHICH HAVE A DIRECT BEARING ON THE JOB FOR WHICH YOU ARE APPLYING.

*Mountain Biking / Reading*

LIST ANY SPECIAL SKILLS OR ABILITIES WHICH DIRECTLY RELATE TO THE JOB FOR WHICH YOU ARE APPLYING.

*Corporate management training / Clyde's corporation.*

DO YOU POSSESS A VALID CURRENT DRIVER'S LICENSE (ONLY FOR JOBS REQUIRING DRIVING A VEHICLE)? ☑ YES ☐ NO

DRIVER'S LICENSE NUMBER AND STATE *NJ*

## MILITARY SERVICE RECORD

HAVE YOU EVER BEEN A MEMBER OF THE ARMED FORCES OF THE UNITED STATES? ☐ YES ☑ NO

IF YES, LIST ANY SPECIAL SKILLS OR ABILITIES YOU DEVELOPED WHILE IN MILITARY SERVICE WHICH DIRECTLY RELATE TO THE JOB FOR WHICH YOU ARE APPLYING.

**ARAMARK 0103**

This application shall only remain active for 60 days. After 60 days, if you are still interested in employment at ARAMARK, you must fill out a new application.

I hereby certify that all statements made in this application are true and correct to the best of my knowledge and belief. I understand and agree that any misrepresentation or omission of facts in my application may be justification for refusal to hire, or termination of employment.

I further understand that an investigative report may be made as to my character and general reputation. I authorize all past employers, schools, persons and organizations having relevant information or knowledge to provide it to ARAMARK or its duly authorized representative for its use in deciding whether or not to offer me employment and specifically waive any required written notification. I hereby release employers, schools, persons and organizations from all liability in responding to inquiries in connection with my application. Upon written request by me, within a reasonable period of time, ARAMARK will make available to me the nature and scope of all reports of every type obtained.

I understand that nothing contained in this employment application or in the granting of an interview is intended to create an employment contract between ARAMARK Corporation, its subsidiaries and affiliates, and me for either employment or for the providing of any benefit. If an employment relationship is established. I understand that my employment can be terminated, with or without cause, at the option of either ARAMARK or myself.

In signing this form, I certify that I understand all the questions and statements in this application.

Further, if granted a position with ARAMARK Corporation or any of its subsidiaries, I will comply with ARAMARK's Business Conduct Policy, a summary of which is printed below.

 **ARAMARK**

# BUSINESS CONDUCT POLICY

## THIS POLICY APPLIES WORLDWIDE

**Compliance with Laws**
It is ARAMARK's policy to comply with the laws in each country in which ARAMARK conducts business.

**Employment/Equal Opportunity**
ARAMARK's policy is to hire, promote, discipline and make all other personnel decisions without regard to race, color, religion, national origin, age, sex, disability, disabled veteran or Vietnam-era veteran status except where bona fide affirmative action programs allow for such considerations.

**Sexual Harassment**
Sexual harassment in any form will not be tolerated in the workplace. Any employee who feels that he or she has been subjected to sexual harassment is required to report the incident immediately.

**Illegal Substances**
It is ARAMARK's policy to maintain an environment free of drug and alcohol abuse.

**Environmental**
ARAMARK's policy is to comply with environmental laws in all countries in which ARAMARK conducts business.

**Collusion**
It is fundamental that ARAMARK independently determine the pricing, commissions and other contractual terms offered to clients or prospective clients.

**Copyright Infringement**
It is ARAMARK's policy to respect copyrights owned by others.

**Political Contributions**
Any political contribution or expenditure by a component is against ARAMARK policy. Also, any reimbursement of an employee for any such contribution or expenditure is against ARAMARK policy.

**Gifts and Entertainment**
It is ARAMARK's policy not to make any gift (other than a nominal holiday remembrance), or provide entertainment (except routine lunches or dinners during the conduct of regular business), to any government or union employee (except as provided in the Business Conduct Policy). Gifts given to non-government or non-union employees are restricted to a value of up to $200 (U.S.) per year, where entertainment is involved, lavish expenditures are to be avoided.

Gifts from any supplier or client to an ARAMARK employee may not total more than $200 (U.S.) per year.

**Accurate Books and Reporting**
All transactions must be accurately recorded. No unrecorded fund, asset, or other improper account of ARAMARK shall be established or maintained for any reason.

**Conflicts of Interest/Related Party Transactions**
It is essential that all ARAMARK employees avoid any situation or interest which might interfere with his/her judgment concerning responsibilities to ARAMARK.

**Outside Employment**
An ARAMARK employee's outside employment should not conflict with his/her responsibilities to ARAMARK.

**Finder's Fee**
Payment of finder's fees is prohibited without the written approval of the General Counsel's Office.

**Disclosure**
If you are aware of possible violations of the BUSINESS CONDUCT POLICY, you must report them to the BUSINESS CONDUCT POLICY SECRETARY c/o the Office of General Counsel, at Corporate Headquarters in writing or by telephoning 1-800-999-8989 extension 3248, or 215-238-3248, or to others listed in the policy booklet.

_____   SIGNATURE OF APPLICANT

7/27/01   DATE

## FOR PERSONNEL USE ONLY

| DATE APPLICATION RECEIVED | REFERRAL SOURCE |
|---|---|
| INTERVIEWED BY | DEPARTMENT |

REFERENCE CHECK COMPLETED (DATE, AND BY WHOM)

DISPOSITION AND REASON

(MIDDLE INITIAL)

(FIRST)

APPLICANT'S NAME
(LAST)

**ARAMARK 0104**

ATTACHMENT/EXHIBIT_____ B _____

**John McCullough**
13202 Drew Hill Lane
Chapel Hill, NC 27514
Telephone: 919-932-5438
E-mail: johnmccnz@att.com

**SUMMARY**   A dedicated professional with twelve years of experience in food preparation and management. Broad knowledge of various cuisines and cooking techniques.

**PROFESSIONAL EXPERIENCE**

2000- Present   **Westfield YMCA,** Westfield New Jersey
**Catering Director/Chef**
Manage all in house catering for club with membership of 8500.
Catered club meetings, fund raisers, etc., as well as local events for organizations such as Chamber of Commerce and Rotary Club.
- Supervise staff of four.
- Menu planning, purchasing and pricing.

1997-1998   **Grand Summit Hotel,** Summit, NJ
**Roundsman**
Preparation of contemporary American cuisine in upscale restaurant.
Assisted in large scale banquet facility as needed.

1996-1997   **Clydes Restaurant,** Reston, Virginia
**Sous Chef**
Cuisine: Contemporary American
Supervision of large kitchen staff including development of daily menu specials, scheduling, staffing, food costing for high volume restaurant (approx. 700-1100 meals/day) Attended corporate management training.

1994-1996   **Oval Room,** Washington, D.C.
**Sous Chef**
Cuisine: Contemporary American
Supervision of line and prep cooks and menu development for a fine dining restaurant.

1993-1994   **Jasmine Cafe,** Reston, Virginia
**Sous Chef**
Cuisine: Southwestern
Purchasing, menu development and management of staff during owner's absence.

ARAMARK 0123

| 1991-1993 | **Golden Dog,** Sydney, Australia |
|---|---|
| | Cuisine: Modern Australian |
| | Promoted from Sous Chef to Head Chef to supervise kitchen staff of seven in preparation of approximately 1500 meals per week. Staffing and training new employees and scheduling. Menu planning and coordination of all purchasing. |
| 1990-1991 | **Circus Bar & Grill** |
| | Cuisine: International |
| | Grill and sauté chef in newly opened restaurant with diverse menu. Managed all kitchen staff during lunch shifts. |

**EDUCATION**          Bay of Plenty Polytechnic, Tauranga, New Zealand
                       General Catering Certificate (3 year program)
                       Restaurant Service Certificate

                       Otumoetai College, 1981-1985

**REFERENCES**         Available upon request.

2

**ARAMARK** 01_4

ATTACHMENT/EXHIBIT____C_____

1       ‾IN THE UNITED STATES DISTRICT COURT

2       FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

3                  DURHAM DIVISION

4            Case No.: 1:02 CV 00992

5

6       _____ )

7       JOHN McCULLOUGH,                )
                                        )
8               Plaintiff,              )
                                        )
9       v.                             )
                                        )
10      ARAMARK EDUCATIONAL SERVICES,  )
        INC.                           )
11                                     )
                Defendant.             )
12      _____ )

13

14                  * * * * *

15

16           DEPOSITION of JOHN McCULLOUGH, a

17   witness called on behalf of the Defendant, taken

18   pursuant to the Federal Rules of Civil

19   Procedure, before Beverly S. Frassinelli, C.P.,

20   Certified Court Reporter and Notary Public in

21   and for the State of North Carolina, at the

22   offices of Empowerment, Inc., 109 N. Graham

23   Street, Chapel Hill, North Carolina, on

24   Thursday, May 22, 2003, commencing at 10:05 a.m.

25

1    -    A.    P-A-O-U-L, I think.  Paolo's --

2    I'm not sure.

3         Q.    Okay.  That's fine.

4         A.    I came in as sous-chef.

5         Q.    What were your responsibilities?

6         A.    Just overseeing the production of

7    the food.

8         Q.    Did you report to a head chef?

9         A.    Yes.

10        Q.    Approximately what year was this

11   employment?

12        A.    That would have been '94.

13        Q.    You came here in 1993; is that

14   right?

15        A.    Yes.

16        Q.    And you did not become employed

17   until 1994; is that right?

18        A.    No, I pretty much did nothing for

19   about six months or so until my green

20   card -- my resident alien card came

21   through.

22        Q.    As sous-chef how many people did

23   you supervise at Paolo's?

24        A.    Maybe four to five people on the

25   line.

1    Q.    Were you the only sous-chef?

2    A.    No, there was one other.

3    Q.    What was the name of the other

4    sous-chef, if you recall?

5    A.    Claus.  The second name alludes

6    me.  He was -- he was a --

7    Q.    That's fine.  Were you equal to

8    him?

9    A.    Yes.

10   Q.    When the head chef was gone, who

11   ran the restaurant?

12   A.    The head chef was very rarely ever

13   gone.

14   Q.    All right.  But when he was gone,

15   who ran the restaurant?

16   A.    That would have come under the

17   general manager.  I mean we ran --

18   Q.    All right.  Let me --

19   A.    -- we oversaw the production to

20   make sure the basic daily functions of what

21   needed to come out of the kitchen kept

22   occurring.

23   Q.    And let me try it again.  When the

24   head chef at Paolo's Restaurant was not

25   there, who oversaw the functions of the

1    kitchen?

2         A.    Would be the sous-chefs.

3         Q.    Okay.  You and the other

4    sous-chef?

5         A.    Correct.

6         Q.    Did you ever share with anyone at

7    Aramark your employment at Paolo's

8    Restaurant?

9         A.    No.

10        Q.    Is there any reason you did not?

11        A.    No.

12        Q.    Okay.  As sous-chef did you have

13   any capacity to hire or fire at Paolo's

14   Restaurant?

15        A.    No.

16        Q.    Did you evaluate anyone?

17        A.    No, sir.

18        Q.    Did they have, for example, a

19   pastry chef or a dishwasher or a line cook

20   at Paolo's?

21        A.    Uh-huh.

22        Q.    And did you supervise all of those

23   folks as sous-chef?

24        A.    The pastry chef, no.  That's like

25   a whole different department.  They would

1    take care of themselves.

2         Q.    Who did you supervise in your

3    position as sous-chef at Paolo's

4    Restaurant?  Give me the names or the

5    positions.

6         A.    You would make sure -- you had to

7    supervise the line cooks and make sure the

8    production was kept -- kept going, kept up

9    to the standard, kept the pace.

10        Q.    Okay.  So you supervised the line

11   chef -- or the line cooks.  Who else?

12        A.    That was pretty much it, because

13   as a sous-chef you were always in the front

14   making sure everything is done correctly.

15        Q.    Okay.  Were you responsible for

16   scheduling the workers?

17        A.    No.

18        Q.    Who did that?

19        A.    Executive.

20        Q.    Who?

21        A.    The executive chef.

22        Q.    All right.  After you -- well,

23   there came a point when you left Paolo's.

24   How long did you work at Paolo's before

25   moving to your next job?

1    A.   Paolo's was fairly short.  It was

2  my first position in the States, and it

3  just didn't work out.  I was -- I left on

4  my own accord.  I just felt the management

5  there was just -- the place was crazy,

6  there was no organization.

7    Q.   As best as you can recall, how

8  long were you employed there?

9    A.   Maybe three or four months.

10   Q.   Were you an hourly worker, or did

11 you receive a salary?

12   A.   I was salaried.

13   Q.   Were you paid overtime as a

14 salaried worker?

15   A.   No.

16   Q.   And why not?

17   A.   Why I wasn't paid?

18   Q.   Yes, sir.  To the best of your

19 knowledge, why didn't they pay you for

20 hours worked in excess of 40 per week?

21   A.   I mean, I took the job based on

22 what they told me was entailed and was

23 expected of a sous-chef.  And I accepted

24 it, and that's what I agreed upon.

25   Q.   Okay.  You took the position as a

1    salaried position; correct?

2        A.    Correct.  Yes.

3        Q.    And did you understand that

4    because it was a salaried position, you

5    would not be paid for hours in excess of 40

6    hours?

7        A.    Correct.

8        Q.    Did they say to you that you would

9    be expected to work more than 40 hours per

10   week, but that you would not be paid for

11   hours worked in excess of 40 hours?

12       A.    Repeat that.

13       Q.    All right.  I'm sorry.  At Paolo's

14   Restaurant were you told before taking the

15   job, that you would be required to work

16   more than 40 hours per week, but that you

17   would not be paid overtime if you worked

18   more than 40 hours per week?

19       A.    Yes.

20       Q.    And you fully understood that?

21       A.    Yes.

22       Q.    And you took the job under those

23   circumstances; correct?

24       A.    Yes.

25            MS. OSMENT:  I'm going to object

1  to the use of "fully understood."

2       MR. BROWN: Objection noted.

3       BY MR. BROWN:

4       Q.   Just so I'm clear:  As early as

5  1994 when you arrived in this country, you

6  understood that if you took a salaried

7  position and you were told that you were

8  required to work more than 40 hours per

9  week, you understood that you would not be

10 paid for hours worked in excess of 40; is

11 that correct?

12      A.   I mean on taking the job it was

13 never posed to me in that way before.  I

14 mean no one --

15      Q.   Listen to my question.  I'm asking

16 you --

17      A.   Right.

18      Q.   -- based on the testimony you just

19 gave me, --

20      A.   Uh-huh.

21      Q.   -- whether you understood in 1994

22 that if you took a salaried position paying

23 you for 40 hours of work per week, and you

24 worked in excess of 40 hours per week as a

25 salaried employee, --

1      A.    Right.

2      Q.    -- that you would not be paid for

3   time worked in excess of 40 hours?

4      A.    Right.

5      Q.    You understood that; is that

6   correct?

7      A.    Yes.

8         MS. OSMENT:   Objection.

9         MR. BROWN:   What's the objection?

10        MS. OSMENT:   Well, there's all

11  kinds of -- understood what?  What the law

12  provides?  What the facts of that job were?

13  What the situation is for employment in the

14  United States?  I just don't think

15  "understood" is clear in that context.   I

16  don't mean to give a sermon, but you --

17        MR. BROWN:   All the objections are

18  preserved except as to form.  So, please

19  try to -- let's stick to those Rules that

20  we stipulated to.

21        BY MR. BROWN:

22     Q.    Okay.  Do you recall the salary,

23  Mr. McCullough, at Paolo's?  And I know

24  it's been ten years ago, but if you recall

25  roughly what the salary was?

1      A.   I think it was 32,000.

2      Q.   And jumping ahead, is it fair to

3 say that the $32,000 salary was more than

4 the salary you were paid at Aramark?

5      A.   Yes.  Yes.

6      Q.   All right.  Do you recall the name

7 of any of your supervisors or co-workers at

8 Paolo's Restaurant?

9      MS. OSMENT:  Objection.  Compound

10 question.

11      BY MR. BROWN:

12      Q.   You can answer it.

13      A.   No.

14      Q.   Where was Paolo's Restaurant

15 located, in what city?

16      A.   Reston, Virginia.

17      Q.   To your knowledge is it still in

18 existence?

19      A.   Yes.

20      Q.   Okay.  All right.  What was your

21 next position of employment after Paolo's

22 Restaurant?

23      A.   I worked at the Oval Room in

24 Washington, D.C.

25      Q.   I'm sorry.  What?

1          -   A.    I worked at a restaurant called

2     the Oval Room.

3              Q.    Oval Room?

4              A.    Correct.  Yes, sir.

5              Q.    And what year was this?

6              A.    I think it was '95 or '96, I think

7     I started there.

8              Q.    You think it clearly was '95 or

9     '96?

10             A.    I think it was between '95 and

11    '97, I think I was at the Oval Room.

12             Q.    Okay.   '95 and '97.  And this was

13    in Washington, D.C., did you say?

14             A.    Yes.

15             Q.    And what was your position there?

16             A.    Sous-chef.

17             Q.    And what were your duties as

18    sous-chef?

19             A.    During lunch I ran the saute

20    station.

21             Q.    What about during breakfast or

22    dinner?

23             A.    I was there for dinner as well.

24    Ran the same station.  That was my sole

25    responsibility, was taking care of that

1    station.

2        Q.    Okay.    Let me back up a minute.

3    Do you recall roughly how many hours per

4    week you worked at Paolo's Restaurant, just

5    roughly?

6        A.    Probably no more than 50.

7        Q.    Okay.    And while we're on that

8    topic.    How many hours per week did you

9    work at the Oval Room?

10       A.    Probably around the 50 hour mark,

11   too.

12       Q.    Was the sous-chef position at the

13   Oval Room salaried?

14       A.    Yes.

15       Q.    And do you recall the salary for

16   the position, the amount of salary?

17       A.    I think when I first got there, I

18   think it was 30.    And then within a short

19   period of time it went to I think it was 32

20   or 33.

21       Q.    And how many sous-chefs were there

22   at the Oval Room?

23       A.    Myself; just one.

24       Q.    Just one.    And you reported to the

25   head chef; is that fair?

1    -    A.    I reported to the chef-de-cuisine.

2    And then he reported to the executive chef.

3         Q.    Were you responsible for

4    supervising anyone?

5         A.    No.    That fell under the

6    chef-de-cuisine.

7         Q.    Did you have anyone working under

8    you in your position as person in charge of

9    the saute station?

10        A.    No.    That was my sole

11   responsibility.

12        Q.    At the position at the Oval Room,

13   when you worked in excess of 40 hours, were

14   you paid overtime?

15        A.    No.

16        Q.    And to the best of your knowledge,

17   why were you not paid for hours worked in

18   excess of 40 at the Oval Room?

19        A.    It didn't happen that often, you

20   know.    During the few busy periods, you'd

21   do up to the 50 hours, and then it was a

22   fairly stable set job.

23        Q.    At the time you accepted the

24   position at the Oval Room, did you

25   understand that you would be required to

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 44 of 167

1    work more than 40 hours as a salaried

2    sous-chef, but that you would not be paid

3    for hours worked in excess of 40?

4         A.    Yes.

5         Q.    At the Oval Room --

6         A.    Uh-huh.

7         Q.    -- did you ever complain to anyone

8    that you were not being paid for hours

9    worked in excess of 40?

10        A.    Complained all the time that I

11    didn't make enough money.

12        Q.    Okay.  I apologize.  Maybe it was

13    a poor question.  Did you ever complain to

14    anyone at the Oval Room that you were not

15    being paid for hours in excess of 40 hours,

16    but that you should have been paid some sum

17    over and above your salary for any hours

18    worked over 40?

19        A.    During the busy time, which is

20    mainly winter in D.C. -- summer is a little

21    quieter -- I recall complaining to the

22    owner that the hours I was doing -- because

23    of the commute that was involved as well,

24    he went ahead and purchased parking for me

25    downstairs at quite a considerable sum,

1   which minimized my travel time, which

2   lessened my work week.

3       Q.   Okay.   I understand that, but

4   listen to my question.   I'm not asking you

5   whether you complained to anyone about the

6   number of hours you worked.

7       A.   Right.

8       Q.   My question is, did you complain

9   to anyone that you were not being paid for

10  hours worked in excess of 40, but that you

11  should have been paid for hours worked in

12  excess of 40?

13      A.   No.

14      Q.   All right.   Is it fair to say that

15  at Paolo's Restaurant you did not complain

16  to anyone there that you should have been

17  paid for hours worked in excess of 40, but

18  that you did not get payment for such

19  hours?

20      A.   No.

21      Q.   No, you did not complain to anyone

22  at Paolo's; is that correct?

23      A.   No.

24      Q.   That is not correct or that is

25  correct?

1       A.   I never complained.

2       Q.   Okay. Fair enough. How long were

3    you at the Oval Room?

4       A.   Just over a year.

5       Q.   Why did you leave?

6       A.   My daughter was born, and I just

7    needed to change my lifestyle a little bit.

8    So I wanted to get a job closer to home,

9    lessen the commute. And just change jobs,

10   just do something different. Mainly just

11   because of my daughter I wanted to....

12      Q.   Okay. Is it fair to say that you

13   left the Oval Room because your daughter

14   was born, and you wanted to spend more time

15   with your daughter?

16      A.   Yes.

17      Q.   Okay. What was your next position

18   after the Oval Room?

19      A.   I think it was a small restaurant

20   called Jasmine Cafe.

21      Q.   Jasmine. And where was that

22   located?

23      A.   That was in Reston as well;

24   Reston, Virginia.

25      Q.   Were you and your wife living in

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 47 of 167

1    Reston, Virginia, at this time?

2         A.    We were in Centerville, which was

3    ten or 15 minutes down the road.

4         Q.    What was your position at Jasmine

5    Cafe?

6         A.    Sous-chef.

7         Q.    Was that a salaried position?

8         A.    Yes.

9         Q.    And do you recall the annual pay

10   for the position?

11        A.    I think, to the best of my

12   knowledge, I think it was 36 a year.

13        Q.    36,000?

14        A.    Yes.

15        Q.    To the best of your knowledge,

16   which year would you have worked at the

17   Jasmine Cafe?

18        A.    I guess that had to be starting

19   maybe '96-'97.

20        Q.    And how many sous-chefs were

21   there?

22        A.    Two.

23        Q.    Were you equal to the other

24   sous-chef?

25        A.    Equal, yes.

1    Q.    What specifically were your duties
2  at Jasmine Cafe?
3    A.    Between Eric and myself, we
4  completed all food production.
5    Q.    Would that include overseeing the
6  general operation of the cafe or restaurant
7  portion of the building?
8    A.    At Jasmine it was unique.  We
9  really took care of just food production
10  alone.  The owner took care of pretty much
11  everything else.
12    Q.    Were there any employees under you
13  who reported to you as sous-chef?
14    A.    It was a fairly small restaurant.
15  We had, I think, one or two in the salad
16  department, and one or two dishwashers.
17  And they reported to Eduardo, the owner.
18  Because of the language barrier we -- they
19  were straight off the boat.
20    Q.    Okay.  How many hours did you work
21  per week on average at Jasmine?
22    A.    Well, the good thing about Jasmine
23  was we did four days on and three days off.
24  So we only worked out of a seven-day work
25  week was only four days.

1       Q.   Okay.  And on average how many

2   hours did you work per week?

3       A.   No more than 45.  It was nice.  It

4   was a good job.

5       Q.   And how long were you at

6   Jasmine's, to the best of your knowledge?

7       A.   Just over a year.

8       Q.   And why did you leave?

9       A.   The place got too small.  It was

10  just a very, very small restaurant.  I

11  mean, we were doing really, really nice

12  food.  That and the owner was a little bit

13  quirky.  He was originally an F & B

14  director, food and beverage director, that

15  all of a sudden he wanted to become a chef.

16      Q.   At the time you accepted the

17  position of sous-chef, did you understand

18  that you would be required to work more

19  than 40 hours, but that you would not be

20  paid any overtime pay for hours worked in

21  excess of 40?

22      A.   Yes.

23      Q.   And is it, in fact, true that you

24  were not paid for hours worked in excess of

25  40 at Jasmine's?

1       A.   Correct.

2       Q.   What was the next position that

3    you held after Jasmine Cafe?

4       A.   Went to work for a restaurant

5    group called Clyde's in the Reston Town

6    Center.

7       Q.   And what was your position there?

8       A.   Sous-chef.

9       Q.   And what -- how many sous-chefs

10   were there?

11      A.   Five.

12      Q.   All right.  Roughly how many

13   employees were there in the kitchen itself?

14      A.   Anywhere between 40 and 50.

15      Q.   And how many employees reported to

16   you?

17      A.   Sixteen.

18      Q.   And is it fair to say that you

19   supervised those 16 employees?

20      A.   Yes.

21      Q.   Is it fair to say that you

22   scheduled their work hours?

23      A.   Yes.

24      Q.   Did you hire some of those

25   employees?

1    A.    Yes.

2    Q.    Did you discipline some of those

3  employees?

4    A.    Yes.

5    Q.    Did you fire some of those

6  employees?

7    A.    Yes.

8    Q.    Did you evaluate those employees?

9    A.    Yes.

10    Q.    Is it fair to say that you were in

11  a management position as the sous-chef?

12    A.    At Clyde's?

13    Q.    Yes, sir.

14    A.    Correct.

15    Q.    All right.  In the hierarchy of

16  sous-chefs, where did you rank since there

17  were five of them?

18    A.    At the time of coming on-board, I

19  would have ranked number five, obviously

20  being the new employee.  Which entailed

21  being the closer of the restaurant, which

22  was kind of the worst shift.  And within a

23  three-month period I had gone from being

24  closer to opener, which is one of the

25  premier shifts.  And so I think quickly I

1    worked my way towards being one of the more

2    recognized sous-chefs in the kitchen.

3        Q.   And would you say that occurred

4    because of your abilities as an employee?

5        A.   Yes.

6        Q.   And would you consider that to

7    have occurred in part because of your

8    management skills?

9        A.   Well, when I first came on-board

10   with Clyde's, before I even stepped into

11   the kitchen we were all sent down -- all

12   the new employees were sent to a management

13   training center for a ten-day period. So

14   they instilled all the Clyde's type

15   functions into you, what to do and how to

16   follow. So, yes, they had a good system in

17   place for us to follow.

18       Q.   Did you say a ten-day training

19   period?

20       A.   Yes, sir.

21       Q.   And the purpose of this training

22   period was what again?

23       A.   Just for all of us to be aware --

24   they had all, you know, the manuals in

25   place of -- well, the procedures that

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 53 of 167

1    Clyde's followed.

2         Q.    Policies and procedures --

3         A.    Yes.

4         Q.    -- for Clyde's Restaurants?

5         A.    Uh-huh.

6         Q.    And one of the things they taught

7    you was how to implement those policies and

8    procedures; is that right?

9         A.    Yes.  And how to follow them, yes.

10        Q.    How to follow them?

11        A.    Uh-huh.

12        Q.    And is it fair to say that the

13   training period was basically to help you

14   be a better manager?

15        A.    Yes.

16        Q.    Did it have anything to do with

17   how to cook food as a sous-chef?

18        A.    The job itself?

19        Q.    Yes, this training period?

20        A.    No.

21        Q.    Okay.  It focused solely on

22   management; is that fair?

23        A.    Yes.  And the history of Clyde's.

24        Q.    Okay.  All right.  How much did

25   that position pay to your knowledge?

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 54 of 167

1      A.    That was 32 a year.

2      Q.    And was it salaried?

3      A.    Yes.

4      Q.    And you talked about working your

5  way up.  When you started at the

6  restaurant, how many hours per week did you

7  work roughly as the closer?

8      A.    Probably around 45-plus.

9      Q.    And how many hours did you work --

10  well, let me rephrase that.

11          When you say "45-plus," what would

12  be the outer limits as best as you can

13  recall?

14      A.    Anywhere from 52 to -- up to 55

15  maybe max.

16      Q.    Okay.  Would you say that your

17  average work week ranged from 52 to 55

18  hours?

19      A.    Probably averaged about 50.

20      Q.    Fifty average?  Okay.  And this

21  was a salaried position, so like the other

22  positions -- let me rephrase that.

23          Were you paid for time worked in

24  excess of 40 hours while at Clyde's?

25      A.    No.

1    ⁻    Q.    Okay.    And when you took the job

2    at Clyde's, did you understand that you

3    would be required to work more than 40

4    hours?

5         A.    Yes.

6         Q.    And when you took the job at

7    Clyde's, did you understand that if you

8    worked in excess of 40 hours, you would not

9    be paid overtime for those hours worked

10   since you were a salaried employee?

11        A.    Yes.

12        Q.    Did you ever complain to anyone at

13   Clyde's that you were working hours in

14   excess of 40 hours per week, but you were

15   not being paid overtime for those hours

16   worked?

17        A.    No.    We had a lot of incentives at

18   Clyde's.

19        Q.    All right.    The answer to my

20   question is no; correct?

21        A.    Correct.

22        Q.    Do you recall the name of your

23   supervisor at Clyde's Restaurant?

24        A.    His first name was Paul.    I can't

25   remember his surname right offhand.    There

1   looking for a salary between 30- and

2   $35,000; is that right?

3       A.  Yes.

4       Q.  You talked about, according to

5   you, the five-day work week with some odd

6   Saturdays.  Did you talk specifically about

7   hours?

8       A.  Dennis did state that the company

9   itself, being Aramark, does not like to

10  work its salaried people any more than 50

11  hours a week.  That was stated at the

12  interview.

13      Q.  So is it fair to say that at the

14  very first interview you had with Dennis

15  Mann, you discussed the fact that your

16  average work week might be 50 hours per

17  week?

18      A.  Up to, yes.

19      Q.  Did Mr. Mann ever -- did Mr. Mann

20  ever tell you that your work week would

21  never exceed 50 hours?

22      A.  No, I don't think he did.

23      Q.  And having worked for years in the

24  dining or food-service industry, if you

25  will, you understood that as a sous-chef

1   your hours could in any given week exceed

2   50, didn't you?

3       A.   Yes.

4       Q.   Did you talk with Mr. Mann about

5   if you worked in excess of 40 hours, as a

6   salaried employee you expected to be paid

7   overtime pay for hours worked in excess of

8   40 hours?

9       A.   I mean, see, that's -- that's a

10  gray area.  That's the thing in the

11  business, you know, it's -- it's a hard --

12  hard question to answer, I mean, it's such

13  a gray area.

14      Q.   Let me try it again.  To the best

15  of your recollection did you say to

16  Mr. Mann, "You have now told me that my

17  average work week could be 50 hours"?

18      A.   Uh-huh.

19      Q.   "I want to tell you that if I work

20  in excess of 40 hours, I expect to be paid

21  overtime pay for anything worked in excess

22  of 40 hours."  Did you have any such

23  conversations with Mr. Mann?

24      A.   No.

25      Q.   Is it fair to say that you

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 58 of 167

1  understood when you first interviewed with

2  Mr. Mann, that if you took the position as

3  a salaried sous-chef at Aramark, you would

4  not been paid for time worked in excess of

5  40 hours per week?

6      A.   Yes.

7      Q.   Is it fair to say that in your

8  first interview with Mr. Mann, you never

9  raised the issue of being paid for hours

10 worked in excess of 40, other than on a

11 salaried basis?

12     A.   Can you repeat that, please.

13     Q.   When you first interviewed with

14 Mr. Mann, did you ever discuss with him

15 that you expected to be paid for hours

16 worked in excess of 40 hours per week, even

17 though you would be a salaried sous-chef?

18     A.   No.

19     Q.   At some later time before you took

20 the position, did you have such a

21 discussion with Mr. Mann?

22     A.   On working beyond 40 hours a week?

23     Q.   No.  Being paid overtime pay for

24 any hours worked in excess of 40 hours per

25 week, even though you would be a salaried

1    sous-chef?

2         A.    No.   He told me -- no.

3         Q.    Okay.   And based on your previous

4    employment as you've testified here

5    today, --

6         A.    Uh-huh.

7         Q.    -- the position at Aramark in

8    terms of being paid as a salaried

9    sous-chef, and not being paid for hours

10   worked in excess of 40, was consistent with

11   your previous employment; correct?

12        A.    No.   I mean at Clyde's if you

13   worked over and above, they would give you

14   days off in lieu.   I mean it just depends

15   on where you worked.

16        Q.    You've already testified that

17   Clyde's never paid you overtime pay --

18        A.    Correct.

19        Q.    -- for hours worked in excess of

20   40 hours per week; correct?

21        A.    Right.   But the way I'm

22   understanding your question -- if you can

23   repeat it one more time, I might get it.

24        Q.    I'll try it again.   I'm trying to

25   understand whether you ever raised with

1    Dennis Mann before you took the position as

2    a salaried sous-chef, that if you worked

3    more than 40 hours per week, you expected

4    to be paid overtime pay for any hours

5    worked in excess of 40 per week?

6         A.    No.

7         Q.    Okay.  Did you ever raise that

8    issue with anyone else at Aramark before

9    you took the position of salaried

10   sous-chef?

11        A.    No.

12        Q.    Okay.  Is it fair to say that at

13   the time you took the position, based on

14   your past employment positions as a

15   salaried sous-chef, --

16        A.    Uh-huh.

17        Q.    -- you understood that if you

18   worked in excess of 40 hours per week as a

19   salaried employee at Aramark in the

20   sous-chef position, you would not be paid

21   overtime pay for hours worked in excess of

22   40 hours per week?

23        A.    Yes.

24        Q.    Okay.  Prior -- let me back up.

25              What happened next after this

1 interview that you had with Mr. Mann?

2     A.    Dennis contacted me by phone. I

3 think it was two days later we spoke on the

4 phone. Stated that the job is mine if I'm

5 still interested. Told me the salary.

6 Told me the job was still open, and I

7 accepted over the phone.

8     Q.    Was that the very first

9 conversation you had had with Mr. Mann

10 since your initial interview with him?

11     A.    Yes.

12     Q.    Okay. Had anyone else from

13 Aramark called you between the time of your

14 initial interview and the phone call you

15 received from Mr. Mann?

16     A.    To my best recollection, no.

17     Q.    Did you have discussions with

18 anyone else at Aramark, other than Dennis

19 Mann, about the sous-chef position before

20 you accepted it?

21     A.    No.

22     Q.    Okay. What did Dennis Mann relate

23 to you about his expectations of you as a

24 sous-chef, in terms of fulfilling

25 supervisory or management functions?

1      -   A.    Most of the conversation --

2              MS. OSMENT:   I object as to form

3      of that question.

4              BY MR. BROWN:

5         Q.    You can answer.   You can answer.

6         A.    Most of the conversation at the

7      interview entailed talking about the new

8      account more so than anything, on Aramark

9      landing the account.   The discussion

10     talking about bringing -- well, actually

11     the decision was made that catering was

12     going to be coming out of the Friday

13     Center.   That my employment would be from

14     the Friday Center.   Mainly just stuff like

15     that was what the interview was about.

16        Q.    Did Dennis Mann say to you that he

17     expected you to be second in charge in

18     terms of the kitchen?

19        A.    Yes.   Sous-chef means under, so I

20     was to be under Dennis Mann.

21        Q.    Okay.   And did he say to you that

22     "I expect you to be in charge of the

23     kitchen in my absence"?

24        A.    I can't recall.

25        Q.    Did you understand that you would

1  be in charge of the kitchen in Dennis

2  Mann's absence?

3      A.  At the time I was just happy to

4  get the job.  I mean you can repeat that

5  again.  I'm really....

6      Q.  During the course of your

7  employment with Aramark, --

8      A.  Uh-huh.

9      Q.  -- if Dennis Mann was absent, who

10  was in charge of the kitchen?

11      A.  Any of the decisions were made by

12  Bill LaFrankie.

13      Q.  If Dennis Mann were absent, --

14      A.  Right.

15      Q.  -- who was in charge of food

16  production in the kitchen itself?

17      A.  I was.

18      Q.  You did not apply to Aramark

19  simply to cook food, did you?

20      A.  No.

21      Q.  And you applied to Aramark to put

22  the management skills that you had garnered

23  over the course of your career to work,

24  didn't you?

25      A.  Yes.

1   LaFrankie on the excessive hours and work

2   load.

3        Q.    Listen to my question again.

4        A.    Right.

5        Q.    My question is, during the time

6   you were employed at Aramark, did you

7   complain to anyone at Aramark that you were

8   working hours in excess of 40 hours per

9   week, but that you were not being paid

10  overtime for hours worked in excess of 40

11  hours per week?

12       A.    No.

13       Q.    Is that a no?

14       A.    No.

15       Q.    Okay.  Is it fair to say that any

16  complaints you made about your work load

17  during the time you were employed at

18  Aramark, related to the number of hours

19  that you were working and not the failure

20  to be paid for hours worked in excess of

21  40?

22       A.    Repeat that, please.

23       Q.    Is it fair to say that while you

24  were employed with Aramark, the complaints

25  that you gave to Bill LaFrankie or Dennis

1    Mann related to the fact that you were

2    working hours in excess of 40 hours per

3    week or that you were working an excessive

4    number of hours, not that you were not

5    being paid for any hours that you worked in

6    excess of 40?

7            MS. OSMENT:  Objection.

8            BY MR. BROWN:

9        Q.    You can answer.

10       A.    My complaint was the massive work

11   load and hours that I was working over and

12   above what Dennis told me that position

13   detailed.

14       Q.    Okay.  So you complained about

15   hours worked, and not failure to be paid

16   for hours worked; is that correct?

17       A.    Correct.

18       Q.    Okay.

19            MS. OSMENT:  Same objection.

20            MR. BROWN:  What's the basis for

21   the objection again?

22            MS. OSMENT:  I think the objection

23   [sic] assumes things.  It assumes that

24   there's a distinction between complaining

25   about the number of overtime hours that

1    my question still truthful?

2          A.    Yes.

3          Q.    Okay.  Were you ever provided a

4    job description at any of your previous

5    places of employment, a written job

6    description to the best of your

7    recollection?

8          A.    I would say out of the jobs that

9    we've discussed today, probably two or

10   three.

11         Q.    Were you ever provided a written

12   job description at Aramark for the

13   sous-chef position?

14         A.    No.

15         Q.    Well let me just rephrase that.

16   Did the Friday Center where you worked have

17   about ten employees when you started in

18   July of 2001?

19         A.    I would say that would be correct.

20         Q.    And those would have been ten

21   employees who worked in the kitchen; is

22   that right?

23         A.    Yes.

24         Q.    All right.  And other than

25   yourself and Dennis Mann, you would agree

1    with me, I take it, that there would have

2    been eight other employees who worked in

3    the kitchen when you started there?

4         A.   Yes.

5         Q.   Can you give me, as best as you

6    can recall, the positions of those

7    employees, the titles of their positions?

8         A.   When I first arrived, there was,

9    to the best of my knowledge, two line

10   cooks.   Three to four in the dish station.

11   I think there was two in pantry, and maybe

12   one to two -- at least one full time and

13   maybe one part time in the bakery

14   department.   And one receiving clerk.

15        Q.   Is it fair to say that all of

16   these positions were subordinate to your

17   position as sous-chef?

18        A.   Yes.   I would say yes.

19        Q.   Is it fair to say that all of

20   these positions that you just named,

21   reported to you or to Dennis Mann as being

22   in charge of the kitchen?

23        A.   This is prior to me taking the

24   job, or this is my first day on the job?

25        Q.   This is during the time of your

1    employment there?

2         A.   Oh, no, no one reported to me at

3    all.

4         Q.   To whom did these eight

5    individuals report?

6         A.   Dennis.

7         Q.   If Dennis Mann were not present,

8    to whom did these eight individuals report

9    in the kitchen?

10        A.   In the kitchen, depending on the

11   severity of the problem, if it was a major

12   complaint it would have went either through

13   Julio or to Bill LaFrankie.  If it was

14   something that was very simple, you know,

15   either Matt or myself or whoever else in

16   the kitchen would work out the problem.

17        Q.   When Dennis Mann was not present

18   in the kitchen, in terms of hierarchy, who

19   was the highest ranking employee in the

20   kitchen?

21        A.   I mean we all worked as a team.

22        Q.   Isn't it true that you would have

23   been the highest ranking employee in Dennis

24   Mann's absence?

25        A.   Yes.

1    Q.   And if the line cooks had an issue

2 in the kitchen when Dennis Mann was absent,

3 they were to come to you to have that issue

4 resolved; correct?

5    A.   If there was any issues, then we

6 all worked them out I mean.   I was a line

7 cook, too, I mean.

8    Q.   You didn't have the title of line

9 cook, did you?

10   A.   No.

11   Q.   Okay.   And you had two line cooks

12 under you; correct?

13   A.   When I first came on-board, yes,

14 there was two.   And then it dropped down to

15 one.

16   Q.   Okay.   And if the dishwashers had

17 an issue about some problem in the kitchen,

18 if Dennis Mann was not present they were to

19 come to you; correct?

20   A.   Most times they would have gone to

21 Julio, because he had the most experience

22 dealing with the Friday Center.

23   Q.   What was Julio's position?

24   A.   He was an hourly room supervisor.

25   Q.   And he was not technically in the

1      Q.    If he was not there, --

2      A.    I never came across that

3  situation.

4      Q.    Is it your testimony that during

5  the entire time you were employed at

6  Aramark, there was never a time when Dennis

7  Mann was gone and you were not left in

8  charge of the kitchen by yourself?

9      A.    In the time I was there, he might

10  have been gone three to four days.  But in

11  those these to four days, I recall no

12  problems occurring.

13      Q.    If problems had occurred, --

14      A.    Right.

15      Q.    -- is it your understanding that

16  the people subordinate to you were to bring

17  their problem to you first if it related to

18  a matter in the kitchen?

19      MS. OSMENT:  Objection, based on

20  it calls for speculation.

21      MR. BROWN:  I asked him his

22  understanding.

23      BY MR. BROWN:

24      Q.    You can answer.

25      A.    My understanding in the job that I

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 71 of 167

1  any candidates who was being considered for

2  a position in the kitchen?

3      A.   To the best of my recollection,

4  no.

5      Q.   Is it your testimony that you've

6  never interviewed anyone who was hired in

7  the kitchen during your employment with

8  Aramark?

9      A.   No.  Formal interviews, no.

10     Q.   How about informal interviews?

11     A.   No.

12     Q.   Okay.  Did you participate in

13 counseling sessions with employees at

14 Aramark during the time you were employed

15 there?

16     A.   Yes.

17     Q.   Tell me the names of the employees

18 you counseled or were involved in

19 counseling sessions with?

20     A.   The one that I do recall is C.C.

21 Tann.  I was probably two to three weeks

22 into my new job, Dennis asked me to sit in

23 on a counseling session of this employee.

24 That was pretty much it.

25     Q.   And how many counseling sessions

1  understood it.

2      A.    Can you repeat that, please.

3      Q.    The eight employees that you

4  mentioned earlier who --

5      A.    Uh-huh.

6      Q.    -- reported to either you or

7  Dennis Mann -

8          MS. OSMENT:  Objection.

9      Q.    -- were they all hourly employees

10  to the best of your knowledge?

11     A.    Yes.

12          BY MR. BROWN:

13     Q.    Okay.  To the best of your

14  knowledge was an hourly employee ever

15  permitted to sit in on a counseling session

16  with another employee?

17     A.    No, I can't recollect.

18     Q.    Okay.  And isn't it true that

19  Dennis Mann spoke with you in advance of

20  the counseling session with C.C. Tann to

21  get your input?

22     A.    I can't recollect that either.  I

23  mean, like I said, there was already two

24  counseling sessions in place before I

25  arrived.

1      Q.    With respect to the counseling

2   session that you sat in on, --

3      A.    Right.

4      Q.    -- did Dennis Mann tell you before

5   that counseling session what he intended to

6   do and sought your input?

7      A.    I think he told me what to do, yes

8   -- what he was about to do.

9      Q.    And did he seek your input?

10      A.    I can't recall.

11      Q.    Did you sit in on the termination

12   of C.C. Tann?

13      A.    Yes, that was the third.

14      Q.    To your knowledge, was any other

15   hourly employee in the kitchen permitted to

16   sit in on the termination of other

17   employees?

18      A.    I'm not sure on the logistics

19   there.   I just know it was just Dennis and

20   myself at the time.   I'm not sure -- not

21   sure.

22      Q.    You can't recall another hourly

23   employee who sat in on terminations.   Is

24   that a fair statement?

25      A.    I don't know what the policy was

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 74 of 167

1  at Aramark.

2      Q.    I didn't ask you about the policy.

3  I asked you whether you can recall another

4  hourly employee who had sat in on any

5  termination of a fellow employee?

6      A.    No, I cannot recall.

7      Q.    Okay.  Isn't it true that you

8  participated in the evaluations of other

9  employees?

10     A.    No.

11     Q.    Okay.  Do you know an individual

12  by the name of Joyce Russell?

13     A.    Yes.

14     Q.    Was she counseled or evaluated or

15  terminated during the course of your

16  employment at Aramark?

17     A.    I think she was counseled once.

18     Q.    And what role did you play in her

19  counseling?

20     A.    I really can't remember.  I know I

21  was present.

22     Q.    You were present at Joyce

23  Russell's counseling session; is that your

24  testimony?

25     A.    For a very -- yes, for a very

1    brief time.

2         Q.   Okay.  And was she terminated

3    during your employment with Aramark?

4         A.   No.

5         Q.   Did she resign during the course

6    of your employment with Aramark?

7         A.   I think she just -- yes, just took

8    it upon herself not to show up for work.

9         Q.   What statements had you made to

10   Joyce Russell about her performance or lack

11   thereof?

12        MS. OSMENT:  Statements when?

13        BY MR. BROWN:

14        Q.   During the time he was employed at

15   Aramark?

16        A.   I had nothing really to do with

17   the bakery department at all.  That was

18   taken care of by Joyce.

19        Q.   Did you ever make any statements

20   to Joyce Russell about her lack of

21   performance or her performance while you

22   were employed at Aramark?

23        A.   There was one instance that Joyce

24   and I had a run-in.

25        Q.   Tell me about that.

1    _    A.    No.

2         Q.    All right.  Did you know an

3    employee by the name of Donna Baldwin when

4    you were employed at Aramark?

5         A.    Uh-huh.  Yes.

6         Q.    And what position did she hold?

7         A.    She worked in the pantry.

8         Q.    Were you ever involved in a

9    counseling session or a disciplinary

10   session with Ms. Baldwin?

11        A.    Nothing formal, no.

12        Q.    Were you involved in an informal

13   counseling session with Ms. Baldwin?

14        A.    I was -- I sat in the back one

15   time and had a discussion with Donna, you

16   know, just as friends and stuff.  And just

17   stated to her, you know, if she doesn't --

18   if she continues down this path of not

19   showing up for work and stuff, that she --

20   you know, Dennis will fire her -- she will

21   be fired by Dennis if she does not continue

22   -- if she continues not showing up for work

23   and stuff.

24             And I was in another very informal

25   one with Dennis, myself, and Donna was

1  right there in the middle of the kitchen in

2  front of all employees, where Dennis was

3  just telling her the correct protocol to go

4  through if she wants -- you know, to take

5  the day off.  Obviously to call in and all

6  that kind of stuff.

7       Q.   All right.  Is it fair to say that

8  you counseled Donna Baldwin on the correct

9  procedure to follow if she were going to be

10 absent from work?

11      A.   As a friend, yes, in the back.  It

12 was a very informal setting.  There was no

13 other people present.

14      Q.   Well, are you saying that you

15 counseled her as a friend but not in your

16 capacity as a sous-chef?

17      A.   More so, yes.

18      Q.   Were you not a sous-chef at the

19 time you counseled her?

20      A.   That was my position, yes.

21      Q.   And was this not during employment

22 hours?

23      A.   Yes.

24      Q.   Why did you counsel Donna Baldwin?

25      A.   I worked with these people day in

1    and day out, side by side, shoulder to

2    shoulder.  I mean a lot -- I mean, I had a

3    good relationship with most of the people

4    in the kitchen.

5         Q.   To your knowledge, did any other

6    employee in the kitchen undertake to

7    counsel Donna Baldwin on the correct

8    procedures to follow if she were going to

9    be absent from work?

10        A.   Dennis.

11        Q.   Anyone other than yourself and

12   Dennis Mann to your knowledge?

13        A.   No.

14        Q.   And you said you were involved in

15   two counseling sessions with Donna Baldwin;

16   correct?

17        A.   Yes.

18        Q.   One that dealt with absences and

19   the other dealt with what again, I'm sorry?

20        A.   I think they were both based on

21   the same action.

22        Q.   Was Donna subsequently terminated?

23        A.   She left -- I think she never

24   showed up for work.  She left on her own

25   accord.

1    Q.    During the time you worked at
2    Aramark, did you know an employee by the
3    name of Barry Morrow?
4         A.    Yes.
5         Q.    What was his position?
6         A.    He was a receiving clerk.
7         Q.    And were you involved in any
8    disciplinary action or counseling sessions
9    regarding Mr. Morrow?
10        A.    Not that I can recall, no.
11        Q.    Would you agree with me that the
12   counseling by yourself of another employee
13   would be a management function?
14        A.    Only one instance with Donna, and
15   that was just common sense.
16        Q.    Would you agree with me that your
17   counseling of another employee would be a
18   management function?
19        A.    No.
20        Q.    What type of function would it be
21   if not a management function?
22        A.    I liked her.  She did a great job.
23   I didn't want to see her get terminated.
24        Q.    As sous-chef since you counseled
25   her, --

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 80 of 167

1     A.    Uh-huh.

2     Q.    -- is it fair to say that you

3  understood you had the authority to counsel

4  other employees?

5     A.    Yeah.  In a sous-chef capacity,

6  yes.

7     Q.    To your knowledge, did any

8  employee in the kitchen under you and

9  Dennis Mann have the authority to counsel

10  other employees?

11     A.    No.

12     Q.    Okay.  And would you agree with me

13  that if Dennis Mann were absent, and the

14  need for the counseling of an employee in

15  the kitchen arose, you would be expected to

16  perform that function?

17     A.    No.  I would need to go and -- if

18  anything major arose, I would need to get

19  Bill LaFrankie's advice.

20     Q.    When you counseled Donna Baldwin,

21  did you get Bill LaFrankie's advice?

22     A.    No.

23     Q.    When you counseled Joyce Russell,

24  did you get Bill LaFrankie's advice?

25     A.    I never counseled Joyce.

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 81 of 167

1    poor one.  I apologize.

2            If a customer --

3        A.    I had no customer contact.

4        Q.    Let me finish.  If a customer, for

5    example, someone ordering food through the

6    serving line, had a customer complaint and

7    Bill -- and Dennis Mann were absent, who

8    was supposed to handle that complaint?

9        A.    Either myself or Matt.

10       Q.    Okay.  And between you and Matt,

11   who had the higher ranking position?

12       A.    Myself.

13       Q.    And if a final decision needed to

14   be made on that customer complaint, were

15   you the one with the final say-so in Dennis

16   Mann's absence?

17       A.    Repeat that, please.

18       Q.    If a customer had a complaint and

19   Dennis Mann were absent, did you have the

20   final authority with respect to handling a

21   customer complaint about the kitchen?

22           MS. OSMENT:  Objection, based on

23   speculation that anyone handled any

24   customer complaints about anything.

25           BY MR. BROWN:

1       Q.  You can answer that question.

2          MR. BROWN:  I will again ask you

3    to please abide by the local Rules for the

4    Middle District with respect to speaking

5    objections.

6          BY MR. BROWN:

7       Q.  You can answer it.

8       A.  Yes.

9       Q.  Were you ever involved in the

10   payment of any bills originating in the

11   kitchen?

12      A.  No.

13      Q.  Okay.  Were you involved in the

14   ordering of inventory for the kitchen?

15      A.  Produce.

16      Q.  Okay.  You were responsible for

17   ordering produce for the kitchen; is that

18   right?

19      A.  Correct.

20      Q.  Okay.  And did you hold that

21   responsibility irrespective of whether

22   Dennis Mann was present?

23      A.  Yes.

24         (DEFENDANT'S EXHIBIT NO. 2 MARKED

25   FOR IDENTIFICATION.)

1          -          BY MR. BROWN:

2          Q.    Okay.  I want to show you what's

3     been marked as Defendant's Exhibit No. 2,

4     and ask you if you can identify that for

5     me?

6          A.    (Witness reviews document.)  What

7     would you like?

8          Q.    Can you identify that document for

9     me, tell me what it is?

10         A.    It's the issuance of a smart-key

11    for the back door of the Friday Center.

12         Q.    Is that your signature on that

13    document under receiver of keys?

14         A.    Yes.

15         Q.    All right.  And did you, in fact,

16    sign this document on or about May 2, 2001?

17         A.    Yes.

18         Q.    Is that your Social Security

19    number on that document?

20         A.    Yes.

21         Q.    And what were these keys -- well,

22    let me rephrase that.

23              Who had keys to the building to

24    your knowledge?

25         A.    Myself, Dennis, Desmond Scott,

1    -   A.    I had no management function.

2        Q.    That's your contention; correct?

3        A.    Yes.

4        Q.    Is it fair to say that in the

5   absence of Bill LaFrankie -- let me

6   rephrase that.

7            Is it fair to say that in the

8   absence of Dennis Mann, you were

9   responsible for the day-to-day operations

10   of the kitchen?

11       A.    Dennis Mann not being there, yes,

12   I was the most experienced.

13       Q.    And therefore, just so I'm clear,

14   since you were the most experienced, in the

15   absence of Dennis Mann you were responsible

16   for the day-to-day operations of the

17   kitchen; correct?

18       A.    I mean it would depend on the

19   severity of the problem.

20       Q.    No.   I'm not talking about a

21   problem.   I'm simply talking about the

22   day-to-day operations of the kitchen?

23       A.    The kitchen ran itself I mean.

24       Q.    I'll try this again.   And this is

25   the last time I'll ask you.

1  worked in the kitchen while you were at

2  Aramark?

3      A.   No, sir.

4      Q.   Who scheduled that?

5      A.   When I first arrived, Julio kind

6  of took care of that.  And then I think it

7  might have been in the 6th or 7th month,

8  Dennis started taking control of that.

9      Q.   And were you involved in any way

10 at all in scheduling the work week for the

11 eight employees who worked under you and

12 Dennis Mann?

13     A.   That was taken care of by Dennis.

14     Q.   Okay.  Were there meetings known

15 as BEO meetings during your time at

16 Aramark?

17     A.   Yes.

18     Q.   Okay.  Tell me what those were.

19     A.   They were banquet event orders.

20 The meetings main function were to organize

21 the upcoming events and prepare ourselves

22 for them.

23     Q.   Okay.  To your knowledge, were

24 only management employees invited to those

25 meetings?

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 86 of 167

1    for directing food production and

2    presenting the food to any guest or

3    customers as Bill -- I'm sorry -- as Dennis

4    Mann directed you to do so?

5          MS. OSMENT: Same objection.

6          BY MR. BROWN:

7      Q.   You can answer it.

8      A.   Yes.

9      Q.   Did you have the responsibility

10   for supervising the daily food production

11   operations?

12      A.   No.  That still fell under Dennis.

13      Q.   Did you have a responsibility for

14   assisting Dennis Mann with the daily food

15   production operations?

16      A.   Yes.

17      Q.   Okay.  And what percentage of your

18   time would have been spent on a given day

19   in food production operations?

20      A.   A good 95 percent.

21      Q.   Okay.  Would you have been

22   responsible for requisitioning food or

23   supplies from the various vendors who

24   served the account?

25      A.   You mean purchasing products?

1    -   Q.   Okay.  I'll use your

2    clarification, your terminology.

3         A.   Produce.

4         Q.   Produce?

5         A.   Yes.

6         Q.   You would have been responsible

7    for securing the produce for the kitchen;

8    is that right?

9         A.   Still over on Dennis's -- I was

10   working under him, yes.

11        Q.   Okay.  But that would have been

12   your responsibility separate from what

13   Dennis would have done; is that fair?

14        A.   Yes.

15        Q.   Okay.  Were you responsible for

16   compliance with the various policies and

17   procedures that Aramark had in place?

18        A.   I was never shown any policies or

19   anything really in effect.  It was a new

20   account, and it was just -- just a lot --

21   just a huge work load.  So I really never

22   had a chance to -- for anybody to show me

23   anything like that at all.

24        Q.   As you worked at Aramark, did you

25   come to understand what some of the

1    A.    I produced the food.    The

2   expectations came from higher up.    I mean,

3   I was just there to produce a certain menu.

4        Q.    One last question.    During the

5   lunch break, did you and your lawyer talk

6   about your testimony this morning and what

7   you are going to testify about this

8   afternoon?

9        A.    No.    I had a curry sandwich that's

10  kind of repeating on me a little bit now.

11       Q.    Is the answer to my question no?

12       A.    No.

13       Q.    Thank you.

14            MR. BROWN:    I'll pass the witness,

15  and reserve questioning subject to your

16  questions.

17            MS. OSMENT:    Very good.

18                 CROSS-EXAMINATION

19            BY MS. OSMENT:

20       Q.    Mr. McCullough, would you please

21  describe your working day when you were

22  employed at Aramark, any, you know, given

23  day?

24       A.    Depending on business, it could be

25  anywhere from a 5 a.m. start to a 7 a.m.

1   start. I'd walk in the door. Go straight

2   to the hot line. Turn all the equipment on

3   to get ready for that day's business. I

4   would go to the board where all the BEOs

5   had been placed the night before by Dennis,

6   to figure out what I needed to do to get

7   the production up and running.

8            First and foremost was always the

9   Friday Center, because that was our largest

10  volume. So I would have the menu in place

11  for that day, and go ahead and start

12  pulling all the food out of the coolers.

13           If it was an early start for me,

14  then I would wait for Matt to come in. And

15  then we'd work on the menu together,

16  producing the food that was on the menu

17  that was placed in front of us. And we

18  would just go about producing that food for

19  the day.

20       Q.   A moment ago when you talked with

21  Mr. Brown about food operations, do you

22  remember that?

23       A.   (No verbal response.)

24       Q.   What did you think he meant by the

25  use of the phrase "food operations"?

Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 90 of 167

1          -          MR. BROWN: Objection. Objection

2     to the form.

3                THE WITNESS: I'm not sure either.

4     With the whole -- just the running of the

5     kitchen, or with just the production of the

6     food?

7                BY MS. OSMENT:

8          Q.   If you were to say you spent 90 to

9     95 percent of your time on food operations,

10    what would you mean by that?

11         A.   That was preparing the product,

12    turning it into the food, preparing the

13    food.

14         Q.   And do you equate preparing food

15    with what Mr. Brown called food production

16    and presentation?

17         A.   No.   Basically I was just the food

18    production.   And the presentation, that was

19    taken care of by the front-of-the-house

20    staff.

21         Q.   Okay.

22                MS. OSMENT: Let's go off the

23    record just a second.

24                (DISCUSSION OFF THE RECORD.)

25                MS. OSMENT: Back on the record.

1   items, the menu?

2       Q.   No.   He prepared the menu for the

3   hot food items for the week?

4       A.   Correct.

5       Q.   And isn't it true that you alone

6   had responsibility for ensuring the

7   preparation of menus for other items like

8   vegetables?

9       A.   That would be just based on what

10  the menu was.  I mean if it was a summer

11  squash casserole, we obviously pulled

12  summer squash out of the cooler.

13      Q.   Okay.  What if it was just a

14  steak, who would decide what vegetables

15  went with the steak?

16      A.   That would be on the menu, the

17  description based on -- yeah, just on the

18  menu.

19      Q.   Did you not select the items that

20  went with the hot food entrees that Dennis

21  Mann had already prepared?

22      A.   We would utilize what was in the

23  cooler, yeah.

24      Q.   And that was your decision;

25  correct?

1      A.    Or Matt's, depending on who --

2      Q.    But it wasn't Dennis's decision,

3  was it?

4      MS. OSMENT:  I'll ask you to let

5  him finish his answers, please.

6      MR. BROWN:  He had finished.

7      MS. OSMENT:  No, he had not.

8      BY MR. BROWN:

9      Q.    Answer the question.

10     A.    Like I said, in the cooler the

11  produce was just an inventory of the same

12  produce.

13     Q.    Are you finished?

14     A.    Yeah.

15     Q.    Okay.  You testified earlier that

16  Dennis Mann would leave you the menus at

17  night, didn't you so testify?

18     A.    Yes.

19     Q.    And that when you got in the next

20  morning, you would look at what Dennis had

21  done, and then you would start preparing

22  for that day.  Was that not your testimony?

23     A.    Correct.

24     Q.    All right.  And was Dennis there

25  when you got in in the morning to start

1    preparation for that day?

2        A.    I would say 90 percent of the

3    time, yes.

4        Q.    And so did you then look at the

5    menu based on what Dennis had prepared the

6    night before, and you'd go to Dennis and

7    say "Dennis, tell me what I should prepare

8    with this steak," for example?

9        A.    I might say to him, "With this

10   steak we have some green beans in the

11   cooler, what do you think about that?"  And

12   he'll say, "Yeah, go with the green beans."

13   Or I'd ask Matt, and we would go ahead with

14   production.

15       Q.    But my point is, Dennis didn't

16   write on the menu "Serve --

17       A.    Sometimes --

18       Q.    -- green beans with the steak,"

19   did he?

20       A.    No, it just depended.  Sometimes

21   there would be a certain dish that would

22   complement that steak, and that would be

23   something that Dennis would specifically

24   want to go with it.  And we didn't deviate

25   from that.

1       Q.    As a general rule, Dennis left the

2    selection of the complementary items to

3    you, didn't he?

4       A.    Not all the time.

5       Q.    How much of the time percentage

6    wise?

7       A.    Maybe 20 or 30 percent of it would

8    be our choice.

9       Q.    How much?

10      A.    Maybe 20-30 percent of it would be

11    our choice.

12      Q.    And so the other 70 percent of the

13    time, the items to go with the hot food

14    items would be written on the menu, is that

15    your testimony?

16      A.    Yes.

17      Q.    Is it your contention that you

18    basically didn't move without checking with

19    Dennis Mann?

20      A.    I had a specific function.  I knew

21    what to do and I got it done.

22      Q.    And you got that done without the

23    direction from Dennis Mann; correct?

24      A.    Repeat that, please.

25      Q.    You knew what your job was;

1    brought to Bill LaFrankie's attention.

2        Q.    Well, I thought Bill LaFrankie

3    attended the BEO meetings?

4        A.    Depends on the severity of the

5    problem.  I mean most people can deal with

6    their own problems.

7        Q.    On a routine day-to-day matter

8    that occurred while Dennis Mann was at the

9    BEO meetings, who in the kitchen was

10   ultimately responsible for making the

11   decision?

12       A.    I was too busy producing the food.

13   I mean that was my main function.

14       Q.    Is it your testimony that no one

15   was responsible then?

16       A.    The responsibility fell on Dennis.

17       Q.    And when Dennis was absent, the

18   responsibility fell on you; correct?

19       A.    He was absent very -- not that

20   often.

21       Q.    Regardless --

22       A.    Yes.

23       Q.    -- of how much he was absent, when

24   Dennis Mann was absent, the responsibility

25   for the kitchen fell on you; correct?

1       - A.    Yes.

2         Q.    Okay.

3              MR. BROWN:  That's all I have,

4    subject to what you might have.

5                   RECROSS-EXAMINATION

6              BY MS. OSMENT:

7         Q.    John, what impression did you have

8    about the seriousness that anyone in

9    management displayed in regard to your

10   evaluation?

11        A.    None.

12        Q.    You had no impression, is that

13   what you're saying?  I don't understand

14   your --

15             MR. BROWN:  Objection to the form.

16             MS. OSMENT:  Let me ask it again.

17             BY MS. OSMENT:

18        Q.    What was your impression about the

19   attitude on the part of Aramark's

20   management about the evaluation you were

21   presented with by Bill LaFrankie?

22        A.    I got the impression from Bill

23   that it wasn't that important.

24        Q.    What gave you that impression?

25        A.    The amount of time we spent on it.

ATTACHMENT/EXHIBIT_____D_____

```
 1      IN THE UNITED STATES DISTRICT COURT
    FOR THE MIDDLE DISTRICT OF NORTH CAROLINA
 2            DURHAM DIVISION
    -------------------------------)
 3                                  )
    JOHN McCULLOUGH,                )
 4                                  )
            Plaintiff,              )
 5                                  )
            -vs-                    )  1:02-CV-00992
 6                                  )
    ARAMARK EDUCATIONAL SERVICES, INC., )
 7                                  )
            Defendant.              )
 8                                  )
    -------------------------------)
 9

10

11

12          DEPOSITION OF DENNIS MANN, a witness called

13  on behalf of the Plaintiff, taken pursuant to the

14  Federal Rules of Civil Procedure, before

15  Lisa A. DeGroat, Registered Professional Reporter and

16  Notary Public in and for the State of North Carolina,

17  at Empowerment, Inc., 109 North Graham Street,

18  Chapel Hill, North Carolina, on Wednesday,

19  March 26, 2003, commencing at 1:45 p.m.

20

21

22          AMERICAN COURT REPORTING SERVICES

23              5007 WHITEHORSE ROAD

24         HILLSBOROUGH, NORTH CAROLINA 27278

25                 (919) 932-9136
```

COPY

1    Q.    Where?

2    A.    I made the request.  I wasn't concerned

3    with where she --

4    Q.    Okay.

5    A.    -- placed the ad.

6    Q.    All right.  Did you get a bunch of

7    applications?

8    A.    Yes.

9    Q.    And then what did you do?

10    A.    Began the screening process.

11    Q.    All right.  And after you screened the

12    applications, what did you do?

13    A.    Then I telephoned the potential candidates.

14    Q.    Okay.  Did this process result in hiring

15    John?

16    A.    Yes.

17    Q.    Okay.  We'll just jump to the chase here.

18    A.    Thank you.

19    Q.    So did you have an interview with John?

20    A.    Yes, I did.

21    Q.    Okay.  And what prompted you to offer him

22    the position of sous-chef that you had advertised?

23    A.    I narrowed the search down to three

24    candidates, I think, and John was the most qualified

25    of the three applicants.

1    Q.⁻    Okay.  Did you offer him the job?

2    A.    Not on the first interview.

3    Q.    Okay.  But at some point you offered him

4 the job?

5    A.    Yes.

6    Q.    What was the job that you offered him?

7    A.    The sous-chef position.

8    Q.    Did it have the same duties that it had

9 with C.C. Tann?

10    A.    No, ma'am.

11    Q.    What were the duties that you assigned to

12 the sous-chef position given John McCullough?

13    A.    An addition to supervise the food

14 production.

15    Q.    Now, a moment ago you said C.C. Tann

16 assisted in the production of food?

17    A.    Assisted in -- yes.  He was actually hands

18 on, as was the second sous-chef choice.  Not

19 supervise -- I'm sorry.  I used the word wrong.  No,

20 I did not.  He -- he works and supervises, because

21 there are other cooks on the line as well.

22    Q.    Okay.

23    A.    So he is not only producing food.  He's

24 also supervising the production of the food.

25    Q.    And that was C.C.'s job, as well as the

1  second --

2      A.      Yes.

3      Q.      -- sous-chef?

4      A.      Yes.

5      Q.      Supervises and assists in production?

6      A.      Yes.

7      Q.      What else were John's duties?

8      A.      John was also responsible -- he was the

9  second in command.  If -- if I wasn't there, if a

10 situation arose, he was expected to take control of

11 the situation.  John was responsible for food

12 ordering.

13     Q.      Not just produce?

14     A.      Mainly produce.  Mainly produce.

15     Q.      In the same method that C.C. did it?

16     A.      Yes.

17     Q.      Okay.  All right.  Well, what, in addition

18 to produce, was John responsible for ordering?

19     A.      Well, if we were out of chicken, John would

20 let me know that we were out of chicken.  So he would

21 assist.  In that form he would also assist in the

22 other ordering.

23     Q.      Okay.  What else were his duties?

24     A.      To supervise the entire kitchen.

25     Q.      And what did that entail?

1     A.-     In addition to the line cooks.

2     Q.     What did that entail, supervising the

3 entire kitchen?

4     A.     To ensure each department ran as it should,

5 as efficiently as it could, assisting me with the

6 cost.

7     Q.     What does that mean?

8     A.     The food -- assisting me with watching --

9 keeping track of the food costs and the labor costs.

10    Q.     How did John help you keep track of the

11 food costs?

12    A.     Helped to ensure we didn't waste any food.

13    Q.     What else? I'm -- when I mean what else,

14 how else did he help you ensure -- did he help you

15 keep track of the food costs?

16    A.     Well, made sure that the food we were

17 cooking was cooked properly. You burn a roast --

18 burn a roast, you throw it out; right?

19    Q.     All of the time.

20    A.     That's right. John was supposed to make

21 sure we didn't burn the roast.

22    Q.     Okay.

23    A.     That's about as elementary as I can put it.

24    Q.     Okay. Any other --

25    A.     Yeah. He was -- he was directly

1  responsible for everything in the kitchen if -- if I

2  wasn't there.

3      Q.    Well, I'm actually still on the food costs.

4      A.    You're on the food costs.

5      Q.    You said, not wasting food, making sure the

6  food doesn't have to get thrown out because it's

7  poorly prepared.

8      A.    And making sure that we prepare the correct

9  amount of food.

10     Q.    Anything else?

11     A.    No.

12     Q.    All right.  And then keeping track of labor

13  costs, you said?

14     A.    Yes, ma'am.

15     Q.    How did he help you keep track of labor

16  costs?

17     A.    By making sure that if an employee was

18  about to go into overtime, one of us would take over

19  that position.

20     Q.    John was in charge of their scheduling?

21     A.    Not their scheduling.  However, on the last

22  day of the week if we noticed an employee was going

23  to be in overtime, we could send the employee home

24  and take over their duties.

25     Q.    Who was, "we"?

1    Q.-   Who have you given written job descriptions

2 to?

3    A.     Utility personnel and the stocker and

4 receiver.

5    Q.     No one else?

6    A.     No.

7    Q.     Did John have the authority to send an

8 employee home if they were --

9    A.     Yes, ma'am.

10          MR. BROWN:  Let her finish the question

11 first.

12          THE WITNESS:  I'm sorry.

13          BY MS. OSMENT:

14    Q.     I think you anticipated what it was going

15 to be.

16          If an employee was moving into an overtime

17 situation, had already worked 40 hours in one week,

18 John had the authority to tell that employee to go

19 home?

20    A.     Yes.

21    Q.     Did John tell employees to go home?

22    A.     To the best of my recollection, yes.

23    Q.     Can you give me the names of any employees

24 he ever sent home?

25    A.     No, I cannot.

1  responded that his duties were to supervise and

2  assist in food production. Do you remember that?

3     A.    Yes.

4     Q.    That he was to keep labor costs down?

5         MR. BROWN:  Objection to your --

6     Q.    Do you remember that?

7         MR. BROWN:  -- characterization of his

8  testimony.

9     Q.    Do you remember that?

10        MR. BROWN:  Same objection.

11        THE WITNESS:  Yes.

12        BY MS. OSMENT:

13    Q.    Okay.  That he was -- that he was to help

14 keep food costs -- keep track of food costs?

15    A.    Yes.

16    Q.    Have I forgotten anything that you can

17 recall, that you've already discussed being one of

18 his responsibilities?

19        MR. BROWN:  You've forgotten his testimony

20 about the supervisory responsibilities for the

21 kitchen.

22    Q.    Well, tell me what his supervisory

23 responsibilities for the kitchen were?

24    A.    He was a salaried manager.  In such, he was

25 expected to manage the business.

1    Q.    Tell me what you mean by that?

2    A.    Well, he was expected to produce the food,

3  for not only the Friday Center, supervise the

4  production of the other departments, other than hot

5  food, cold food, deserts.    In conjunction with doing

6  the same thing for Carolina Catering.

7    Q.    Did John have the authority to hire

8  employees?

9    A.    Yes, he did.

10    Q.    Did he hire employees?

11    A.    Not to my knowledge.

12    Q.    Were any employees hired during the period

13  that John was employed by Aramark?

14    A.    Yes.

15    Q.    Who hired them?

16    A.    I hired them.

17    Q.    Did John fire any employees while he was

18  employed by Aramark?

19    A.    No.

20    Q.    Were any employees fired during the period

21  he worked at Aramark?

22    A.    Yes.

23    Q.    Do you recall who they were?

24    A.    C.C. Tann.

25    Q.    Do you know when he was fired?

1    A.⁻    I cannot recall.

2    Q.    Okay.

3    A.    I cannot remember that.

4    Q.    Okay.  Now, a moment ago you mentioned

5  counseling sessions.  Tell me about the counseling

6  sessions that you were referring to?

7    A.    As John being a salaried manager, if there

8  was to be an employee disciplined, there needed to be

9  a witness.  If I needed to discipline an employee,

10 John would be the witness.

11    Q.    Okay.  What role did John play as witness?

12    A.    John was there to witness, to -- he was

13 there to witness the -- the disciplinary process.  I

14 do remember John was vocal.  He did speak out

15 concerning a few things.  It was very open.

16         If he needed to -- I made it very clear to

17 John, if he felt he needed to say something to the

18 employee during the disciplinary procedure, then that

19 was definitely the time to do it.

20    Q.    What -- I want to talk about each

21 disciplinary counseling session.  Break them down.

22 So what's the first one that you can recall

23 happening?

24    A.    The very first one?

25    Q.    Uh-huh.

1    A.    Was with C.C. Tann.

2    Q.    Okay.  What was the disciplinary action

3  being taken?

4    A.    C.C. was being terminated.

5    Q.    Okay.  Whose decision was it to terminate

6  C.C.?

7    A.    It was mine.

8    Q.    What did you base your decision to

9  terminate him on?

10   A.    On his poor performance.

11   Q.    How did you determine that he had performed

12  poorly?

13   A.    He could not do the job.

14   Q.    How did you know he couldn't do the job?

15   A.    He could not complete his assigned tasks.

16   Q.    The assignments you had given him?

17   A.    Yes, ma'am.

18   Q.    So tell me about the counseling session?

19   A.    I asked John to -- to sit in as a witness

20  on the final leg of the disciplinary process in which

21  C.C. Tann were to -- he was going to be terminated.

22   Q.    Okay.  And what happened?  Do you recall

23  the session?

24   A.    Yes, I do.

25   Q.    Tell me about it?

1    A.-    I explained to C.C. that his performance

2  was not where it needed to be, which he was very well

3  aware.  This was his third write-up.  His third part

4  of the disciplinary procedure.

5    Q.    Okay.

6    A.    He had already had two previous sessions.

7    Q.    Counseling sessions?

8    A.    Yes.

9    Q.    Had John attended those?

10    A.    No.  Those began before John arrived.

11    Q.    So that -- the previous two happened before

12  John came?

13    A.    Yes.

14    Q.    Okay.  All right.  So keep telling me about

15  the third?

16    A.    Well, it was very short.  I just asked John

17  to sit in.  We sat the gentleman down in the dining

18  room.  I explained to him that there were no hard

19  feelings.  It's just not working out.  It's a new

20  operation, you know.

21    Q.    That's always fun.

22    A.    Yes.  I needed certain things from a

23  sous-chef, and I was not getting those from

24  C.C. Tann.

25    Q.    Okay.  What other counseling sessions did

1  John participate or get called in as a witness?

2      A.    John and I had counseling sessions with

3  Donna Baldwin.

4      Q.    More than one with Donna?

5      A.    Yes.  Two with Donna.

6      Q.    And tell me about the first one?

7      A.    It was absenteeism.

8      Q.    Do you know --

9      A.    No call.  No show for work.

10     Q.    Did it happen the same way?  You asked John

11  to sit in as a witness?

12     A.    Yes.

13     Q.    Okay.  Can you recall the actual session?

14     A.    Yes.  John had worked with Donna.  He was

15  more familiar with her.  So he did -- he was vocal.

16  He did say things to her, counseling, reminding her

17  that if she could not get to work, there's a

18  procedure.  There's protocol we follow.  Phone calls

19  to be made.  People to be notified.

20     Q.    Sure.  How long do you think that session

21  lasted?

22     A.    Not very long.  Maybe less than ten

23  minutes.

24     Q.    Okay.  All right.  What about your second

25  session with Donna Baldwin?

1     A._    Almost exactly the same as the first.  Once

2 again, she had no call, no show to work.

3     Q.    Was it John's idea to terminate her?

4     A.    No.  We did not have to terminate Donna.

5 She abandoned the job.

6     Q.    Okay.

7     A.    Her absenteeism went for three days, and

8 Aramark considers that job abandonment.

9     Q.    Was it John's idea to discipline her?

10    A.    Together we made the decision.

11    Q.    So you've got two sessions with Donna

12 Baldwin, and one with C.C. Tann?

13    A.    Yes.

14    Q.    Any others?

15    A.    One with Barry Marrow.

16    Q.    Tell me about that?

17    A.    No call, no show to work.

18    Q.    So what happened?

19     MR. BROWN:  Make sure you understand her

20 question.  She's asking about his participation, not

21 just what happened generally.

22     THE WITNESS:  What are you asking?

23     BY MS. OSMENT:

24    Q.    I want to know what you -- happened

25 generally?

1     A.-   What happened generally.

2     Q.    Yeah.  What happened?

3     A.    Like I said, he had no call, no show to

4 work.  On the following day, when he returned to

5 work, we spoke with him.  As I remember it, whenever

6 he no showed, it was actually, I think, a day I had

7 taken off.

8     Q.    So how did you find out he hadn't shown up?

9     A.    From John.

10    Q.    What was John's participation in the

11 counseling session?

12    A.    He offered his opinion.

13    Q.    What was his opinion?

14    A.    Very similar to mine.

15    Q.    Which was?

16    A.    We extended -- we reminded him once again

17 there is a proper protocol to follow if you're not

18 going to be able to make it to work.  A protocol --

19 made sure he was provided with the phone numbers.  He

20 knew what to do.  It was a fairly simple procedure.

21    Q.    Okay.  So that was one counseling session

22 with Barry Marrow?

23    A.    Yes.

24    Q.    Any more?

25    A.    The last one I remember was -- actually, I

1  can't recall another one.

2      Q.    Okay.  A moment ago you said that, to the

3  best of your recollection, when Barry Marrow had

4  missed -- had not shown up for work, it was on a day

5  that you had off.  So John brought it to your

6  attention?

7      A.    Yes.

8      Q.    Did you and John usually work the same

9  hours?

10     A.    Most times, yes.

11     Q.    When would you have not worked the same

12 hours?

13     A.    If, for example, either one of us needed a

14 day, needed -- had an appointment, doctor, dental,

15 whatever, we had some type of appointment we needed

16 to attend to, something of that nature.

17     Q.    Okay.

18     A.    The majority of the time we worked the

19 exact same schedule.

20     Q.    Okay.  So when you were putting in that

21 first fiscal year --

22     A.    Uh-huh.

23     Q.    -- your 70 to 80 hours a week, he was doing

24 roughly the same thing?

25     A.    Yes, ma'am.

1    Q.-    Now, when I asked you the question, I said

2  describe John's day.  And when you answered the

3  question, it was a, "we"?

4    A.    We.

5    Q.    Who is the, "we"?

6    A.    John and I, because we worked the same

7  schedule.

8    Q.    Did John place the orders?

9    A.    Produce.

10    Q.    Right.  But did he place the orders for

11  anything else?

12    A.    No.  I would generally do the orders for

13  everything else.

14    Q.    Okay.  And did John devise the menus?

15    A.    Yes.  Let me make sure I'm very clear on

16  this.  When I write the menu for the week, I write

17  what the entrees are going to be.  There's a lot to a

18  menu, other than just entrees.  Every day two soups

19  have to be produced, a vegetarian entree, two fresh

20  vegetables of the day, a starch, and that's it.

21    Q.    Uh-huh.

22    A.    So the only thing that -- the only thing

23  that's written is the entrees.

24    Q.    Uh-huh.

25    A.    The rest of the menu is devised that

1  morning by -- by the staff, by the cooks.

2     Q.    And that includes the line cooks?

3     A.    Yes.

4     Q.    It includes the pastry people?

5     A.    No.   The pastry people will take care of

6  the pastry things.

7     Q.    Okay.   They probably have a routine every

8  day?

9     A.    Yes.

10     Q.    Okay.

11     A.    Yes.

12     Q.    Okay.   Did you drive a car to work?

13     A.    Yes.

14     Q.    Where do you park?

15     A.    At the Friday Center.

16     Q.    And who pays for that?

17     A.    Aramark.

18     Q.    Does Aramark pay for Mr. LaFrankie?

19     A.    Yes.

20     Q.    And Mr. Scott?

21     A.    Yes.

22     Q.    Mr. Cachefiero?

23     A.    No.

24     Q.    Did it pay for Mr. McCullough?

25     A.    No.

1    A.  Yes.

2    Q.  Did you include Mr. McCullough in the

3  interview process when you were considering the

4  hiring of new employees?

5    A.  Yes, I did.

6    Q.  And did you allow him to interview any

7  employee he so desired to interview?

8    A.  Yes.

9    Q.  Did you consult with Mr. McCullough about

10  the employees you were anticipating hiring?

11    A.  I'm sorry?

12    Q.  Did you consult with Mr. McCullough about

13  employees that you were anticipating hiring for the

14  kitchen?

15    A.  Yes.

16    Q.  All right.  Did you consult with

17  Mr. McCullough about employees you were contemplating

18  firing?

19    A.  Yes.

20    Q.  And did you give him a chance to speak his

21  mind with respect to the hiring or firing of any

22  employee?

23    A.  Yes.  I asked him what he thought about it.

24    Q.  And did he share his views with you

25  normally?

1    A.‾   Yes.  Normally.

2    Q.    You talked a lot about disciplining of

3    employees.  Did you involve Mr. McCullough in the

4    disciplining of employees in the kitchen area?

5    A.    Yes.

6    Q.    You talked a lot about counseling of

7    employees.  Did you include Mr. McCullough in the

8    counseling process of employees in the kitchen area

9    under your supervision?

10   A.    Yes.

11   Q.    When you hired Mr. McCullough, did you make

12   it clear to him that you wanted him to be, and

13   considered him to be, part of the kitchen supervisory

14   team?

15   A.    Absolutely.

16   Q.    And, to your knowledge, did Mr. McCullough

17   understand that?

18   A.    Yes.

19         MS. OSMENT:  Objection.

20         THE WITNESS:  I -- I feel he understood

21   that completely.

22         MS. OSMENT:  Objection.

23         BY MR. BROWN:

24   Q.    And during the time that you worked with

25   Mr. McCullough and observed his performance, did he

1  indicate to you that he understood that he was a part

2  of the supervisory team in the kitchen?

3  　　A.　　Yes.

4  　　Q.　　You were asked questions about Bill

5  LaFrankie and Desmond Scott and Joey Fortenberry in

6  terms of parking and two-way radios.  Do you recall

7  that?

8  　　A.　　I'm sorry.  I didn't catch that.

9  　　Q.　　I'll rephrase it.

10  　　　　　You were asked questions about parking and

11  two-way -- two-way radios and whether Aramark paid

12  for such parking or provided such radios.  Do you

13  recall that?

14  　　A.　　Yes, I do.

15  　　Q.　　All right.  And I believe you identified

16  yourself, Bill LaFrankie and Desmond Scott and -- let

17  me rephrase that.

18  　　　　　You identified yourself, Bill LaFrankie and

19  Desmond Scott as people that, to your knowledge,

20  Aramark would pay parking for; is that right?

21  　　A.　　Yes.

22  　　Q.　　All right.  And are those three

23  individuals, yourself, Mr. LaFrankie and Mr. Scott,

24  considered department heads at Aramark?

25  　　A.　　Yes.

ATTACHMENT/EXHIBIT_____ E_____

Carolina Catering Job Descriptions

## Executive Chef
### Aramark Job Code RCKI

Supervises and coordinates activities of the Sous Chef, all cooks and other kitchen personnel. Estimates food consumption and requisitions food, is directly responsible for weekly inventory resulting in responsiblility for the fiscal success of the kitchen. Plans, selects and prices menus and develops recipes and oversees the proper production of such. Responsible for scheduling and training all kitchen personnel. May cook selected items, no more than 20% of the time. May oversee special catering events/functions. May also offer culinary instruction and/or demonstrates culinary techniques. Directly supervises all kitchen personnel with responsibility for hiring, discipline, performance reviews and initiating pay increases. Typically reports to a Food Service Director or Catering Director.

## Sous Chef
### Aramark Job Code

Administrative authority, responsibility and accountability necessary to direct the food production and presentation to the guest and staff as directed by the Executive Chef. To supervise the daily food production operations and may be responsible for requisitioning food form vendors. To consistently use food production methods in accordance with current federal, state and local standards, guidelines and regulations that govern the facility. Must also comply with management and organizational policies, procedures and the Executive Chef's instructions. Responsible for scheduling and training all kitchen personnel. Directly supervises all kitchen personnel with responsibility for assisting the Executive Chef in hiring, discipline, performance reviews and initiating pay increases. Must participate in management team meetings necessary to the success of the operation. To ensure that the customer's expectations are consistently exceeded at all times with the maximum fiscal responsibility.

## Lead Cook
### Aramark Job Code

Performs food production and presentation to the customers and staff as directed by the Executive Chef and Sous Chef. To consistently use food production methods in accordance with current federal, state, and local standards, guidelines and regulations that govern the facility. Must also comply with department and organizational policies, procedures, and the Executive Chef and Soups Chef instructions. To ensure that the customer's expectations are consistently exceeded at all times with the maximum fiscal responsibility.

**ARAMARK 0001**

ATTACHMENT/EXHIBIT_____F_____

 **ARAMARK**

July 30, 2001

Mr. John McCullough
13202 Drew Hill Lane
Chapel Hill, NC 27514

Dear John:

On behalf of the Southeast Region of ARAMARK, I would like to take this opportunity to "welcome you aboard." We are pleased to offer you a position as Sous Chef with ARAMARK Services Management of North Carolina, Inc. We are confident that you are well qualified to build a good future for yourself with ARAMARK.

Your work with ARAMARK's Campus Services Division was set to begin on July 25, 2001 at UNC Chapel Hill. As agreed upon, your starting salary will be $576.92 per week; annualized that is $30,000. You will also be receiving a $500 (less taxes) sign on bonus.

As an employee of ARAMARK, you will have the option of obtaining individual and dependent medical coverage, short and long-term disability insurance and additional group life insurance. You will become eligible for this coverage on the first of the month following one full calendar month of continuous employment. In addition, you will become eligible for our retirement plan two months after your starting date. You are also welcome to participate in the other aspects of our benefits package as appropriate. Our Corporate Benefits Department will be sending a full benefits package to your home address shortly following your second paycheck.

Once again John, we are very excited about the contribution you will make to the Southeast Region and UNC Chapel Hill. If you have any further questions, please don't hesitate to contact me at (803) 254-7392 or my assistant, Penny Carroll, at (919) 854-1331. We look forward to hearing from you in the near future.

Sincerely,

Philis M. Best
Human Resources Director

    cc: Mike Masone, FSD
        Evan Klingman, DM
        Ray Handy, RVP
        Regional File
        Recruiting Department

1100 CRESCENT GREEN, SUITE 208
CARY, NC 27511
919 854 1331  FAX 919 854 1329

ARAMARK 0108

ATTACHMENT/EXHIBIT_____5_____


## ARAMARK

<em>UNC-Chapel Hill Campus Dining Services</em>
**Record of Employee Discussion/Counseling**

Name: __Barry Morrow__                    Date: _9/08/01_

### Reason for Discussion
❑ Performance Coaching
❑ Verbal
❑ XXFirst Written
❑ Final Written Warning
❑ Termination/ Suspension

### Specific Cause
❑ Performance
❑ Policy Violation
❑ Procedure Breach
❑ Follow Up
❑ XX Other

**Discussion Topic**  Barry showed up to work strongly smelling of alcohol and seeming still under the influence of alcohol.

### Background Information:
List specific facts, address concerns, possible causes, witnesses, previous discussions, and other pertinent information.

Barry showed up for work as scheduled on Saturday, 9/8/01 and strongly smelled of alcohol and seemed to still be under the influence. This is not the first time this has happened, the first time I counseled Barry on proper work ethics and informed him that this type of behavior is completely unacceptable and cannot be tolerated. He could easily hurt himself or others if he is under the influence.

W



*UNC-CH Campus Dining Services*
Employee Counseling/Discussion Follow-Up

## Steps to be Used During the Discussion:

1. Describe the problem in a friendly manner.
2. Ask for the employee's help in solving the problem.
3. Discuss causes of the problem.

4. Identify and list possible solutions.
5. Describe specific actions to be taken by employee.
6. Agree on specific follow-up dates/times.

**KEY POINTS/NOTES FROM DISCUSSION:**

Barry understands the seriousness of his actions and has been warned that the incident wil not repeat itself if he wants to continue his employment here.

| PERFORMANCE PLAN Action(s) to be Taken | Responsible Person(s) | Objective Date |
|---|---|---|
| | | . |
| | | |
| | | |

## Detail Consequences for Employee if corrective action is not taken and/or other violations of established work rules occur:

Employee's Comments:

|  |
|---|

Employee Signature                                                Date  9/8/01

Supervisor Signature                                            Date  9/8/01

Witness Signature                                                 Date

Form Revision 7/01/01


# ARAMARK
## UNC-Chapel Hill Campus Dining Services
## Record of Employee Discussion/Counseling

Name: ___Barry Morrow_____     Date: 9/13/01_____

| *Reason for Discussion* | *Specific Cause* |
|---|---|
| ❏ Performance Coaching | ❏ Performance |
| ❏ Verbal | ❏ Policy Violation |
| ❏ First Written | ❏ Procedure Breach |
| ❏ XX Final Written Warning | ❏ Follow Up |
| ❏ Termination/ Suspension | ❏ XX Other |

**Discussion Topic**
> No Call, No Show!

## Background Information:
List specific facts, address concerns, possible causes, witnesses, previous discussions, and other pertinent information.

Barry did not show up for work as scheduled on Wednesday, 9/13/2001. He did not call any manager and had no written excuse from a doctor. When asked about why he did not show up for work he said, "There's really no excuse, it was physical." Chef Mann asked him what that meant, and he responded, "I was in a physical confrontation." Chef Mann asked if he was in a fight. Barry responded, "Yea!" Chef Mann asked, "Were you in jail?" Barry responded, "No." Chef Mann told Barry that this behavior is unacceptable and will not be tolerated. Barry understood the seriousness of his actions.



**UNC-CH Campus Dining Services**
Employee Counseling/Discussion Follow-Up

## Steps to be Used During the Discussion:

1. Describe the problem in a friendly manner.
2. Ask for the employee's help in solving the problem.
3. Discuss causes of the problem.

4. Identify and list possible solutions.
5. Describe specific actions to be taken by employee.
6. Agree on specific follow-up dates/times.

**KEY POINTS/NOTES FROM DISCUSSION:**

Barry's behavior is consistent. He has been written up and sent home for smelling of alcohol and has been given multiple chances to correct his work life and has failed to do so. The next incident will lead to termination.

| PERFORMANCE PLAN Action(s) to be Taken | Responsible Person(s) | Objective Date |
|---|---|---|
| | | |
| | | |
| | | |

## Detail Consequences for Employee if corrective action is not taken and/or other violations of established work rules occur:

Employee's Comments:

| | |
|---|---|
| Employee Signature | Date 9/13/01 |
| Supervisor Signature | Date 9/13/01 |
| Witness Signature | Date |

Form Revision 7/01/01



## ARAMARK
*UNC-Chapel Hill Campus Dining Services*
## Record of Employee Discussion/Counseling

Name: Joyce Russell                                Date: 02/09/2002

| *Reason for Discussion* | *Specific Cause* |
|---|---|
| ❑ Performance Coaching | ❑ Performance |
| ❑ Verbal | ❑ Policy Violation |
| ❑ First Written | ❑ Procedure Breach |
| ❑ XX Final Written Warning | ❑ Follow Up |
| ❑ Termination/ Suspension | ❑ Other |

**Discussion Topic**   | Joyce Russell |

**Background Information:**
List specific facts, address concerns, possible causes, witnesses, previous discussions, and other pertinent information.

On two occasions this week Joyce Russell has blatantly disregarded the catering policy on "food pick-ups", referring to the time a catered function must be ready for delivery. She knew very well the times these two functions were to be ready and this action thus creates a performance issue. I have explained to her in detail how the system works, and how vital it is that all employees abide by this system. Her actions led to the catering team being rushed to set-up the function within the allotted time causing the entire operation to look unprofessional. The second time the catering team was actually late to the function and this is absolutely unacceptable.

**ARAMARK 0021**

 **ARAMARK**

*UNC-CH Campus Dining Services*
Employee Counseling/Discussion Follow-Up

## Steps to be Used During the Discussion:

1. Describe the problem in a friendly manner.
2. Ask for the employee's help in solving the problem.
3. Discuss causes of the problem.

4. Identify and list possible solutions.
5. Describe specific actions to be taken by employee.
6. Agree on specific follow-up dates/times.

**KEY POINTS/NOTES FROM DISCUSSION:**
Our success at this account will be determined by each and every employee working together to achieve a common goal; high-quality food and service delivered in a timely fashion to satisfy our clients and their guests. The entire team must work together or else we do not succeed!

| PERFORMANCE PLAN<br>Action(s) to be Taken | Responsible<br>Person(s) | Objective<br>Date |
|---|---|---|
| Joyce will become a team player and contribute without causing confusion or animosity. | Joyce Russell | ASAP |
| Joyce will realize that she is an hourly employee and will/must take direction from a manager without creating a scene. In order for the operation to succeed, she must do what she is told to do. | Joyce Russell | ASAP |
| | | |

## Detail Consequences for Employee if corrective action is not taken and/or other violations of established work rules occur:

I have had several counseling sessions with Joyce, as have other managers at this operation, outlining her job requirements and objectives, this is the last time she will be counseled. Any further violations or problems will result in immediate termination!!

## Employee's Comments:

**ARAMARK 0022**

*Employee refused to sign this document, as witnessed by / on ,*

Employee Signature

Date  2/13/02

Supervisor Signature

Date

Witness Signature _____ Date 2/13/02

Form Revision 7/01/01

ARAMARK 0023

ATTACHMENT/EXHIBIT_____H_____



## ✈ ARAMARK

### UNC-Chapel Hill Campus Dining Services
### Record of Employee Discussion/Counseling

Name:  CC Tann                                      Date: 10/04/2001

| | |
|---|---|
| **Reason for Discussion** | **Specific Cause** |
| ❑ Performance Coaching | ❑ XX Performance |
| ❑ Verbal | ❑ Policy Violation |
| ❑ First Written | ❑ Procedure Breach |
| ❑ Final Written Warning | ❑ Follow Up |
| ❑ XX Termination/ Suspension | ❑ Other |

**Discussion Topic**   I have counseled CC Tann several times and written him up twice for performance related issues, with no obvious improvement.

### Background Information:
List specific facts, address concerns, possible causes, witnesses, previous discussions, and other pertinent information.

Sous Chef John Mccullough and myself, are of the same opinion that CC Tann cannot keep up with the production needs of an upscale, high volume operation. We had hoped that CC Tann would improve his performance but did not. We continued to train him and help him understand this aspect of the business but he didn't seem to grasp these concepts. He had trouble with even the simplest of culinary techniques. The seperation was an amicable one and he has since called and asked me for a recommendation for another job. I agreed and told him I would be happy to offer a recommendation.

**ARAMARK 0029**



*UNC-CH Campus Dining Services*
Employee Counseling/Discussion Follow-Up

## Steps to be Used During the Discussion:

1. Describe the problem in a friendly manner.
2. Ask for the employee's help in solving the problem.
3. Discuss causes of the problem.

4. Identify and list possible solutions.
5. Describe specific actions to be taken by employee.
6. Agree on specific follow-up dates/times.

**KEY POINTS/NOTES FROM DISCUSSION:**

CC Tann has been given numerous chances to improve himself and his rate of production with no resolve. Therefore, we feel it is best for all parties involved to separate, his termination is effective immediately.

| PERFORMANCE PLAN Action(s) to be Taken | Responsible Person(s) | Objective Date |
|---|---|---|
| | | |
| | | |
| | | |

## *Detail Consequences for Employee if corrective action is not taken and/or other violations of established work rules occur:*

Employee's Comments:

**ARAMARK 0030**

Employee Signature _____  Date  10/4/01

Supervisor Signature _____  Date  10/4/01

Witness Signature _____  Date

Form Revision 7/01/01

ATTACHMENT/EXHIBIT_____ I _____



SALARIED

EMPLOYEE PROFILE & REVIEW

ARAMARK

CHRONOLOGICAL WORK HISTORY

1  • SOCIAL SECURITY NO  I 05 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

2  EMPLOYMENT CATEGORY  CODE 11 REG FULLTM-ACTV  PROFILE DATE 08/04/01

3  POSITION/JOB  CODE 11 REG FULLTM-ACTV  COMP NO .2135  CHK DIST/BEN DIST 101  Y N C

COMPONENT  2135-0  COMPONENT NUMBER  2135-0  ☒ SALARIED  CHECK ( ) ONLY FOR CHANGE TO NON-SALARIED  EFFECTIVE DATE 08/04/01  ELIG FOR REHIRE  POSITION/JOB DATE 07 25 01  COMPONENT DATE 07 25 01  TRANSACTION DATE 07 25 01 NEW HIRE-REG FT

RESPONSIBILITY CODE 316G  MCCULLOUGH  JOHN

COMPONENT NAME UNC-FRIDAY CENTER  TRANSACTION NAME NEW HIRE-REG FT  LATEST HIRE 07 25 01  ORIGINAL HIRE 07 25 01  ADJUSTED HIRE

4  SALARY/PAY  REASON FOR CHANGE  TITLE CODE RCWG  COMP NO .2135  POSITION/JOB DATE 07 25 01 CHEF  CHANGE AMOUNT .000  SALARY PLAN 08  07 25 01  576.920  NEXT SAL REVIEW 07 25 02  COST CODE 21

5  SALARY/PAY  % RANGE  -.00  MINIMUM 1  MIDPOINT 2  MAXIMUM 3  SALARY PLAN CB  SALARY GRADE 08  BASE RATE 576.920  HRTS USE  % CHANGE  F E N S O  N 6  EVALUATION PLAN  SALARY/PAY DATE 07 25 01  PAY FREQ 01  UNION CONTRACT JOB Y N  HIRING PROGRAM

6  PERSONAL  HOURLY FOR R BASE TYPE 07  RATE BASE TYPE (CIRCLE ONE) H W E N  SCHEDULED HRS/WK 50.00  BIRTH DATE 01 24 68  • SEX M F  EDUCATION LEVEL 21  WEEKLY FOR H RATE BASE TYPE  ANNUAL/WEEKLY FOR W RATE BASE BASE INCREASE 29,999

7  PERSONAL  STREET ADDRESS (23) 13202 DREWHILL LANE  HOME PHONE 919 932-5438  CITY (23) CHAPEL HILL  STATE NC  ZIP CODE 27514  AREA HISPANIC H  ETHNIC CODE  AMER INDIAN A  ASIAN/ PACIFIC O  BLACK B  WHITE W  VET Y N  VET PLAN Y N  MILITARY Y N  DIS VET Y N  DIS ABLED Y N  HANDI CAPPED Y N

8  TAX  • MARITAL STATUS M S  FEDERAL EXEMPTIONS 03  ADD'L FED WITHHOLDING $ ONLY 00

REMARKS -

MARK AS APPROPRIATE  EXCEPTION PERFORMANCE (To Expectations)  TIME □  FAR EXCEEDED X □  % □  OVER MAXIMUM A □  ACHIEVED P □  OTHER F □  CLIENT REQUEST

APPROVALS & REVIEW
1 ORIGINATE & RECOMMEND    TITLE    DATE
2 REVIEW & ENDORSE    TITLE    DATE
3 REVIEW & ENDORSE    TITLE    DATE
4 PERSONNEL APPROVAL FIELD    TITLE    DATE
5 PERSONNEL APPROVAL HQDTRS    TITLE    DATE
6 FINAL LINE APPROVAL    TITLE    DATE

NEXT PERFORMANCE REVIEW MO Y

TRANSACTION  CODE 101  MO 07  YR 01  RT E  BASE 576.920  PAY MO 07  YR 01  ANNUAL 29,999  SALARY PL/GR PL CB  GR 08  MO/YR 07/01  CODE RCWG  JOB CHEF  MO 07  YR 01  NUMBER 2135  MO 07  YR 01  COMPONENT UNC-FRIDAY CENTER

ARAMARK 0110



ATTACHMENT/EXHIBIT_____ ⅃_____



# NON-SALARIED

## EMPLOYEE PROFILE & REVIEW — ARAMARK

**LAST NAME (14)** ALSTON
**FIRST NA** MATTHEW

| | LATEST HIRE MO DA YR | ORIGINAL HIRE MO DA YR | ADJUSTED HIRE MO DA YR | NEXT PERFORM/ REVIEW MO DA YR |
|---|---|---|---|---|
| | 11 28 01 | 04 05 01 | – – – – | |

**RESPONSIBILITY CODE** 316G
**CMP/ MGR CDE**

**SOCIAL SECURITY NO** 05 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

## EMPLOYMENT CATEGORY
**CODE** 11 REG FULLTM-ACTV
**NAME**

## COMPONENT
**COMP NO** 2135

**EFFECTIVE DATE** 12/07/01

**PROFILE DATE** 12/

**TRANS CODE** Y N C
**ELIG FOR REHIRE** YNC

**CHK DIST/BEN DIST** 2135-0

**POSITION/JOB DATE MO DA YR** 11 28 01

**COMPONENT DATE MO DA YR** 11 28 01

☒ NON-SALARIED
☐ CHECK ( ) ONLY FOR CHANGE TO SALARIED

## POSITION/JOB
**REASON FOR TRANSFER (CIRCLE ONE)** O V N I R H
**TITLE CODE** RCWB
**TITLE** LEAD COOK

**COMPONENT NAME** 11 28 01 REHIRE-REG

**TRANSACTION NAME** 11 28 01 REHIRE-REG

## SALARY/PAY
**REASON FOR CHANGE (CIRCLE ONE)** H D W C E N
**RATE BASE TYPE (CIRCLE ONE)** H D W C M E N
**COMP NO** 2135

| | MINIMUM | MIDPOINT | MAXIMUM | PLAN | PAY GRADE | BASE RATE |
|---|---|---|---|---|---|---|
| PAY RANGE | 0 | 0 | 0 | | | 40.000 |

**CHANGE AMOUNT $** 2.000
**.000**
**12.06**

**NEXT PAY REVIEW MO DA YR**
**HOURS USE** 20

**COST CODE** 20

**% CHANGE**

**COMPONENT NAME** 11 28 01 UNC-FRIDAY CENTER
**TRANSACTION DATE MO DA YR** 11 28 01

**EVALUATION PLAN MO YR**
**UNION CONTRACT ☐ JOB** Y N
**FT**

## PERSONAL
**% RANGE** .00

**NH**

**AREA** 919
**HOME PHONE** 932-9035

**STREET ADDRESS (23)** 204 JAMES ST

**CITY (23)** CHAPEL HILL
**STATE** NC
**ZIP CODE** 27516

**ETHNIC CODE** HISPANIC H / AMER INDIAN A / ASIAN/PACIFIC O / BLACK B / WHITE W

**MILITARY** VET Y/N  VET NAM Y/N  DIS Y/N  ABLED N
**HAND CAPPED** Y N

**SALARY/PAY DATE MO DA YR** 11 28 01
**PAY FREQ** 01

**BIRTH DATE MO DA YR** 02 06 72
**EDUCATION LEVEL** 14

**SEX** M F  M

**HIRING PROGRAM**

## SALARY/PAY
| | BASE | ANNUAL | PL GR | SALARY PL/GR MO YR |
|---|---|---|---|---|
| | | | | |

**WEEKLY/ANNUAL ANNUAL FOR W RATE BASE TYPE INCREASE** .00

**400.00 APPROVALS & REVIEW**

## REMARKS

| MARK AS APPROPRIATE | EXCEPTION PERFORMANCE (to Expectations) | | TIME | | |
|---|---|---|---|---|---|
| | | FAR EXCEEDED ☒ | % | | |

**1 ORIGINATE/RECOMMEND** — TITLE DOC  DATE 11/30/
**2 REVIEW & ENDORSE** — TITLE  DATE
**3 REVIEW & ENDORSE** — TITLE 750 DATE 30/02
**4 PERSONNEL APPROVAL FIELD** — TITLE DATE
**5 PERSONNEL APPROVAL HDQTRS** — TITLE DATE
**6 FINAL LINE APPROVAL** — TITLE DATE

☐ OVER MAXIMUM  ☐ ACHIEVED A  ☐ APPROVED P  ☐ FAR BELOW
**CLIENT REQUEST**

## HRONOLOGICAL WORK HISTORY

| TRANSACTION | FEDERAL EXEMPTIONS / ADD'L FED WITHHOLDING $ ONLY | PAY RANGE | | PAY | | SALARY PL/GR | | JOB | COMPONENT |
|---|---|---|---|---|---|---|---|---|---|
| | | MINIMUM | | BASE | ANNUAL | PL GR MO YR | | TITLE | NAME |
| MARITAL STATUS M S | 02 00 | | | 10.000 | 20,800 | | 11/01 | RCWB LEAD COOK | UNC-FRIDAY CENTER |
| NE 21 11/01 H | | | | | | | 04/01 | RCXE COOK | UNC-CATERING |
| 01 04/01 H | | | | 13.000 | 27,040 | | | | |
| | | | | | | 2135 11/01 | | UNC-FRIDAY CENTER | |
| | | | | | | 2720 07/01 | | UNC-CATERING | |
| | | | | | | 2720 04/01 | | UNC-CATERING | |

ARAMARK 0131



ARAMARK 0132

NON-SALARIED

EMPLOYEE PROFILE ✦ ARAMARK

( 05 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

*SOCIAL SECURITY NO

LAST NAME (14)  ALSTON
FIRST NAME  MATTHEW

EMPLOYMENT CATEGORY
CODE
11 REG FULLTM-ACTV

COMPONENT
NAME

EFFECTIVE DATE  02/22/02
PROFILE DATE  MO DA YR

CHECK (✓) ONLY FOR CHANGE TO SALARIED
□

CMP MGR CDE  316G

*TRANS CODE  121

POSITION/JOB DATE  MO DA YR  11 28 01 LEAD COOK

ELIG FOR REHIRE  Y N C

PLANNED RETURN  MO DA YR

CHK DIST/BEN DIST

COMPONENT NUMBER  2135-0

⊠ NON-SALARIED

RESPON-SIBILITY CODE

POSITION/JOB
TITLE CODE  2135  COMP. NO.  0
SW/SF CHEF RCWB

COMPONENT DATE  MO DA YR  11 28 01 UNC-FRIDAY CENTER

TRANSACTION DATE  MO DA YR  11 28 01 REHIRE-REG

TRANSACTION NAME  FT

LATEST HIRE  MO DA YR  11 28 01
ORIGINAL HIRE  MO DA YR  04 05 01
ADJUSTED HIRE  MO DA YR  - - - - -
NEXT PERFORMAN REVIEW  MO YR  5 03

SALARY/PAY
% RANGE  .00
REASON FOR CHANGE  PT

RATE BASE TYPE (CIRCLE ONE)  H D W C E M N

USE ONLY FOR CHANGE TO SALARIED

MINIMUM  0
MIDPOINT  0
MAXIMUM  0

CHANGE AMOUNT  $  3.000
PLAN  PAY GRADE
BASE RATE  15.00  .000

HOURS USE  20

% CHANGE  20.0
SCHEDULED WK HRS  40.00

SALARY/PAY DATE  MO DA YR  01 30 02
PAY FREQ  01

EVALUATION PLAN  MO YR

UNION CONTRACT Y JOB N  N 7

REASON FOR CHANGE  P O P E D A
(D CIRCLE ONE)  H D W C E M N

PERSONAL
STREET ADDRESS (23)  204 JAMES ST
AREA  919  HOME PHONE  932-9035

ETHNIC CODE
HISPANIC  H  AMER INDIAN  A  ASIAN PACIFIC  A  BLACK  B  WHITE  W

CITY (21)  CHAPEL HILL
STATE  NC
ZIP CODE  27516

VET  Y N  VIET NAM  Y N  MILITARY  Y N  DIS VIET NAM  Y N  HANDI CAPPED  Y N

BIRTH DATE  MO DA YR  02 06 72
EDUCATION LEVEL  14

HIRING PROGRAM

*SEX  M F

WEEKLY/ANNUAL ANNUAL FOR W RATE BASE TYPE INCREASE  480.00

REMARKS

MARK AS APPROPRIATE

EXCEPTION PERFORMANCE (To Expectations)

NUMBER  2135
MO YR  11/01
COMPONENT  UNC-FRIDAY CENTER

TIME  □
FAR EXCEEDED  X
%  □
ACHIEVED  □
COST  MAXIMUM  □
APPROACHED  P
OTHER  O
FAR BELOW  □

APPROVALS & REVIEW

1 ORIGINATE PERFORMANCE  TITLE DOC  DATE 5 6 02
2 PERFORMANCE ENDORSE  TITLE FSD  DATE 5/6/02
3 REVIEW & ENDORSE  TITLE  DATE
4 PERSONNEL APPROVAL FIELD  TITLE  DATE
5 PERSONNEL APPROVAL HDQTRS  TITLE  DATE
6 FINAL LINE APPROVAL  TITLE  DATE

CHRONOLOGICAL WORK HISTORY
MARITAL STATUS  M S
FEDERAL EXEMPTIONS  ADD'L FED WITHHOLDING $ ONLY  02  00

TRANSACTION  MO YR  RT
21 11/01 H
31 04/01 H

PAY
BASE  MO YR
12.000 01/02
10.000 11/01
13.000 04/01

ANNUAL
24.960
20.800
27.040

SALARY PL/GR
PL GR MO YR

CODE
RCWB LEAD COOK
RCXE COOK

TITLE JOB
2135 UNC-FRIDAY CENTER
2720 UNC-CATERING
2720 UNC-CATERING

NUMBER  MO YR  COMPONENT
2135 11/01 UNC-FRIDAY CENTER
2720 07/01 UNC-CATERING
2720 04/01 UNC-CATERING

ATTACHMENT/EXHIBIT_____ K _____



Case 1:02-cv-00992-JAB   Document 26   Filed 09/03/03   Page 142 of 167

ATTACHMENT/EXHIBIT_____ L_____

In Re: FOOD LION, INCORPORATED, FAIR LABOR STANDARDS ACT "EFFECTIVE SCHEDULING" LITIGATION; JEFFREY L. ROYSTER; DANIEL BAKER; CLARENCE L. ALSTON; CHARLES V. STRICKLAND, JR.; RON MURCHISON; LARRY BRITT; CARL WILLIAMS; TRUMAN SURLES; TIM LAYDEN; KIM PIPPA; JEFFREY BARNES; GLENN JOHNSON; STEVE TWIDDY; LARRY RILEY; WAYNE NEIL HAND, JR.; MICHAEL ALPHIN; HARVEY KEITH MATTHEWS; TERRY N. CONNER; JAMES E. DANIELS; BILLY MADDOX; RUSSELL THOMAS; JONATHAN ANDERSON; WOODROW BREEDEN; AARON NORRIS; JAMES GRUBER; REGINALD ASHFORD; CLINTON E. BLOYER, III; RICKY COLTREN; BILLY RAY COLLINS; WILLIAM DALE FITZGERALD; ROBIN DALE STEWART; STEPHEN A. WILLIAMS; REGINALD GILL; LESTER BRITT, and TERRY W. MCLAWHON, on behalf of himself and all others similarly situated; KEITH LAMONT PERRY, on behalf of himself and all others similarly situated; RONALD GRANNIS; BOSTON D. MCCORNELL; RANDY E. JONES; TIMOTHY E. PEELE; ANDY CZUBAI; CHRISTOPHER AYDEN SURLES; KELLY E. QUINN; JAMES L. ROYAL; FRANCIS D. CARPENTER; GREGORY TODD RING; LESTER JEROME MITCHELL; RODNEY M. RAMSEY; WILLIAM RICHARD HAMM; BILLY M. PARSON; WOODROW CARROLL, JR.; BOBBY GLYMPH; KEVIN CARR; BRAD CLARK; BILLY WILLIAMS, Plaintiffs, v. FOOD LION, INCORPORATED, Defendant-Appellee. In Re: FOOD LION, INCORPORATED, FAIR LABOR STANDARDS ACT "EFFECTIVE SCHEDULING" LITIGATION; RICKIE PRINGLE; CARLOS BRYANT; BRUCE A. CLARK; STEVEN HARVEY, Plaintiffs-Appellants, and RICHARD BISHOP; RONNIE HAWKINS; QUENTIN SMALLS; LARRY BARNER; RAYMOND BECKHAM; DAVID BENFIELD; LARRY BLAND; WENDELL BROWN; RONALD FELDER; KEN GALLMAN; JONATHAN JOY; HENRY LONG; HOMER MEANS; MELVIN MONTGOMERY; LARRY PURVIS; S. JIM ROBISON; ANTHONY SCOTT; DELORES SNELGROVE; JACK WEATHERFORD, JR.; CLYDE ASH, III; HEIDI BLECKLEY; JAMES "JIM" CRIBB; MAX HERRON; RICCI HOSKINS; KATHLEEN WEATHERSBY; ROBERT WILLETT, JR.; ROBERT BECKHAM; JIMMIE BLACKBURN; BRENDA BYRD; KENNETH CAPPS; LESLIE CLIFTON, III; HERMAN CURRENCE, III; DARREN DIEDRICH; DELORES EDWARDS; ERNEST EVANS; KENNETH GADDIST, JR.; BARRY HANNA; PATRICK J. KARLE, JR.; DAVID MCAULEY; DON MCCLARY; JAMES MCMANUS; ANTHONY MEFFORD; STUART MOKOWSKI; MICHAEL PRICE; ROBERT RAND; KENNETH REDMON; HAROLD RIDGEWAY; EDWARD ROBL; JAMES SCOTT; MITCHELL SHEPARD; BOOKER SMITH; CHERYL SMITH; THURSTON SMITH; DONNA K. SPIVEY; JOE C. SPIVEY; STEVEN SWANN; CHARLES TAYLOR; NOEL N. THOMPSON; BRETT TURNER; JOHN UPDIKE; JACKIE WELCH; HAROLD H. WILSON, JR.; HERBERT WRIGHT, JR.; TYRONE WRIGHT; VICTOR YOUNG, III; JOHN G. RICE; STEVEN B. SCOTT; JERRY W. MACKELDON; DORIS JEAN HARRIS; WILLIE JOE REDMOND; DARREN L. JONES; JOHNNY R. ADAMS; THOMAS C. ENGLISH, JR.; LLOYD S. MESSINA; JAMES ALBERT ASHLEY; BOBBIE RAY WEED; DAVID L. JOHNSON; WILLIAM J. GOFF; WILLIAM A. CARTER; RANDY K. BENTON; MARY B. JORDAN; RONALD E. CARRIGG; RICHARD ALAN BISHOP; GATLIN CLIFTON CRIBB; JULIAN M. RAMSUE; THADDIEUS J. DULEY; ROBERT JOHN EDWARDS; JAY CORBETT; GEORGIA LYNCH; JAMES HOGUE, Plaintiffs, v. FOOD LION, INCORPORATED, Defendant-Appellee. In Re: FOOD LION, INCORPORATED, FAIR LABOR STANDARDS ACT "EFFECTIVE SCHEDULING" LITIGATION; JOHN GORE; WAYNE LOSCO; ALAN O'NEAL; ALLAN SEIDL, Plaintiffs-Appellants, and KERRY BUSHER; DOROTHY KAELIN; JAMES HALL; JACOB HENDERON; MERRY BURDEN; WILLIAM COLLINS; JOSEPH FENDICK; STEPHEN JANOSICK; ARNOLD LIVERMAN; JOHN O'LOUGHLIN; RONALD J. ROLLO; HENRY WAYNE CUMBESS; DAVID LECLAIRE; BRUCE USERY; JOHN TIMMONS; ERNEST RAY KING; DWAYNE KING; CHARLIE BOYD; MARGIE HOLDEN; JOHN CUMBESS; BARNEY RICK SMITH; KIMBERLY LANTRIP; RICKY BEARD; ROY AUSTIN; LOIS M. FOSTER; KELLY FROESE; STEPHEN LENNON, Plaintiffs, FOOD LION, INCORPORATED, Defendant-Appellee. In Re: FOOD LION, INCORPORATED, FAIR LABOR STANDARDS ACT "EFFECTIVE SCHEDULING" LITIGATION; DONALD T. LEDFORD; J. MICHAEL OAKES, MICHAEL CARDOZA; R. CHUCK VILLARREAL, JR.; ROY SARTER; LARRY WORLEY; TOMMY ARRINGTON; BILLY BAKER; CHERYL BORN; DANNY BUCKNER; ROBERT CALLOWAY; DONA CATLIN; KIM CAUDILL; JOSEPH COCKERHAM; MICHAEL COFFEY; FELECIA COLEMAN; ROBERT DALY; JAMES DARROW; CHRISTOPHER DUNHAM; RHONDA DUPREE; ROBERT DYER; FRANK EASON; RHONDA ENGLAND; PAUL ERB; RICHARD FAWLKES; CHRIS FRENCH; RICHARD P. HENSLEY; ROGER ALLEN HILL; RICKEY HINSON; TERRY HORTON; PATRICIA HOYLE; CHRISTOPHER JOLLY; ALECIA JONES; WILLIAM JOYCE; WELDON JUNGE; MONTY LEE; PAUL LUCAS; SCOTT MATTOX; KEVIN O'BRIANT; GARY O'NEAL; KIM PAIVA; VICTOR PRONIER; RUSSELL RAMSEY; JOE REED; ELVA JEAN RILEY; SAMUEL SHERRIN; MARLIN SHUFORD; RONALD

STURGILL; JOSEPH SULTON; RICK TRAVIS; LESLIE TUCKER; DEREK WHITE; WARREN WHITE; TERRY WHITMIRE; GARY WOODS; BURNELL G. WRIGHT, Plaintiffs-Appellants, v. FOOD LION, INCORPORATED, Defendant-Appellee. In Re: FOOD LION, INCORPORATED, FAIR LABOR STANDARDS ACT "EFFECTIVE SCHEDULING" LITIGATION; C. MARSHALL HOLLAND, JR.; CHARLES LEE SMITH; WALTER CRAWFORD THOMAS, JR.; WILLIAM BRIAN BAREFOOT; TONYA Y. BROWN; ROSA BOND; EARNEST A. BRYANT; WAYNE JAY COCHRAN; WILLIAM A. COOKE; JEFFREY J. GOERMAN; KEITH HARRIS; CHARLES S. KNOWLES; FAYE LEE; JOHN M. LYNCH; VERNON W. MENIFEE; BRUCE E. POPE; BOBBY A. ROBERTSON; WARREN D. ROMAN; KEITH W. TINGEN; HASKELL TURNER, Plaintiffs-Appellants, and DARRYL ELLIS; DEBBIE GARDNER; ERIN RICE; KENNETH W. COOPER; ALAN E. ERETT; DANNY LEEANDER PERSON; JOE WILLIAM BAKER; PETER M. SLOKA, SR.; JOHNNY ANDREW PUNCH, III; ESTER M. WOODS; FRED MCMILLAN; ISSAC RAY PACK; ALEXANDER J. SMITH; STEVE J. KIRSCH; MARILYN S. WILSON; VICKI ANN WOOD; PHILLIP LARRY OLDHAM; TERRY A. YOUNG; RICHARD W. MCDONALD; MICHAEL WRENN; STEPHEN G. PARRISH; RANDALL LEE RIGSBEE; DELORES EARP; WILLIAM P. HASKINS; W. EDWARD CAMPBELL; JOHN L. WALLACE; CRAIG WILSON PRESSLEY; STAN M. GRIFFIN; MARY PEEPLES; DAVID G. MYERS; RANDY LAKE; KENNETH RANDALL COOPER; WOODROW WILLIAMS, JR.; ERIN RICE ALBRIGHT; LEISHA BAYNARD; STEPHAN PARRISH, Plaintiffs, v. FOOD LION, INCORPORATED, Defendant-Appellee.

No. 94-2360, No. 97-1443, No. 97-1444, No. 94-2645, No. 95-1274

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

1998 U.S. App. LEXIS 11809

January 30, 1998, Argued
June 4, 1998, Decided

**NOTICE:**
**PUB-STATUS: [*1]** RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**SUBSEQUENT HISTORY:** Reported in Table Case Format at: 1998 U.S. App. LEXIS 24318.

**PRIOR HISTORY:** Appeals from the United States District Court for the Eastern District of North Carolina, at Raleigh. James C. Fox, District Judge. (CA-91-133-4-F, MISC-92-198-5-F, CA-92-827-5-F, CA-92-717-5-F). Appeal from the United States District Court for the Western District of North Carolina, at Asheville. James C. Fox, District Judge, sitting by designation; J. Toliver Davis, Magistrate Judge. (CA-91-184, MISC-92-198-5-F, CA-92-185-5-F). Appeal from the United States District Court for the Middle District of North Carolina, at Greensboro. N. Carlton Tilley, Jr., District Judge; James C. Fox, District Judge, sitting by designation. (MISC-92-198-5-F, CA-92-503-2).

**DISPOSITION:** AFFIRMED.

**CASE SUMMARY**

**PROCEDURAL POSTURE:** Appellants, assistant managers and hourly employees, filed claims for overtime pay against appellee employer under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq. The United States District Court for the Eastern District of North Carolina granted a partial summary judgment for the employer and dismissed certain of the FLSA claims for noncompliance with case management deadlines. The assistant managers and hourly employees appealed.

**OVERVIEW:** The assistant managers and hourly employees filed a class action against the employers for overtime compensation under section 7(a)(1) (29 U.S.C.S. § 207(a)(1)) of the FLSA, 29 U.S.C.S. § 201 et seq. The assistant managers argued they were not exempt from overtime pay; the hourly employees argued they worked more than 40 hours a week. On consolidated appeal, the court held the partial summary judgment was proper because (1) the supporting affidavit was not conclusory and set forth specific facts of which the affiant had personal knowledge under Fed. R. Civ. P. 56(e); and (2) the affidavit, job description, and depositions showed the assistant managers met the bona fide executive exemption under the short test of 29 C.F.R. § 541.1(f) in that they were paid on a salary basis, their actual job duties were primarily managerial, and they did not present rebuttal evidence of their duties. The dismissals were proper

because (1) there was no exceptional circumstances for the tardy consent forms; (2) the questionnaires were untimely or incomplete and there was no viable explanations therefor; and (3) the claims were not timely when the consents were not filed within the three-year period.

**OUTCOME:** The court affirmed the district court's grant of the partial summary judgment for the employer and the dismissal of the hourly employees' claims, which failed to comply with the case management deadlines.

**CORE TERMS:** manager, exemption, duty, managerial, assistant manager, questionnaire, job description, summary judgment, overtime, bona fide, exempt, deadline, similarly situated, class action, non-exempt, Fair Labor Standards Act, store manager, hourly, regulations, primary duty, job duties, consolidated, stocker, personal knowledge, grocery, affiant, salary, manual, summary judgment motion, deposition

## LexisNexis(TM) HEADNOTES - Core Concepts

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN1]The limitations period for filing overtime claims is three years for willful violations by an employer. 29 U.S.C.S. § 255(a).

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN2]Section 7(a)(1) (29 U.S.C.S. § 207(a)(1)) of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., requires employers to pay employees time-and-a-half wages for hours worked over 40 hours per week.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN3]See 29 U.S.C.S. § 207(a)(1).

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN4]Under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., certain categories of employment are exempt from the otherwise mandatory overtime provision, section 7(a)(1) (29 U.S.C.S. § 207(a)(1)) of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq. One such exemption, the bona fide executive exemption, provides that the provisions of 29 U.S.C.S. §§ 206,207 of Title 29 shall not apply with respect to any employee employed in a bona fide executive, administrative, or professional capacity as such terms are defined and delimited from time to time by regulations of the Secretary of Labor. 29 U.S.C.S. § 213(a)(1).

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN5]Department of Labor regulations define that which constitutes employment in an executive or administrative capacity. Two elements are required for the exemption from the mandatory overtime provision, section 7(a)(1) (29 U.S.C.S. § 207(a)(1)) of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq. First, an employee must be paid on a salary basis. 29 C.F.R. §§ 541.1(f), 541.2(e), 541.118(a). Payment on a salary basis is defined as follows: An employee will be considered to be paid on a salary basis if under his employment agreement he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed. The employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. An employee need not be paid for any work week in which he performs no work. 29 C.F.R. § 541.118(a) (1997).

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN6]The second element for an exemption from the mandatory overtime provision, section 7(a)(1) (29 U.S.C.S. § 207(a)(1)) of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., is that an employee's primary duty must be either management, administration, or a combination of both. 29 C.F.R. 541.1(f), 541.2(e), 541.600(a) (1997). The regulations provide a short test and a long test for determining

Page 3

whether an employee's primary duty is management. The short test applies when an employee in question makes more than $ 250 per week. Under the short test, any employee who is compensated for his services on a salary basis at a rate of not less than $ 250 per week and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of the 29 U.S.C.S. § 213(a)(1) exemption. 29 C.F.R. § 541 (1997).

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

[HN7]Analysis of whether an employee's primary duty is management begins with determining which of an employee's duties involve management of a recognized department or subdivision of the employer. An employee must devote more than 50 percent of his time to such duties. Other pertinent factors may indicate that management is an employee's primary duty. Among the factors to be considered are: (1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which an employee exercises discretionary powers, (3) an employee's relative freedom from supervision, and (4) the relationship between an employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

[HN8]Whether management duties constitute a primary job duty is determined on a case-by-case basis. 29 C.F.R. § 541.103 (1997). While the amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee, time alone, is not the sole test, and in situations where an employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN9]Non-exempt work is work other than that which employees with management duties perform; it is performed by hourly employees who are not exempt from the overtime pay provisions of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq. 29 C.F.R. § 541.111 (1997).

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN10]A party that raises the bona fide executive exemption as an affirmative defense to claims under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., has the burden of proof on such issue.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN11]Under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., an employer must prove that any exemption to the overtime provision applies. Proving the exemption is an affirmative defense; the act assumes that an employee is covered.

*Civil Procedure > Appeals > Standards of Review > Clearly Erroneous Review*

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN12]Whether a job duty qualifies as managerial or not is a legal question governed by the pertinent regulations promulgated by the wage and hour administrator. The amount of time devoted to managerial duties, and the significance of those duties, present factual questions that the court reviews for clear error.

*Civil Procedure > Pleading & Practice > Defenses, Objections & Demurrers > Motions to Strike*

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

[HN13]A district court's evidentiary rulings, including whether to strike an affidavit, are reviewed for abuse of discretion.

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*

[HN14]Fed. R. Civ. P. 56(e) (1998) reads, in pertinent part: Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.

*Civil Procedure > Summary Judgment > Supporting Papers & Affidavits*

[HN15]Affidavits which accompany a summary judgment motion must contain admissible evidence and be based on personal knowledge. They must not be conclusory or based upon hearsay.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN16]A classwide exemption exempts, in blanket-like fashion, an employee of a particular job classification from the overtime pay provisions, section 7(a)(1) (29 U.S.C.S. § 207(a)(1)) of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., because of an employee's job's classification or title, irrespective of the facts of an employee's individual case.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN17]Although time is not the sole factor, it is relevant to the determination that appellants meet the managerial exemption to the overtime provisions, section 7(a)(1) (29 U.S.C.S. § 207(a)(1)) of the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN18]An employee can be subject to the bona fide executive exemption even though he spends the majority of his time on non-exempt work and makes few significant decisions.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN19]The fact that an employee executes both managerial and nonexempt work tasks normally undertaken by hourly employees does not preclude his qualifying for the bona fide executive exemption.

*Civil Procedure > Dismissal of Actions > Involuntary Dismissal*

*Civil Procedure > Appeals > Standards of Review > Abuse of Discretion*

*Civil Procedure > Class Actions > Judicial Discretion*

[HN20]In a class action, review of a district court's dismissals for case management reasons is for abuse of discretion. With respect to multi-district litigation, a district court needs to have broad discretion in coordinating and administering multi-district litigation.

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

*Governments > Legislation > Statutes of Limitations > Statutes of Limitations Generally*

*Governments > Legislation > Statutes of Limitations > Time Limitations*

[HN21]The statute of limitations for an action under the Fair Labor Standards Act, 29 U.S.C.S. § 201 et seq., claiming unpaid overtime compensation is two years, except that a cause of action arising out of an alleged willful violation may be commenced within three years after the cause of action has accrued. 29 U.S.C.S. § 255(a).

*Labor & Employment Law > Wage & Hour Laws > Civil Procedure & Remedies*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN22]Title 29 U.S.C.S. § 216(b) states, in relevant portion: An action to recover unpaid overtime may be maintained by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.

*Civil Procedure > Pleading & Practice > Filing of Complaint*

*Civil Procedure > Class Actions*

*Labor & Employment Law > Wage & Hour Laws > Administrative Remedies & Proceedings*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN23]Title 29 U.S.C.S. § 256 states: In determining when an action is commenced for the purposes of 29 U.S.C.S. § 255, an action shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor Standards Act of 1938, as amended, it shall be considered to be commenced in the case of any individual claimant.

*Civil Procedure > Class Actions > Prerequisites*

[HN24]Until a plaintiff, even a named plaintiff, has filed a written consent, he has not joined in the class action, at least for statute of limitations purposes.

Page 5

Signed consents filed after the filing of the complaint do not relate back to the date the complaint was filed. Each claimant's action is commenced on the date on which his or her consent is filed with the court.

**COUNSEL:** ARGUED: Jeffrey Todd Eddy, NESS, MOTLEY, LOADHOLDT, RICHARDSON & POOLE, Charleston, South Carolina, for Appellants.

William Pinkney Herbert Cary, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellee.

ON BRIEF: John C. Davis, Kent Spriggs, SPRIGGS & JOHNSON, Tallahassee, Florida, for Appellants.

James [*2] T. Williams, Jr., M. Daniel McGinn, BROOKS, PIERCE, MCLENDON, HUMPHREY & LEONARD, L.L.P., Greensboro, North Carolina, for Appellee.

**JUDGES:** Before WILKINSON, Chief Judge, BUTZNER, Senior Circuit Judge, and MICHAEL, Senior United States District Judge for the Western District of Virginia, sitting by designation. Senior Judge Butzner wrote a concurring and dissenting opinion.

**OPINION: OPINION**

PER CURIAM:

In this case we consider appeals from the district court's grant of partial summary judgment in favor of an employer and dismissal of the consolidated Fair Labor Standards Act overtime pay claims of numerous of the employer's salaried and hourly wage employees. For the reasons stated herein, we affirm the district court.

I.

In a previous opinion, In re Food Lion, Inc., Fair Labor Standards Act "Effective Scheduling" Litigation, 73 F.3d 528 (4th Cir. 1996) (published) (Hall, J.) (Butzner, J., dissenting), we recited the factual and procedural background of this case. This second narration is taken, almost verbatim, from our earlier opinion.

Beginning in 1991, several small groups of employees and former employees of Food Lion, Inc. ("Food Lion"), filed civil actions in Federal [*3] courts in a number of southern States in which Food Lion owns and operates grocery stores. In each of these actions, the plaintiffs asserted claims for unpaid overtime and penalties under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201 et seq. Hourly employees alleged that they were forced to work "off the clock" in

order to finish the tasks for which they were responsible under Food Lion's company-wide scheduling system, and several assistant managers claimed that they were not exempt from FLSA's overtime provisions because the tasks they performed did not qualify as "managerial."

On June 13, 1992, the Judicial Panel on Multidistrict Litigation ("JPML" or "Panel") issued an order transferring two of these actions, one from the District of South Carolina (Scott ) and the other from the Western District of North Carolina (Ledford), to the Eastern District of North Carolina for "coordinated or consolidated pretrial proceedings" n1 with another action then pending there (McLawhon); all of the cases assigned to Judge Fox. The Panel thereafter transferred six tag-along cases n2 over the next five months. Judge Fox eventually had eleven separate actions before him. [*4] n3

- - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - -

n1 28 U.S.C. § 1407(a).

n2 See R.Proc.J.P.M.L. 1.

n3 In addition to two cases filed in his district, Judge Fox had before him a case from each of the other two districts in North Carolina, three from South Carolina, one from the Eastern District of Virginia, two from the Eastern District of Tennessee, and one from the Northern District of Florida. Although the Virginia case arrived in Judge Fox's court via a transfer of venue entered by the district court in Virginia pursuant to 28 U.S.C. § 1404(a), it was consolidated with the other transferred cases for pretrial matters and treated as if it were a § 1407 case.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

In October 1992, court-approved notices were sent to some 60,000 current and former Food Lion employees who had worked in stores in North Carolina, South Carolina, Florida, Georgia, Virginia, or Tennessee after October 16, 1989. n4 Almost one thousand of these employees (including the named plaintiffs in the eleven separate actions) opted into the litigation by returning "consent forms," [*5] and each employee returning a consent form was assigned a "court number." A master file was created in a consolidated case denominated In re: Food Lion, Inc., Fair Labor Standards Act "Effective Scheduling" Litigation, and

each "opt-in" plaintiff was assigned to one of the individual cases.

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n4 [HN1]The limitations period for filing overtime claims is three years for willful violations by an employer. 29 U.S.C. § 255(a).

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

In a series of pretrial orders, Judge Fox dismissed the claims of about half of the plaintiffs on summary judgment. On March 22, 1994, a "suggestion of remand" n5 was filed by the district court and forwarded to the Panel. On June 2, 1994, the Panel remanded eight of the actions to their respective transferor courts. n6

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n5 See R.Proc.J.P.M.L. 14(c)(ii).

n6 The Virginia case was retransferred by an order entered by Judge Fox.

- - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[*6]

After remand, one of the two cases remaining in the Eastern District of North Carolina was completed, and an appeal was taken by a number of the plaintiffs whose claims had been dismissed by summary judgment during the consolidated pretrial proceedings (the Royster appeal). At about the same time, some of the plaintiffs who had met a similar fate in Judge Fox's court, but who were part of cases from one of the two other districts in North Carolina, asked for and received Fed.R.Civ.P. 54(b) certifications for immediate appeal from the respective transferor district courts. These two appeals were consolidated with the Royster appeal, and we heard oral argument on October 30, 1995.

In our published opinion thereafter, we declined to reach the merits reasoning:Because there are numerous other plaintiffs who have not yet appealed but who were dismissed by the same district court on essentially the same grounds as one or more of the appellants, we believe that 28 U.S.C. § 1407, the multidistrict litigation statute, requires that the other dismissed plaintiffs have the opportunity to join in the appeals before us.In re Food Lion, Inc., Fair Labor Standards Act "Effective [*7] Scheduling"

Litigation, 73 F.3d at 530. Accordingly, we first held in abeyance the then-pending appeals from the three North Carolina districts. Second, we directed the Panel to retransfer from the District of South Carolina, the Northern District of Florida, and the Eastern District of Tennessee to the Eastern District of North Carolina those claims that were dismissed by Judge Fox prior to the June 20, 1994 remand by the Panel. Finally, we ordered the district court for the Eastern District of North Carolina, after retransfer, to enter final judgment as to all such claims, pursuant to Fed.R.Civ.P. 54(b) and to allow any appeals taken pursuant to such certifications to be heard in this court. Id. at 533.

After our remand and the entry of final judgments by the Eastern District of North Carolina in March 1997, seventy-one plaintiffs from two cases originally filed in the District of South Carolina and eight plaintiffs from the case originally filed in the Northern District of Florida took appeals which were consolidated with the earlier Royster appellants by Order of this court on April 22, 1997. We now reach the merits of all appeals.

## II. THE FAIR LABOR STANDARDS ACT [*8]

[HN2]Section 7(a)(1) of the FLSA, 29 U.S.C. § 207(a)(1), requires employers to pay employees time-and-a-half wages for hours worked over forty (40) hours per week. As [HN3]the statute reads:Except as otherwise provided in this section, no employer shall employ any of his employees who in any workweek is engaged in commerce or in the production of goods for commerce, or is employed in an enterprise engaged in commerce or in the production of goods for commerce, for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed.29 U.S.C. § 207(a)(1) (West 1965 & Supp. 1997).

The plaintiffs' class alleged dual claims under the FLSA against Food Lion. First, certain salaried assistant managers of the employer charged that they were not exempt from the overtime pay provisions of the FLSA by virtue either of their salaried or managerial status and, second, certain hourly employees alleged that they worked "off the clock" and, thereby, were entitled to overtime compensation under the statute.

### A. The Bona Fide Executive [*9] Exemption

The court below entered partial summary judgment against numerous salaried assistant managers at Food Lion by Orders of October 27, 1993 and November 5, 1993.

[HN4]Under the FLSA, certain categories of employment are exempt from the statute's otherwise mandatory overtime provision. One such exemption, the "bona fide executive" exemption, provides:The provisions of section 206 . . . and section 207 of this title shall not apply with respect to . . . any employee employed in a bona fide executive, administrative, or professional capacity . . . (as such terms are defined and delimited from time to time by regulations of the Secretary. . . .)29 U.S.C. § 213(a)(1) (West 1965 & Supp. 1997). [HN5]Department of Labor regulations carefully define that which constitutes employment in an executive or administrative capacity. Two elements are required for that exemption. First, an employee must be paid "on a salary basis." 29 C.F.R. §§ 541.1(f), 541.2(e), 541.118(a) (1997). The regulations define payment "on a salary basis" as follows:An employee will be considered to be paid "on a salary basis" within the meaning of the regulations if under his employment agreement [*10] he regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of his compensation, which amount is not subject to reduction because of variations in the quality or quantity of work performed. . . . The employee must receive his full salary for any week in which he performs any work without regard to the number of days or hours worked. This policy is also subject to the general rule that an employee need not be paid for any workweek in which he performs no work.29 C.F.R. § 541.118(a) (1997). [HN6]Second, an employee's primary duty must be either management, administration, or a combination of both. Id. §§ 541.1(f), 541.2(e), 541.600(a) (1997).

The regulations provide a "short test" and a "long test" for determining whether an employee's primary duty is management. See Shockley v. City of Newport News, 997 F.2d 18, 25 (4th Cir. 1993); Murray v. Stuckey's, Inc., 939 F.2d 614, 617 (8th Cir. 1991), cert. denied, 502 U.S. 1073, 117 L. Ed. 2d 135, 112 S. Ct. 970 (1992). The "short test" applies when the employee in question makes more than $ 250 per week. n7 Under this test:Any employee . . . who is [*11] compensated for his services on a salary basis at a rate of not less than . . . $ 250 per week . . . and whose primary duty consists of the management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof, and includes the customary and regular direction of the work of two or more other employees therein, shall be deemed to meet all the requirements of [the 29 U.S.C. § 213(a)(1) exemption].29 C.F.R. § 541 (1997). As we have instructed previously:[HN7]

Analysis of whether an employee's primary duty is management begins with determining which of the employee's duties involve management of a recognized department or subdivision of the employer. As a "rule of thumb," the employee must devote more than fifty percent of his time to these duties. . . . Other pertinent factors, however, may indicate that management is the employee's primary duty. Among the factors to be considered are: (1) the relative importance of the managerial duties as compared with other types of duties, (2) the frequency with which the employee exercises discretionary powers, (3) the employee's relative freedom from supervision, and (4) the [*12] relationship between the employee's salary and the wages paid other employees for the kind of nonexempt work performed by the supervisor.Shockley, supra, 997 F.2d at 25-26 (citing 29 C.F.R. § 541.103 (1992)).

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n7 The court below found and the parties agreed that all of the assistant managers made more than $ 250 per week. Thus, the "long test" for the bona fide executive exemption of 29 C.F.R. § 541.1(a)-(e) is inapplicable here. Rather, the "short test" of § 29 C.F.R. 541.1(f) governs the inquiry.

- - - - - - - - - - - - End Footnotes- - - - - - -
- - - - - -

[HN8]Whether management duties constitute a primary job duty is determined on a case-by-case basis. 29 C.F.R. § 541.103 (1997). While "the amount of time spent in the performance of the managerial duties is a useful guide in determining whether management is the primary duty of an employee[,] . . .time alone, however, is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty [*13] if the other pertinent factors support such a conclusion." Id.; Murray, supra, 939 F.2d at 618 (holding that time alone is not the sole test in determining whether the primary duties of an employee were "management" and upholding exemption even where employee spent a majority of time performing non-exempt n8 work). The quantitative fifty percent rule, in other words, is, as the regulations state, only a "rule of thumb." 29 C.F.R. § 541.103 (1997).

- - - - - - - - - - - - - - Footnotes - - - - - - - - -
- - - - - -

n8 [HN9]"Non-exempt work" is work other than that which employees with management duties perform; it is performed by hourly employees who are

not exempt from the overtime pay provisions of the FLSA. 29 C.F.R. § 541.111 (1997).

- - - - - - - - - - - End Footnotes- - - - - - - - - - - -

[HN10]Because Food Lion raised the bona fide executive exemption as an affirmative defense to the assistant managers' FLSA claims, it had the burden of proof on that issue. Clark v. J.M. Benson Co., 789 F.2d 282, 286 (4th Cir. 1986). n9

- - - - - - - - - - - - - Footnotes - - - - - - - - -

n9 [HN11]Under the FLSA, an employer must prove that any exemption to the overtime provision applies. Proving the exemption is an affirmative defense; the statute assumes that an employee is covered.

- - - - - - - - - - - End Footnotes- - - - - - - - - - -

[*14]

B. Standards of Review

[HN12]Whether a job duty qualifies as managerial or not is a legal question "'governed by the pertinent regulations promulgated by the Wage and Hour Administrator.'" Shockley, supra, 997 F.2d at 26 (quoting Icicle Seafoods, Inc. v. Worthington, 475 U.S. 709, 714, 89 L. Ed. 2d 739, 106 S. Ct. 1527 (1986)). On the other hand, "the amount of time devoted to managerial duties, and the significance of those duties, present factual questions that we review for clear error." Id. (citing Fed.R.Civ.P. 52(a)) (other citations omitted).

C. Assistant Managers' Claims

Food Lion moved for summary judgment on the ground that each of the assistant managers met the bona fide executive exemption. In support of the summary judgment motion, Food Lion offered the affidavit of the Vice-President of Grocery Operations, Charles C. Buckley, and the store's assistant manager job description from the "Store Operations Manual." n10 In addition, the store offered individual assistant managers' depositions which showed that the job tasks they actually performed were consistent with the affidavit and job description.

- - - - - - - - - - - - - Footnotes - - - - - - - - -

n10 The Food Lion manual reads, in pertinent part:

JOB DESCRIPTION: ASSISTANT MANAGER JOB OBJECTIVE: To assist the Store Manager to see that the Company customer service standards are met and to manage the total store in compliance with the policies, standards, security measures, and regulations of the Company.

AUTHORITY: Responsible for the total store in the absence of the Store Manager. Directly responsible for supervision and management of the Grocery Manager, the Scan Analyst, and HBA Clerk.

- - - - - - - - - - - End Footnotes- - - - - - - - - - -

[*15]

According to Buckley's affidavit and the manual's job description, assistant managers in each Food Lion store are primarily responsible for the operation of the Grocery Department, a division of the store. The Grocery Department accounts for some sixty-five percent of sales floor space in the typical store and oversees the sale of all Food Lion merchandise with the exceptions of produce, dairy, meat, frozen foods, and delicatessen products. An assistant manager supervises a Grocery Department manager, one or more full-time shelf "stockers," and numerous part-time stockers. A full-time stocker's maximum weekly pay is eighty percent of an assistant manager's minimum weekly salary. Among other duties, an assistant manager's duties include hiring and training stockers, training the Grocery Department manager, and evaluating the performance of other Grocery Department employees. In the absence of a Food Lion store's manager, the assistant manager is primarily responsible for overseeing the entire store. The typical assistant manager works about half of the time under such circumstances when the manager is absent. From 1986 to 1993, the lowest range for all the Food Lion assistant managers' [*16] weekly salary was $ 390 per week. In addition to the Buckley affidavit and job description, Food Lion also adduced evidence from individual stores' assistant managers to show that their particular job duties were consistent with those of the assistant manager position so described in the affidavit and Food Lion manual.

The district court found that Food Lion met its initial burden of producing evidence that the assistant managers met the managerial exemption to the FLSA. The court also denied the assistant managers' motion to strike the Buckley affidavit. The crux of these appeals by the assistant managers, then, is whether in adducing

the Buckley affidavit and job description, Food Lion failed to offer proof that each individual assistant manager primarily performed actual managerial work consistent with the 29 U.S.C. § 213(a)(1) exemption. Related to this issue is the question of whether the court abused its discretion when it refused to strike the Buckley affidavit. We address the issues in reverse order.

1. Motion to Strike Affidavit

[HN13]A district court's evidentiary rulings, including whether to strike an affidavit, are reviewed for abuse of discretion. Evans v. Technologies [*17] Applications & Service Co., 80 F.3d 954, 962 (4th Cir. 1996) (citing United States v. Hassan El, 5 F.3d 726, 731 (4th Cir. 1993), cert. denied, 511 U.S. 1006, 128 L. Ed. 2d 50, 114 S. Ct. 1374 (1994)). Appellants argue that the affidavit purports to state job duties of Food Lion assistant managers about which the affiant lacked "personal knowledge," as required by Fed.R.Civ.P. 56(e). n11

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n11 [HN14]Rule 56(e) reads, in pertinent part:Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein.Fed.R.Civ.P. 56(e) (West 1998).

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

As we stated in Evans, [HN15]affidavits which accompany a summary judgment motion must contain "admissible evidence and be based on personal knowledge." Id. (citing Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991)). They must not be conclusory or based upon hearsay. Id. (citing [*18] Rohrbough v. Wyeth Labs., Inc., 916 F.2d 970, 975 (4th Cir. 1990); Maryland Highways Contractors Ass'n v. Maryland, 933 F.2d 1246, 1252 (4th Cir.), cert. denied, 502 U.S. 939, 116 L. Ed. 2d 325, 112 S. Ct. 373 (1991)). In Evans, we affirmed the district court's decision to strike portions of an affidavit filed in opposition to a summary judgment motion in a sex and age employment discrimination case because:Several of the portions struck consisted of [the affiant's] own unsupported assertions of . . . the abilities of her colleagues. Because, again, we generally consider self-serving opinions without objective corroboration not significantly probative, the decision to strike . . . was not improper.Id. We stated further that "the district

court determined that [the affiant], a low-level employee" would not have had access to the corporate information about which she testified and, appropriately, struck portions of her affidavit. 80 F.3d at 962 n.6.

Here, Vice-President Buckley, a high-level Food Lion employee, had directly supervised the assistant managers for seven years at the time he testified in specific detail in the affidavit about their [*19] job duties. As well, the information about which he testified was corroborated in the Food Lion manual's assistant manager job description. The Buckley affidavit met the requirements of Rule 56(e) in that it was not conclusory, did not contradict the affiant's earlier sworn testimony, and set forth specific facts of which the affiant had personal knowledge, rather than mere generalities. See, e.g., Barwick v. Celotex Corp., 736 F.2d 946, 960-61 (4th Cir. 1984). Because we cannot find that the district court abused its discretion when it found that the information recited in Buckley's affidavit derived from personal knowledge, we affirm the district court's Order of October 27, 1993 refusing to strike the affidavit.

2. The "Class Exemption"

Appellants assert that with the Buckley affidavit and job description, Food Lion only offered evidence of the job duties of a "hypothetical" assistant manager. The assistant managers maintain that an employer invoking the exemption from the overtime pay provisions of the FLSA must come forward with evidence that each employee actually performs exempt executive or managerial work, as claimed. In support of the proposition that classwide [*20] exemptions n12 are not permissible under the FLSA, appellants cite Hodgson v. The Klages Coal and Ice Co., 435 F.2d 377, 382 (6th Cir. 1970) ("An employer seeking an exemption from the overtime requirements of the Act under 29 U.S.C. § 213(a)(1) must prove that each employee is entitled to the exemption by plain and unmistakable evidence.") (citation omitted), Mitchell v. Williams, 420 F.2d 67, 69 (8th Cir. 1969) ("The employer must prove that any particular employee meets every requirement before the employee will be deprived of the protection of the Act.") (citation omitted), and Brock v. Norman's Country Market, Inc., 835 F.2d 823, 826 (11th Cir. 1988). Appellants argue that Food Lion, by not offering evidence as to every individual assistant manager's actual work duties, effectively sought and received a "class exemption" for all assistant managers.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - -

n12 [HN16]A "classwide exemption" exempts, in blanket-like fashion, an employee of a particular job classification from the FLSA's overtime pay provisions because of that employee's job's classification or title, irrespective of the facts of that employee's individual case.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*21]

On this point, the appellants overlook two critical distinctions between the valid authority they cite and the instant matter. First, in addition to the Buckley affidavit and job description, here Food Lion did offer particularized evidence in the form of numerous assistant managers' depositions relating to their actual individual job duties, in support of its summary judgment motions. Second, it must be remembered that here appellants were proceeding collectively under the FLSA, 29 U.S.C. § 216(b), and, as such, had been determined to be "similarly situated" factually by the district court. Considering that the instant matter was an FLSA class action, the authority cited by appellants is distinguishable as no such case involved an FLSA collective proceeding. By offering the affidavit, the job description, and individual assistant managers' deposition testimony, we hold that Food Lion, not only met but exceeded its initial burden to come forth with evidence that appellants fell within the bona fide executive exemption. Such a holding is consistent with FLSA caselaw appellants invoke concerning non-collective actions. In a case with a fact pattern similar to the instant case's, [*22] an employer was deemed to have met its initial burden of producing evidence in support of the exemption by adducing only an affidavit from its vice-president articulating the general duties of its associate managers without a more particularized showing at that early stage. Dole v. Papa Gino's of America, Inc., 712 F. Supp. 1038, 1040 (D.Mass. 1989). n13

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n13 Additional proof that Food Lion did not seek a classwide exemption is the fact that it did not move to dismiss every assistant manager claim. See, e.g., Ronald Rollo, a Florida plaintiff. Rather, it acknowledged that factual differences existed across the assistant managers' class.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

Once Food Lion satisfied its initial burden to present evidence that the assistant managers met the bona fide executive exemption, the burden shifted to the assistant managers to offer evidence that they were not exempt from the act. Similar to Food Lion's evidence, the assistant managers made a "consolidated response" that included representative affidavits [*23] from some, but not all, assistant managers. The responsive affidavits stated that appellants remained covered under the act, notwithstanding the exemption, because they performed manual labor and other non-exempt duties and because the store manager was usually in the store and in charge when they were working.

The district court found that numerous of the post-notice assistant managers among the appellants had met their burden by presenting at least some evidence that their actual job duties varied from those recited in the Buckley affidavit and the manual's job description. n14 For this reason, the court denied Food Lion's summary judgment motion as to those assistant managers. The court, however, entered summary judgment against the remaining assistant managers because they did not rebut Food Lion's evidence and, thus, created no triable issue of fact as to the duties of those assistant managers.

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - -

n14 These assistant managers used individual questionnaires, deposition testimony, and affidavits to counter Food Lion's evidence about the duties of assistant managers. The district court denied Food Lion's motion for summary judgment as to these appellants because they came forward with particularized evidence tending to rebut the Buckley affidavit and job description.

- - - - - - - - - - - End Footnotes- - - - - - - - - - - - -

[*24]

Appellants correctly state that the issue of "whether employees are exempt from the requirements of the [FLSA] is primarily a question of fact." Klages Coal, supra, 435 F.2d at 382. While this is true, the assistant who failed to attempt to rebut Buckley's affidavit and the Food Lion manual's assistant manager job description did not create a genuine issue of fact to survive summary judgment and send their claims to a jury. Accordingly, the district court properly granted Food Lion judgment as a matter of law and dismissed the claims of those assistant managers who did not

adduce any evidence to counter Food Lion's evidence that appellants met the bona fide executive exemption.

### 3. The Evidence of Managerial Duties

Assistant managers Rickie Pringle and Allan Seidl, Busher appellants, did file responses to Food Lion's summary judgment motion. They challenge the district court's grant of judgment as a matter of law against them. They contend that they did not have primarily managerial responsibilities at Food Lion and, thus, fell outside of the bona fide executive exemption.

In his deposition, however, Pringle himself testified that he, along with the store [*25] manager, was in charge of Food Lion's"effective scheduling" program in the grocery department. He testified that during about one-half of his working hours, he was in charge of the store without the store manager. During those periods, he would handle customer complaints, supervise the stockers, "keep an eye on the grocery department," and recommend disciplinary actions. While Pringle also typically performed non-exempt work during these same periods when he was in charge of the store in the store manager's absence, he did both the non-exempt work and the managerial work at the same time.

Assistant manager Seidl also filed a declaration as part of the appellants' consolidated response to Food Lion's summary judgment motion. In it, he states that only five percent of his time was devoted to managerial duties. Looking to the duties themselves, however, he admits that he listened to employee complaints, verified deposits, interviewed job candidates, wrote up employees for disciplinary problems, and supervised employees' work. Seidl states, however, that the grocery manager and customer service manager also would be able to perform such duties.

The evidence presented in the cases of [*26] the Royster appellants was of a similar nature. When asked how often he worked in the store without the manager, for example, assistant manager Oakes testified that "most of the time we were there together." Oakes apparently worked some fifty-eight hours per week. The store had three shifts, and the manager came in on the three "truck days" per week at five to six a.m. On those days, Oakes would close the store at ten p.m. and work another few hours setting up displays (which itself is nonexempt work). The two employees, then, overlapped only an hour or two in the middle afternoon. Because one or the other employee had to cover some 126 hours per week, the two could not have worked together "most of the time." In any event, when Oakes was at the store in the absence of the store manager, he clearly was in charge and performing the store's "managerial duties" as that term is defined in

the employer's regulations. Oakes kept an eye on his store's various departments, made sure people were working, and disciplined employees from time to time.

In assistant manager Junge's case, for instance, he testified in deposition that his and the store manager's work schedules overlapped approximately [*27] six hours a day, five days a week, from noon until six p.m. In other words, given that Junge worked about sixty-five hours per week, for about half the work week Junge was in complete charge. Importantly, in terms of his managerial duties, he testified that his actual job duties were the same as those of a typical assistant described in the Food Lion manual. Junge dealt with customer complaints, gave constructive advice to other employees, and, in the absence of the manager, was in charge of the store.

The evidence as to the other Royster appellants, White, Lucas, Holland, Smith, Erb, and Pronier, was materially similar. Each appellant was in charge of the store in the absence of the store manager every working week. Each appellant supervised the work of other employees while on duty. While in charge of the store, each appellant handled complaints and problems in the store as they arose. Each appellant possessed authority to discipline co-workers and make employment decisions as to them.

Looking to the depositions of the various assistant managers, while the individual assistant managers' actual duties differed somewhat throughout the various stores, all were in charge to varying [*28] degrees and for varying periods when the managers were absent. The appellants were in sole command of the stores in which they worked about half the time. [HN17]Although time is not the sole factor, of course, it is relevant to the determination that the appellants meet the managerial exemption to the FLSA's overtime provisions. Shockley, supra, 997 F.2d at 25-26; 29 C.F.R. § 541.103. The appellants all supervised stockers and Grocery Department personnel. While appellant Seidl counters that only five percent of his time was devoted to managerial duties, he does not dispute that he periodically did supervise stockers and other personnel. In the seminal FLSA case involving assistant managers at a fast-food restaurant, the First Circuit stated, "The supervision of other employees is clearly a management duty." Donovan v. Burger King Corp. ("Burger King I"), 672 F.2d 221, 226 (1st Cir. 1982). As to Seidl's argument that his time spent in managerial tasks fell short of the "fifty percent" rule, that rule, again, is only a "rule of thumb." Shockley, supra, 997 F.2d at 26. [HN18]An employee can be subject to the bona fide executive exemption "even though he spends the majority of [*29] his time on non-exempt work and makes few significant decisions.

Burger King I at 226-27 (citing Rau v. Darling's Drug Store, Inc., 388 F. Supp. 877, 881 (W.D.Pa. 1975)) (other citations omitted).

To be sure, the assistant managers periodically performed some non-exempt duties such as stocking the shelves and unloading grocery trucks. [HN19]The fact that an employee executes both managerial and nonexempt work tasks normally undertaken by hourly employees, however, does not preclude his qualifying for the bona fide executive exemption. Donovan v. Burger King Corp. (Burger King II), 675 F.2d 516 (2d Cir. 1982) (holding that fast-food restaurant's assistant managers were exempt under the bona fide exemption's short test despite large amount of non-exempt work performed). Conversely, appellants claim that their managerial responsibilities sometimes were performed by non-exempt hourly employees. This contention is of no moment because "the regulations do not provide . . . that an employee whose primary duty is managerial will not qualify for exempt executive status because other, non-supervisory employees are able to and sometimes do perform his or her managerial duties." [*30] Stuckey's, supra, 939 F.2d at 618 n.2. Finally, the assistant managers argue that during the time that the store manager was absent, the assistant manager in charge was merely a glorified stocker with the store manager available by telephone to make important decisions that might arise. On this point, the Second Circuit has held that when the record shows "that for the great bulk of their working time, assistant managers are solely in charge of their restaurants and are the 'boss' in title and in fact[,] . . . that the . . . manager is available by phone does not detract in any substantial way from this conclusion." Burger King II, supra, 675 F.2d at 522.

For the reasons stated and after careful review of the record and the applicable law, we conclude that the actual job duties of the appellant assistant managers were primarily managerial. The district court properly granted summary judgment against them on their FLSA overtime claims.

## III. CASE MANAGEMENT DISMISSALS

The hourly employees of Food Lion appeal certain of the district court's case management decisions resulting in dismissals of their claims. [HN20]In a class action, review of a district court's dismissals [*31] for case management reasons is for abuse of discretion. See, e.g., Central Wesleyan College v. W.R. Grace & Co., 6 F.3d 177, 185 (4th Cir. 1993) ("Issues of class action manageability are properly committed to the district court's discretion, because that court 'generally has a greater familiarity and expertise' with the 'practical . . . and primarily . . . factual' problems of administering a lawsuit 'than does the court of appeals.'") (quoting

Windham v. American Brands, Inc., 565 F.2d 59, 65 (4th Cir. 1977) (en banc) (other citation omitted). With respect to multi-district litigation, as here, we have instructed, "a district court needs to have broad discretion in coordinating and administering multi-district litigation." In re Showa Denko K.K.L-Tryptophan Products Liability Litig.-II, 953 F.2d 162, 165 (4th Cir. 1992).

### A. Late Consents

The district court established a January 4, 1993 cutoff date for persons wishing to opt in to the "Effective Scheduling" litigation. Three would-be plaintiffs, Royster, Murchinson, and Mattox, missed the cutoff by several days and were dismissed. Appellants Gore, Losco, O'Neal, and Seidl also failed to file consents by the appointed [*32] deadline.

Appellants' sole argument on appeal on this point is nothing more than that the FLSA is remedial and should be stretched to allow in as many such claims as possible. The prerogative of the district court to manage its docket with timetables and deadlines, however, prevents even remedial statutes from stretching to the breaking point. It cannot be gainsaid that the district court was clear about its cut-off deadline. On October 20, 1992, the district court, when it authorized the opt in notice, set a cut-off deadline for persons wishing to opt in on December 31, 1992 (later extended to January 4, 1993). The court stated that late opt-in forms, absent a showing of "exceptional circumstances," would not be considered by the court and such persons sending tardy forms would not be in the class. As the court simply stated, "whoever gets in by the 31st of December is in. Whoever who's not in is not in. That's the end of it." Transcript of October 16, 1992 conference at 37.

Several appellants (Losco, O'Neal, and Seidl) later filed affidavits attempting to establish "exceptional circumstances" as an excuse for their untimely filed opt-in forms. Losco claimed that he mailed his consent [*33] form on the appointed date; O'Neal stated that his father was terminally ill when he received the opt-in form and that he mailed the consent after his father died; and Seidl asserted that, after a period of time spent out of town, he completed and mailed the form upon his return. As far as Losco's having mailed his consent only on--not before--the deadline, we have stated in another context that the "litigant who decides to rely on the vagaries of the mail must suffer the consequences." Thompson v. E.I. DuPont de Nemours & Co., 76 F.3d 530, 534 (4th Cir. 1996). With respect to the court's decision declining to find exceptional circumstances accounted for the tardy consents, we cannot say that the court abused its discretion. See, e.g., Hoffmann-LaRoche, Inc. v. Sperling, 493 U.S.

165, 172, 107 L. Ed. 2d 480, 110 S. Ct. 482 (1989) (holding that a district court is empowered to establish "cut off dates to expedite disposition of the action."). To the extent to which appellants additionally assert that the district court abused its discretion when it dismissed, with prejudice, the claims of the tardy consent filers, sanctions in such a circumstance properly may include dismissal. See Rabb v. Amatex [*34] Corp., 769 F.2d 996, 1000 (4th Cir. 1985).

## B. Imperfect Questionnaires

In May 1993, the district court sent out questionnaires, approved by plaintiffs and defendant, that required each of the almost one thousand pre-notice and post-notice plaintiffs to complete, notarize, and mail to plaintiffs' counsel by June 11, 1993. Plaintiffs' counsel was then required to pass the questionnaires on to Food Lion's attorneys by June 25, 1993. The court had approved use of the questionnaires in order to streamline discovery of post-notice plaintiffs, provide basic information about each plaintiff's claim, and, thereby, to spur possible settlement negotiations. The court's order alerted the plaintiffs that failure to comply with the above deadlines could result in the dismissal, with prejudice, of the plaintiff's claim.

Many would-be plaintiffs missed the return deadline or sent in incomplete forms (e.g., forms which lacked proper notarization) or the wrong forms (e.g., in April 1993, plaintiffs' counsel had their clients fill out questionnaires for counsel's own use and many plaintiffs wrongly mailed these forms). The district court gave each plaintiff who failed to return a questionnaire [*35] or completed the wrong questionnaire an opportunity to show cause by August 2, 1993 why his form was untimely or incomplete. Those plaintiffs who did show cause were not dismissed. The district court found, however, that many claimants did not proffer viable explanations, if any at all was proffered, and entered dismissal orders against them.

Three appellants, Harvey, Bryant, and Clark, failed to submit notarized questionnaires to plaintiffs' counsel by June 11, 1993, and failed to complete and forward the questionnaires to Food Lion before the June 25, 1993 deadline. As well, Bryant and Clark failed to submit timely, properly sworn and notarized explanations in response to the court's show cause order as to why they were late in the first instance. While the three appellants' personal circumstances at the time may explain the tardiness of their questionnaires and may entitle them to some degree of sympathy, n15 because we review the district court's rulings on this point for abuse of discretion, we do not find that the appellants are entitled to legal relief. Given that this consolidated action had almost one

thousand claims in the beginning of proceedings, this court will afford [*36] the district court significant latitude in its handling of pretrial matters and in its case management directives. The court acted within its discretion when it dismissed the claims of the non-complying appellants. Rabb, supra, 769 F.2d at 1000 (holding that failure to comply with a discovery order warrants dismissal).

- - - - - - - - - - - - - - Footnotes - - - - - - - - - - - - - - - - - -

n15 Harvey asserted that he was traveling at the time he received the court questionnaire. He stated that although the questionnaire arrived at his house in South Carolina and was forwarded to him by his wife in a timely manner, he never received it. Nevertheless, even after he did receive the questionnaire, he delayed three weeks before submitting it. Clark stated that he traveled because of his job and was out of town for seven days at the time the questionnaire arrived. Bryant asserted that he had moved around the time the questionnaire was sent and that his mail was not forwarded to him.

- - - - - - - - - - - - End Footnotes- - - - - - - - - - - - - -

## C. Statute of Limitations

[HN21]The statute of limitations for an FLSA action claiming unpaid overtime [*37] compensation is two years, except that a cause of action arising out of an alleged willful violation may be commenced within three years after the cause of action accrued. 29 U.S.C. § 255(a) (West 1985 & Supp. 1998). By Orders of October 18 and October 27, 1993, the district court applied the three year statute of limitations period.

### 1. Post-Notice Hourly Employees

Five opt-in hourly employees wrote in their consents to join the suit that their alleged uncompensated overtime work had occurred more than three years earlier. The district court dismissed these five employees' claims entirely on statute of limitations grounds.

Appellant Surles, for example, said in his consent, which he filed in December 1992, that he last worked "off-the-clock" in February 1989. In his case, however, only his questionnaire--not his initial consent form, his first "pleading,"--alleged unpaid overtime at any time three years before the filing of his consent. This allegation in the questionnaire alone is not enough to avoid the limitations bar when his consent form alleged no unpaid overtime within the previous three

years. Accordingly, the court did not err in dismissing his claim.

The remaining [*38] opt-in plaintiffs were rightly found to have been time-barred because they did not clearly allege when they worked overtime without pay. n16

------------- Footnotes ---------
------

n16 Appellant Barnes quit in December 1990 and filed the consent in December 1992. Appellant Pippa presented no evidence of having worked overtime within the limitations period. Appellant Ramsey was assistant manager within the limitations period and, thus, would have had no viable off-the-clock claims. Appellant Williams' evidence did not clearly state when he worked off-the-clock.

----------- End Footnotes- -------
------

2. Named Hourly Employee Plaintiffs

Again, causes of action under the FLSA have a three-year statute of limitations period; claims for overtime cannot extend back past three years. The district court began counting from the date when each plaintiff filed his consent to opt in to the litigation. Included in this ruling were six named plaintiffs in the original suit. Instead of counting from the date the complaint was filed, the district court also required them to file a consent within [*39] the limitations period. The six named plaintiffs who failed to file timely consents now argue their consents relate back pursuant to Fed. R. Civ. P. 15(b) to the date the complaint was filed or, alternatively, that consents are not required of named plaintiffs.

The precise wording of two sections of the FLSA indicates otherwise. [HN22]As section 16(b) of the FLSA states, in relevant portion:[An] action to recover [unpaid overtime] may be maintained . . . by any one or more employees for and in behalf of himself or themselves and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought.29 U.S.C. § 216(b) (West 1965) (emphasis added). [HN23]As section 7 of the Portal-to-Portal Act of 1947, 29 U.S.C. § 256, additionally states:In determining when an action is commenced for the purposes of Section 255 of this title, an action . . . shall be considered to be commenced on the date when the complaint is filed; except that in the case of a collective or class action instituted under the Fair Labor [*40] Standards Act of 1938, as amended, . . . it shall be considered to be commenced in the case of any individual claimant--(a) on the date when the complaint is filed, if he is specifically named as a party plaintiff in the complaint and his written consent to become a party plaintiff is filed on such date in the court in which the action is brought; or(b) if such written consent was not so filed or if his name did not so appear--on the subsequent date on which such written consent is filed in the court in which the action was commenced.29 U.S.C. § 256 (West 1985) (emphasis added).

Case authority has interpreted the statutory sections as requiring all plaintiffs in a collective action under the FLSA to file written consents for statute of limitations purposes. [HN24]"Until a plaintiff, even a named plaintiff, has filed a written consent, []he has not joined in the class action, at least for statute of limitations purposes." Songu-Mbriwa v. Davis Memorial Goodwill Indus., 144 F.R.D. 1, 2 (D.D.C. 1992) (citing and quoting 29 U.S.C. § 256(a)) (other citations omitted). Moreover, signed consents filed after the filing of the complaint do not relate [*41] back to the date the complaint was filed. Kuhn v. Philadelphia Elec. Co., 487 F. Supp. 974 (E.D.Pa. 1980), aff'd, 745 F.2d 47 (3rd Cir. 1984). Rather, each claimant's "action is commenced on the date on which his or her consent is filed with the court." 487 F. Supp. at 976.

Had this action been brought simply as an individual case with several plaintiffs, there would have been no need for any consents to have been filed. The filing of a collective action under 29 U.S.C. § 216(b), however, renders consents necessary, and these claims below were brought in just such a fashion--they were brought on behalf of the named individuals and others similarly situated. Redundant though it may seem to require consents from the named plaintiffs in a class action, the district court did not abuse its discretion in ordering such consents nor in dismissing the appellants' claims which exceeded the limitations period when no consents were filed within the applicable three year period.

IV.

For the foregoing reasons, the district court's grant of partial summary judgment in favor of Food Lion on the FLSA claims of numerous assistant managers and its dismissal of various claims of hourly employees [*42] who failed to comply with certain case management deadlines, shall be and hereby are

AFFIRMED.

CONCURBY: BUTZNER (In Part)

**DISSENTBY:** BUTZNER (In Part)

**DISSENT:** BUTZNER, Senior Circuit Judge, concurring in part and dissenting in part:

I join in affirming the district court's case management dismissals. The district court's task was extremely difficult and cumbersome, and it acted well within its discretion to strictly enforce the administrative deadlines.

I dissent, however, from the methodology used by Food Lion to prove its right to summary judgment. An employer bears the burden of proving the affirmative defense that employees fall within the exemptions established by the Fair Labor Standards Act. See Corning Glass Works v. Brennan, 417 U.S. 188, 196-97, 41 L. Ed. 2d 1, 94 S. Ct. 2223 (1974); Idaho Sheet Metal Works, Inc. v. Wirtz, 383 U.S. 190, 206, 15 L. Ed. 2d 694, 86 S. Ct. 737 (1966). To carry its burden of proof, Food Lion relies upon an affidavit given by Charles Buckley, the vice president of grocery operations. Food Lion also relies upon the assistant manager's job description in its "Store Operations Manual." Neither of these submissions meet the standard of Federal Rule of Civil Procedure 56(e), which **[*43]** requires the personal knowledge of the affiant. Buckley had at one time supervised assistant managers in the grocery department, but he does not demonstrate that he knew the jobs of each of the assistant managers in this case. He had no personal knowledge of how they spent their time on a day-to-day basis. Similarly, the Store Operations Manual describes only a hypothetical assistant manager's duties.

The job performed by each assistant manager should have been considered on a case-by-case basis. 29 C.F.R. § 541.103 (1997). Evaluation of an assistant manager's work is intensely factual. Dalheim v. KDFW-TV, 918 F.2d 1220, 1226 (5th Cir. 1990) ("The inquiry into exempt status under [ 29 U.S.C. § 213(a)(1)] remains intensely factbound and case specific."). I cannot accept Food Lion's claim that the assistant managers failed to rebut the Buckley affidavit or the Store Operations Manual job description. The burden is not on the employee to establish that he is not entitled to a management exemption. On the contrary, the burden remains on the employer to prove that the employee is exempt. Evans v. McClain of Georgia, Inc., 131 F.3d 957, 965 (11th Cir. 1997). Food Lion's methodology **[*44]** of proof stands the Fair Labor Standards Act on its head.

Food Lion, however, claims that since this is a class action, all assistant managers are similarly situated with those who gave depositions.

The assistant managers are similarly situated to the extent that they bear similar titles and they all work for Food Lion. But whether their day-to-day jobs are similar depends in large part on the authority and discretion granted to them by the store managers and by the individual's ability to execute managerial responsibilities. "Section 213(a)(1) does not provide a class exemption . . . ." Hodgson v. Klages Coal & Ice Co., 435 F.2d 377, 384 (6th Cir. 1970).

Title 29 U.S.C. § 216(b), upon which Food Lion relies, provides for an employee class action with opt in provisions. The class action provision and the "similarly situated" requirement in § 216(b), however, are procedural. See Allen v. Marshall Field & Co., 93 F.R.D. 438, 441-42 (N.D.Ill. 1982). The similarly situated requirement is not meant to change the substantive protections under the FLSA. It does not alter the employer's burden of proof or the rule that the Act's exemptions must be narrowly construed against the **[*45]** employers seeking to assert them. See Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 4 L. Ed. 2d 393, 80 S. Ct. 453 (1960). The "similarly situated" requirement of § 216(b) is "considerably less stringent than the requirement of Fed. R. Civ. P. 23(b)(3) that common questions 'predominate.'" Heagney v. European American Bank, 122 F.R.D. 125, 127 n.2 (E.D.N.Y. 1988). The plaintiffs need show only that their positions are similar to that of the putative class, not identical. Grayson v. K Mart Corp., 79 F.3d 1086, 1096 (11th Cir. 1996). Class treatment is not defeated even if the class members performed different jobs in different geographical locations. See Heagney, 122 F.R.D. at 127; Allen, 93 F.R.D. at 443. An employer should not be allowed to use the similarly situated requirement of § 216(b) to meet its burden of proving a FLSA exemption.

Moreover, a party moving for summary judgment must show that there are no genuine issues of material fact in dispute and that the party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986). The Buckley affidavit does not prove that each individual **[*46]** assistant manager primarily performed managerial duties as the Act's exemption requires. See 29 U.S.C. § 213(a)(1). The assistant managers who were deposed and other assistant managers who proceeded on affidavits submitted facts sufficient to disclose genuine issues of material fact concerning the work that they actually performed.

Dissenting, I would reverse the grant of summary judgment to Food Lion for two reasons--the deficiencies in its method of proof and the presence of genuine issue of material fact. I would remand these cases for trial in their respective districts. 28 U.S.C. §

1407(a); see Lexecon, Inc. v. Milberg Weiss Bershad
Hynes & Lerach, 523 U.S. 26, 140 L. Ed. 2d 62, 118 S.
Ct. 956 (1998).

TERRI JONES, Plaintiff-Appellant, and BEATRICE MOON, Plaintiff, v. VIRGINIA OIL COMPANY, INCORPORATED, Defendant-Appellee.

No. 02-1631

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

2003 U.S. App. LEXIS 14675

June 4, 2003, Argued
July 23, 2003, Decided

**NOTICE:**
**PUB-STATUS:** [*1] RULES OF THE FOURTH CIRCUIT COURT OF APPEALS MAY LIMIT CITATION TO UNPUBLISHED OPINIONS. PLEASE REFER TO THE RULES OF THE UNITED STATES COURT OF APPEALS FOR THIS CIRCUIT.

**PRIOR HISTORY:** Appeal from the United States District Court for the Western District of Virginia, at Charlottesville. Norman K. Moon, District Judge. (CA-01-88-3).

**DISPOSITION:** Affirmed.

## CASE SUMMARY

**PROCEDURAL POSTURE:** Plaintiff employee, a manager at a convenience store, sued defendant employer for unpaid overtime wages under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq. The United States District Court for the Western District of Virginia, at Charlottesville, granted the employer's motion for summary judgment after concluding that the employee was exempt as a "bona fide executive" under the FLSA. The employee appealed.

**OVERVIEW:** The parties agreed that the employee supervised two or more employees; the only issue on appeal was whether "primary duty" consisted of carrying out managerial tasks. Although the employee spent well over half of her time performing nonmanagerial work, she was able to simultaneously perform many of her management tasks. Further, the employee was responsible for a number of managerial tasks, including hiring, scheduling, training, and disciplining employees, and these managerial functions were critical to the success of the convenience store. She exercised discretionary powers, e.g., she had the discretion to hire, train, schedule, discipline, and fire employees. And she had the discretion to handle customer complaints. The employee's discretion in running the day-to-day operations of the store was not constrained by supervisors. The employee made more, or at least the same, in her management position as nonexempt employees in her store. Finally, because the employee's responsibilities included both the evaluation of subordinates and the exercise of considerable discretion, the working foreman exception was inapplicable in her case.

**OUTCOME:** The appellate court affirmed the decision of the district court.

**CORE TERMS:** manager, primary duty, duty, managerial, salary, customer, spent, paperwork, bona fide, exemption, hourly, exempt, inventory, summary judgment, discretionary, supervision, overtime, wage, nonexempt, foreman, line-worker, training, assistant manager, convenience store, undisputed facts, nonmanagerial, regulations, day-to-day, scheduling, restaurant

**LexisNexis(TM) HEADNOTES - Core Concepts**

*Civil Procedure > Summary Judgment > Summary Judgment Standard*

[HN1]In a motion for summary judgment, a court construes the facts in the light most favorable to the nonmovant and draws all justifiable inferences in her favor.

*Civil Procedure > Summary Judgment > Standards of Review*

[HN2]An appellate court reviews a district court's grant of summary judgment de novo.

*Labor & Employment Law > Wage & Hour Laws > Coverage & Definitions*

*Evidence > Procedural Considerations > Burdens of Proof*

[HN3]Because the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., is a remedial statute, exemptions from coverage are construed narrowly against those asserting them. An employer bears the burden of establishing by clear and convincing evidence that an employee qualifies for an exemption from the FLSA's requirements.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

*Labor & Employment Law > Wage & Hour Laws > Overtime & Work Period*

[HN4]The Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., requires employers to pay their employees time and a half for work over 40 hours a week. 29 U.S.C.S. § 207(a)(1). But the FLSA provides exemptions from the overtime requirement for persons "employed in a bona fide executive, administrative, or professional capacity." 29 U.S.C.S. § 213(a)(1). The accompanying regulations provide both a "long test" and a "short test" for determining whether an employee falls within the exemption. 29 C.F.R. § 541.1.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN5]An employee is exempt under the executive exemption's short test pursuant to C.F.R. § 541.119(a) if: (1) the employee's primary duty consists of the management of the enterprise or of a customarily recognized department or subdivision thereof; and (2) the employee customarily and regularly directs the work of two or more other employees.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN6]Under 29 C.F.R. § 541.102(b), exempt work includes interviewing, selecting, training, disciplining, and supervising employees, and setting pay rates and hours of work.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN7]The regulations accompanying the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., set forth five factors for determining whether management is an employee's primary duty: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid other employees for non-exempt work. 29 C.F.R. § 541.103.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN8]The first factor of the "primary duty" test under 29 C.F.R. § 541.103 -- the time spent on managerial duties -- is an important one. The regulations state that as a "rule of thumb," an employee who spends over 50 percent of her time in management has management as her primary duty.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN9]For purposes of the "primary duty" test under 29 C.F.R. § 541.103, time alone is not the sole test, and in situations where an employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion. Thus, the amount of time spent on nonmanagement tasks is not dispositive, particularly when non-management duties are performed simultaneous to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial. In other words, an employee will have management as her primary duty if while engaged in nonexempt work, the employee also supervises other employees, directs the work of warehouse and delivery men, handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require. 29 C.F.R. § 541.103. A number of federal courts have disregarded the time factor of the short test where the manager is in charge of a separate facility such as a convenience store or restaurant chain.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN10]Under 29 C.F.R. § 541.103, the second factor to consider is the relative importance of an employee's managerial tasks to nonmanagerial work. Courts frame this query as a measure of the significance of the managerial tasks to the success of the facility.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN11]The third and fourth "primary duty" factors under 29 C.F.R. § 541.103 -- discretionary powers and freedom from supervision -- overlap to a certain extent and are easily examined together. The exercise of "discretionary powers" is displayed by the employee who normally and recurrently is called upon to exercise and does exercise discretionary powers in the day-to-day performance of his duties. 29 C.F.R. § 541.107(b).

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN12]For purposes of the exemption provisions under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., and 29 C.F.R. § 541.103, a manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity.

*Labor & Employment Law > Wage & Hour Laws > Exemptions*

[HN13]The regulations under the Fair Labor Standards Act (FLSA), 29 U.S.C.S. § 201 et seq., distinguish between a bona fide executive and a working foreman or working supervisor who regularly performs production work or other work which is unrelated or only remotely related to his supervisory activities. 29 C.F.R. § 541.115. Where an individual's responsibilities extend to the evaluation of subordinates and include the exercise of considerable discretion, the working foreman exception does not apply.

**COUNSEL:** ARGUED: John Edward Davidson, DAVIDSON & KITZMANN, Charlottesville, Virginia, Appellant.

David Patrick Corrigan, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, P.C., Richmond, Virginia, for Appellee.

ON BRIEF: Jeremy D. Capps, HARMAN, CLAYTOR, CORRIGAN & WELLMAN, P.C., Richmond, Virginia, for Appellee.

**JUDGES:** Before MICHAEL and MOTZ, Circuit Judges, and Robert R. BEEZER, Senior Circuit Judge of the United States Court of Appeals for the Ninth Circuit, sitting by designation.

**OPINION: PER CURIAM:**

Terri Jones and Beatrice Moon sued Virginia Oil Company, Inc. (Virginia Oil) in the U.S. District Court for the Western District of Virginia seeking unpaid overtime wages under the Fair Labor Standards Act, 29 U.S.C. §§ 201 et seq. (FLSA). The district court granted Virginia Oil's motion for summary judgment after concluding that Jones [*2] and Moon were exempt as "bona fide executives" under the FLSA. Jones and Moon filed this appeal. Moon's claim has been resolved, so only Jones's appeal is before us for decision. For the reasons that follow, we affirm the judgment of the district court in Jones's case.

I.

Because Jones was the nonmovant in the summary judgment proceedings, [HN1]we construe the facts in the light most favorable to her and draw all justifiable inferences in her favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). Jones is a former employee of Virginia Oil. On December 30, 1998, Virginia Oil hired Jones as an assistant manager at its combination Dairy Queen and convenience store (together, "Dairy Queen") in Stanardsville, Virginia, after Virginia Oil bought the store from Jones's prior employer. Jones's initial weekly salary with Virginia Oil, which she had received under the store's previous ownership, was $ 403.85. After one month, Virginia Oil raised Jones's salary to $ 495 per week. Jones was transferred briefly to Virginia Oil's Dairy Queen in Ruckersville, Virginia; she returned to the Stanardsville store in May 1999. On July 30, 1999, Jones [*3] was promoted to manager and began receiving $ 550 per week. In January 2000 she received another raise to $ 585 per week, and she was paid that amount until she left her employment in February 2001. For hourly employees, the average starting pay was $ 6 per hour. Jones testified that employees often wanted $ 8 per hour, but she just "couldn't afford to pay them that." The highest paid hourly employee at Jones's store, a "semi in-charge person," earned $ 8.25 per hour. As part of the company's management team, Jones was eligible for, and received, bonuses based on her store's performance. Jones worked approximately 60 hours per week throughout her employment with Virginia Oil. She was never paid for her overtime.

Jones testified that even after she was promoted to a manager, she spent approximately 75-80 percent of her time carrying out basic lineworker tasks. These tasks included cooking burgers and other fast food, serving ice cream, cleaning the store and its bathrooms, working the cash register, stocking shelves, and sweeping the parking lot. At times Jones was the only person in the store when it opened, "which literally meant [she] would take the customer's order up front, [*4] run to the back, and prepare their food, and then take it up front and give it to the customer." In addition to her line-worker tasks, Jones carried out management-related duties. These duties included: the daily cigarette count, the daily sales paperwork, the invoice paperwork, the monthly fast food inventory, the monthly gas and lottery inventory, the weekly schedule and payroll, the weekly truck order, the daily drawer change, and the close out of drawers and the running of reports. She changed gas prices on the computer, greeted vendors, conducted convenience store inventory and ordering, and handled customer complaints. Jones also was responsible for hiring, training, evaluating, and firing employees. She set salaries for the hourly employees and made recommendations to upper management about employee raises. Jones had a key to the store; she also had access to the safe, which was only available to persons in management. James Miller, the director of operations, referred to Jones as a "working manager." Jones referred to herself as the "captain of the ship" at her store. According to Jones, she "was in charge of everything, but [she] also was out there in the daily grind with [*5] all of the employees doing everything

else. [She] didn't spend too much time on paperwork, it was mainly being out there in the field."

As a manager, Jones generally worked an opposite shift from an assistant manager and worked alongside four to six regular employees. Tom Singleton, the district manager, would stop by the store one to four times a week to check on things, and he would stay anywhere from five minutes to all day depending on the store's needs. The Stanardsville Dairy Queen was often short-staffed, and the store would not have been able to serve its customers if Jones had not stepped in to help the regular employees. In fact, Jones's Dairy Queen was so short-staffed that at times Singleton would come to the store to help out with Jones's paperwork. At other times, Jones called upper management to request additional help. Over the course of her employment with Virginia Oil, Jones became increasingly dissatisfied with her position, in large part because she (and some other females in management positions) felt that they were being paid less than men in the same positions. For instance, one male colleague earned $ 650 per week as an assistant manager and then $ 675 per [*6] week as a manager, nearly $ 100 more than what Jones earned in those positions. Jones eventually gave notice and left her employment with Virginia Oil on February 28, 2001.

Jones (and Moon) filed a complaint in the district court on August 29, 2001, seeking unpaid overtime wages under FLSA. After discovery, Virginia Oil filed a motion for summary judgment, arguing that the undisputed evidence showed that the plaintiffs were exempt executives under the Act. The district court granted Virginia Oil's motion, and the two plaintiffs appealed. With Moon's case resolved and dismissed with prejudice, we address only Jones's appeal.

II.

A.

[HN2]We review the district court's grant of summary judgment de novo. [HN3]Because FLSA is a remedial statute, exemptions from coverage are construed narrowly against those asserting them. *Haines v. S. Retailers, Inc.*, 939 F. Supp. 441, 445 (E.D. Va. 1996). An employer bears the burden of establishing by clear and convincing evidence that an employee qualifies for an exemption from FLSA's requirements. *Shockley v. City of Newport News*, 997 F.2d 18, 21 (4th Cir. 1993).

B.

[HN4]FLSA requires employers to pay their employees time [*7] and a half for work over forty hours a week. 29 U.S.C. § 207(a)(1). But the Act provides exemptions from the overtime requirement for persons "employed in a bona fide executive, administrative, or professional capacity." *Id.* § 213(a)(1). The accompanying regulations provide both a "long test" and a "short test" for determining whether an employee falls within the exemption. 29 C.F.R. § 541.1. The parties agree, as do we, that the short test applies in this case. *Id.* § 541.1(f) (short test used when employee is paid more than $ 250 per week). [HN5]An employee is exempt under the executive exemption's short test if: (1) the employee's primary duty consists of the management of the enterprise or of a customarily recognized department or subdivision thereof, and (2) the employee customarily and regularly directs the work of two or more other employees. *Id.* § 541.119(a); *Smith v. First Union Nat'l Bank*, 202 F.3d 234, 250 (4th Cir. 2000).

In this case the parties agree that Jones supervised two or more employees; the only issue on appeal is whether she meets the "primary duty" requirement. The record is clear that [*8] Jones performed managerial duties as those duties are defined in [HN6]29 C.F.R. § 541.102(b) (exempt work includes interviewing, selecting, training, disciplining, and supervising employees, and setting pay rates and hours of work). The question is whether her *primary* duty as an employee consisted of carrying out these managerial tasks. [HN7]The regulations accompanying FLSA set forth five factors for determining whether management is an employee's primary duty: (1) the amount of time spent in the performance of managerial duties; (2) the relative importance of the managerial duties as compared with other types of duties; (3) the frequency with which the employee exercises discretionary powers; (4) the employee's relative freedom from supervision; and (5) the relationship between the employee's salary and the wages paid other employees for non-exempt work. 29 C.F.R. § 541.103; *Shockley*, 997 F.2d at 26. The district court concluded that under these five factors, Jones was exempt as a matter of law from FLSA's overtime pay requirements. Our consideration of these factors in light of the undisputed facts leads us to agree [*9] with the district court's conclusion.

[HN8]The first factor of the "primary duty" test -- the time spent on managerial duties -- is an important one. *See Clark v. J.M. Benson Co., Inc.*, 789 F.2d 282, 286 n.2 (4th Cir. 1986). The regulations state that as a "rule of thumb," an employee who spends over 50 percent of her time in management has management as her primary duty. 29 C.F.R. § 541.103. *But* [HN9]"time alone . . . is not the sole test, and in situations where the employee does not spend over 50 percent of his time in managerial duties, he might nevertheless have management as his primary duty if the other pertinent factors support such a conclusion." *Id.* Thus, the amount of time spent on nonmanagement tasks is not

dispositive, "particularly when non-management duties are performed simultaneously to the supervision of employees or other management tasks and other factors support a finding that the employee's primary duty is managerial." _Horne v. Crown Central Petroleum, Inc._, 775 F. Supp. 189, 190 (D.S.C. 1991). In other words, an employee will have management as her primary duty if while engaged in nonexempt work, the employee [*10] also "supervises other employees, directs the work of warehouse and delivery men, . . . handles customer complaints, authorizes payment of bills, or performs other management duties as the day-to-day operations require." 29 C.F.R. § 541.103. _See also Smith_, 202 F.3d at 250-51. Indeed, "a number of federal courts have disregarded the time factor of the short test where the manager is in charge of a separate facility such as a convenience store or restaurant chain." _Haines_, 939 F. Supp. at 449 (internal quotation marks and citation omitted). _See, e.g., Murray v. Stuckey's, Inc._, 939 F.2d 614, 618-20 (8th Cir. 1991) (Stuckey's manager met the "primary duty" test even though 65-90 percent of the manager's time was spent on nonmanagerial duties); _Donovan v. Burger King Corp._, 675 F.2d 516, 521-22 (2d Cir. 1982) (relying on § 541.103 example to hold that Burger King assistant managers had the "primary duty" of management despite the fact that over 50 percent of their time was spent on routine matters); _Donovan v. Burger King Corp._, 672 F.2d 221, 226-27 (1st Cir. 1982) (same). [*11] _But see Cowan v. Treetop Enters., Inc._, 120 F. Supp. 2d 672, 690-91 (M.D. Tenn. 1999) (noting foregoing line of cases but holding nonetheless that unit managers at franchise restaurant were not bona fide executives).

Viewed in the light most favorable to Jones, the record demonstrates that Jones spent well over half of her time performing nonmanagerial work. In fact, she testified that she spent as much as 75-80 percent of her time performing basic line-worker tasks. However, even assuming that Jones spent the bulk of her time performing such line-worker tasks as cooking, cleaning the store, and manning the cash register, the record reflects that Jones could simultaneously perform many of her management tasks. That is, while Jones was doing line-worker tasks, she also engaged in the supervision of employees, handled customer complaints, dealt with vendors, and completed daily paperwork. Time alone then is not determinative in Jones's case but must be considered in light of the other factors in the "primary duty" test. _See_ 29 C.F.R. § 541.103.

[HN10]The second factor to consider is the relative importance of an employee's managerial tasks [*12] to nonmanagerial work. "Courts frame[ ] this query as a measure of the significance of the managerial tasks to the success of the facility." _Haines_, 939 F. Supp. at 450. In _Donovan v. Burger King_ the Second Circuit noted that the restaurant in question could not have operated successfully in the absence of the tasks carried out by the assistant managers. In that case, the management tasks included determining the amount of food to be prepared, running cash checks, scheduling and supervising employees, and checking inventory. _Donovan_, 675 F.2d at 521. In this case Jones was responsible for a number of managerial tasks, including hiring, scheduling, training, and disciplining employees, checking inventory and ordering supplies, handling customer complaints, counting daily receipts, and making bank deposits. _See Murray_, 939 F.2d at 618. Jones acknowledged that she was "the captain of the ship" at the store, and that she "was in charge of everything." "The [regular employees] merely rowed the boat; [Jones] charted and steered its course." _Horne_, 775 F. Supp. at 191. _See also, e.g., Murray_, 939 F.2d at 619-20, [*13] _Donovan_, 675 F.2d at 521; _Haines_, 939 F. Supp. at 450; _Stricker v. E. Off Road Equip._, 935 F. Supp. 650, 654 (D. Md. 1996) ("Store managers are frequently held to be exempt under the executive category."). The undisputed facts in the record demonstrate that Jones's managerial functions were critical to the success of the Dairy Queen. That is, the Dairy Queen could not have operated successfully unless Jones performed her managerial functions, such as ordering inventory, hiring, training, and scheduling employees, and completing the daily paperwork.

[HN11]The third and fourth "primary duty" factors -- discretionary powers and freedom from supervision -- overlap to a certain extent and are easily examined together. _See Haines_, 939 F. Supp. at 450. With regard to these two factors, Jones makes no real argument of her own but asserts that Virginia Oil failed to identify undisputed evidence in the record that would establish by clear and convincing evidence that these factors are met. The exercise of "discretionary powers" is displayed by "the employee who normally and recurrently is called upon to exercise and does exercise [*14] discretionary powers in the day-to-day performance of his duties." 29 C.F.R. § 541.107(b). Virginia Oil points to uncontradicted evidence that Jones exercised discretionary powers. For example, Jones had the discretion to hire, train, schedule, discipline, and fire employees. And she had the discretion to handle customer complaints. The record also reflects that Jones's discretion in running the day-to-day operations of the store was not constrained by supervisors. The only favorable evidence cited by Jones is that Singleton, her district manager, sometimes relieved her of paperwork so that she could concentrate on line duties. But while Singleton stopped by the store on a regular basis and sometimes helped

Jones out with management tasks when the store was understaffed, the record does not reflect that upper management heavily supervised Jones's work. Rather, Jones was usually the senior-most person on the job site. Thus, Jones was "vested with enough discretionary power and freedom from supervision to qualify for the executive exception." *Haines, 939 F. Supp. at 450. See also Meyer v. Worsley Cos., Inc., 881 F. Supp. 1014, 1020-21 (E.D.N.C. 1994);* **[*15]** *Horne, 775 F. Supp. at 191; cf. Murray, 939 F.2d at 619* ("Like other courts that have considered the question, we believe that [HN12]the manager of a local store in a modern multi-store organization has management as his or her primary duty even though the discretion usually associated with management may be limited by the company's desire for standardization and uniformity.").

Finally, we look at the relationship between Jones's salary and that of a nonexempt worker. Jones argues on appeal that the district court improperly looked at the $ 6 per hour average wage when calculating salary differentials. But Jones herself testified that the average starting salary was $ 6 per hour and that she could not afford to pay employees more than $ 8 per hour. The only employee who ever made that much was "a semi in-charge person there for a while" who made $ 8.25 per hour. Using the $ 6 per hour figure, if an hourly employee worked 60 hours per week (what Jones typically worked), her pay would be $ 420 per week; 55 hours worked would equal $ 375 per week. Jones earned more than these wages throughout her employment with Virginia Oil. In fact, she earned $ 585 per **[*16]** week -- $ 165 more than an average hourly employee working 20 hours of overtime -- during her last year at the Dairy Queen. Even at $ 8.25 per hour (the highest hourly wage in Jones's store), an employee working 60 hours per week would earn $ 577.50, still less than what Jones was earning in the last year of her employment. The fact that Jones made less per week than some other managers is not relevant to the salary inquiry; the issue is how her salary compares to that of nonexempt employees, not other managers. *See 29 C.F.R. § 541.103.* The undisputed evidence shows that Jones was making more, or at least the same, in her management positions as nonexempt employees. *See Haines, 939 F. Supp. at 451; Horne, 775 F. Supp. at 191* ("The difference in pay brings this factor in line with finding that [the plaintiff] is within the executive exemption.").

In sum, we conclude that when the five factors relevant to determining whether an employee's primary duty is management are applied to the undisputed facts in this case, it is clear that Jones's primary duty was management. In other words, we conclude that Virginia Oil offers **[*17]** evidence sufficient as a matter of law to prove that Jones was a "bona fide" executive under the FLSA. We note finally that, contrary to her argument, Jones does not fall under the "working foreman" exception to the bona fide executive exception. [HN13]The regulations "distinguish between the bona fide executive and the working foreman or working supervisor who regularly performs production work or other work which is unrelated or only remotely related to his supervisory activities." *29 C.F.R. § 541.115.* We have said that where an individual's responsibilities extend "to the evaluation of . . . subordinates" and include "the exercise of considerable discretion," the working foreman exception does not apply. *Shockley, 997 F.2d at 27. See also West v. Anne Arundel County, 137 F.3d 752, 763-64 (4th Cir. 1998).* Because Jones's responsibilities included both the evaluation of subordinates and the exercise of considerable discretion, the working foreman exception is inapplicable in her case.

III.

We affirm the district court's order awarding summary judgment to Virginia Oil on Terri Jones's claim.

*AFFIRMED*